Ah

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

KNIFE RIGHTS, INC., JOHN COPELAND and PEDRO PEREZ,

PLAINTIFFS,

-against-

Case No.: 11CV3918

CYRUS VANCE, JR., in his Official Capacity as the New York District Attorney, CITY OF NEW YORK and ERIC SCHNEIDER, in his Official Capacity as Attorney General of the State Of New York,

DEFENDANTS.

-----------------------------------------------------------X

DATE: April 26, 2012

TIME: 10:06 A.M.

DEPOSITION of the Plaintiff, KNIFE RIGHTS, INC., by a Witness, DOUG RITTER, taken by the Defendants, pursuant to a Notice and to the Federal Rules of Civil Procedure, held at the offices of Jay Suites, 30 Broad Street, 14th Floor, New York, New York 10038, before RENATE E. MOY, a Notary Public of the State of New York.

A P P E A R A N C E S:

DAVID JENSEN, PLLC
Attorney for the Plaintiff
KNIFE RIGHTS, INC.
111 John Street, Suite 230
New York, New York 10038
BY: DAVID D. JENSEN, ESQ.

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
Attorney for the Defendant
CYRUS R. VANCE, JR.
One Hogan Place
New York, New York 10013
BY: PATRICIA J. BAILEY, ESQ.

MICHAEL A. CARDOZO, ESQ.
CORPORATION COUNSEL
THE NEW YORK CITY LAW DEPARTMENT
Attorney for the Defendant
CITY OF NEW YORK
100 Church Street
New York, New York 10007
BY: LOUISE LIPPIN, ESQ.
File #: 2010-018277
Control #: BBB04039

NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
Attorney for the Defendant
ERIC SCHNEIDERMAN b/s/h/a ERIC SCHNEIDER
80 Centre Street
New York, New York 10013
BY: EVA MARIE DOWDELL, ESQ.

ALSO PRESENT:
SCOTT BACH,
Legal Advisor to Knife Rights, Inc. (Observing)

* * *

D O U G R I T T E R, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MS. BAILEY:

(Whereupon, a 17-page document was collectively marked as Defendants' Exhibit A, a 9-page document was collectively marked as Defendants' Exhibit B, a series of documents Bates-stamped KR00397 though KR00508 was collectively marked as Defendants' Exhibit C, an 8-page 2008 tax return was marked as Defendants' Exhibit D, an 11-page 2009 tax return was marked as Defendants' Exhibit E for identification as of this date by the Reporter.)

Q. Please state your name for the record.

A. Doug Ritter.

Q. What is your address?

A. P.O. Box 657, Gilbert, Arizona 85299.

Q. Good morning, Mr. Ritter. How are you?

A. Fine.

Q. My name is Patricia Bailey. I'm an Assistant District Attorney and I represent the Defendant New York County District Attorney Cyrus R. Vance Jr. in this case. I am going to ask you a few questions this morning. I'm

A. You would have to go to KnifeWorks.com.

Q. Are you affiliated with KnifeWorks.com?

A. They licensed the right to manufacture and sell my designs, the RSK Mk 1, the RSK Mk 2 and the RSK Mk 3.

Q. Are they licensed to manufacture the designs of other knife makers or knife designers or are you the only one that they sell for?

A. They are a retailer for a large, a vast number of manufacturers, I think. I honestly don't know.

Q. Okay. Fair enough.

There is also an organization who is not a plaintiff in this case called Knife Rights Foundation; is that correct?

A. That is correct.

Q. What is your affiliation, if any, with that? Is this a corporation?

A. Uh-huh, I'm chairman of the board.

Q. Are you also the executive director?

A. No, we don't have an executive director of the foundation.

Q. Are there other members of the board?

A. There are.

Q. Are they the same members that are members of Knife Rights, Inc.?

A. Some of them are.

your duties and obligations or responsibilities there?

A. Essentially the same.

Q. Essentially the same?

A. Yes.

Q. What's the difference between the two, between Knife Rights, Inc. and Knife Rights Foundation?

A. First of all, Knife Rights, Inc. is a 501C3 or C4. Knife Rights, Inc. is a 501C4. It's a membership organization. Knife Rights Foundation is a 501C3. You know, it's founded primarily to do educational-type stuff that a 501C3 would do. The foundation is prohibited by federal law from doing legislative work. Contributions to the foundation are tax-deductible. Contributions to Knife Rights, Inc., as we do legislative work, that is our primary reason for being in many respects, are not deductible, so two very different organizations, both interested in maintaining our knife rights.

Q. And both organizations are accessed by going to the same website KnifeRights.org?

A. That's correct.

Q. Do they have separate web sites that are not, you know, KnifeRights.org, but other web sites?

A. No.

Q. You had to pause; is there any particular reason?

A. Well, because I was just trying to think. We

have a bunch of domains but they are not in use and so there are not any web sites so, no.

Q. So going to Knife Rights, Inc., the Plaintiff here, what do you view as its purpose, you as the chairman of the board and the executive director; what is its purpose?

A. I think the mission statement for Knife Rights, Inc. is to essentially protect and enhance our right to own, buy, sell, carry, use knives as tools, to promote the safe use of knives, to promote responsible use of knives, to oppose anti-knife legislation, to encourage pro-knife legislation. You know, pretty much what any civil rights organization would do.

Q. And Knife Rights Foundation, what is its purpose?

A. The Foundation was originally conceived as a -- primarily as an educational and research foundation that would -- that would promote knife safety with educational publications and stuff on the web, that would publish information about existing law, that would finance -- salary work on the subject of knives and the law, that sort of thing. Subsequently, because of the need to address the District Attorney's misapplication of New York's penal code on gravity knives and switchblades, it's also become the source of funding for the legal affairs.

Q. That's the foundation?

A. That's the foundation.

Q. And that, considering what type of organization is it under the tax code, that's permissible?

A. That's correct.

Q. So when someone goes to KnifeRights.org and signs up as a member, are they a member of both organizations or just one?

A. No, the member organization is Knife Rights.

Q. So Knife Rights Foundation has no memberships?

A. That's correct.

Q. They are a, Knife Rights Foundation is a donor-funded incorporation; would that be fair to say?

A. I'm not sure I understand the question.

Q. How does it sustain itself? Where does it get money to sustain itself as an organization?

A. It gets contributions.

Q. From the website and or elsewhere or just from the website?

A. Some come in via the website. I would say the majority come in elsewhere.

Q. You indicated that part of your duties as the chairman of the board and as the executive director of Knife Rights, Inc., that you do legislative lobbying; what do you do specifically when you are lobbying, how do you lobby?

recall, that you met representatives and then you name several -- are they manufacturers?

A. AG Russell is a retailer, sponsors shows and is also a manufacturer of knives as well. The rest are all manufacturers. The custom knife makers are custom knife makers, I mean they are not manufacturers. They make knives by hand, essentially.

Q. I'm going to ask you to look at what's been previously marked as Exhibit C and those are documents provided by your Counsel. They are Bates-stamped KR00397 through KR00508.

A. Okay.

Q. Just looking at the very first page, under Bates stamp 397 --

A. Okay.

Q. -- is that your handwriting?

A. No, it is not.

Q. Do you know whose handwriting it is?

A. Yes, it's my wife's.

Q. Is this just a generalized -- of the expenditures for the trip to Arkansas, for the AG Russell event?

A. Correct.

Q. The very top line, could you read what that says.

A. KRF apostrophe Inc.

Q. Apostrophe or comma?

A. Excuse me, comma.

Q. Does KRF refer to Knife Rights Foundation, Inc.?

A. I don't know. My wife put this together.

Q. You don't know? What is your wife in relationship to Knife Rights, Inc. or Knife Rights Foundation?

A. She is a volunteer.

Q. What does she volunteer to do?

A. Essentially bookkeeping and those kind of, sort of -- I guess what you might refer to as clerical things, when she is well enough to do it.

Q. You are not familiar with these documents?

A. I glanced at them. She put it together for Counsel when I asked her to put together all the expenses.

Q. So she pulled up whatever expenditures were, just looking at the first few documents, related to your attendance at the AG Russell knife event?

A. Yes.

Q. If you know, and we may have to have another witness to clarify this, but if you know, the very first line, is that who was charged or whoever the expenses were expensed to?

A. I don't know.

Q. You don't know, okay.

MS. BAILEY: Just note for the record we are

materials which is C. I'm going to go to Bates stamp number KR00405.

A. Okay.

Q. In here is this a listing of -- in your wife's handwriting, of expenditures for the trip that is referenced in paragraph 11 of the declaration, the meeting in New York with Paragon.

A. I believe so.

Q. At the very top line on that report it says Knife Rights Foundation, all written out, each word.

A. Uh-huh, again, I think my wife -- it couldn't have been Knife Rights Foundation, because Knife Rights Foundation didn't have any money at that time, so I'm assuming she is --

Q. She expended it to the wrong organization?

A. I assume that her title is incorrect because money couldn't have come from the foundation at the time. Sue is not a bookkeeper or CPA. She just tries and keeps things in order and then we hand it off to the accountant who does all the accounting.

Q. So if the idea is that the handwritten notes by Ms. Ritter that indicate Knife Rights Foundation was charged for -- debited these expenditures for these trips, that you believe that that is wrong; is there some sort of accountant forms that were done on behalf of Knife Rights,

Inc. or Knife Rights Foundation that show us where these expenditures were debited to?

A. I assume that they are someplace.

MS. BAILEY: I'm just going to note for the record to come back. We have to get those reports.

MR. JENSEN: We'll take it under advisement. I would suggest that we speak about it after the deposition.

MS. BAILEY: That's fine.

Q. If you go to paragraph 12 of Exhibit B, your declaration.

A. Okay.

Q. In that paragraph 12 you are referencing a Mr. Jasne, J-A-S-N-E, in New York City?

A. Jasne.

Q. Excuse me, what's the pronunciation?

A. Jasne.

Q. Jasne, thank you. Is Mr. Jasne or was Mr. Jasne a criminal attorney that was hired on behalf of individuals arrested here in New York County, hired or paid for by Knife Rights?

A. Yes.

Q. Do you recall specifically which individual you were meeting with Mr. Jasne with on -- during the July 2010

meeting? Which criminal defendant were you meeting about?

A. At that particular time we were not meeting about a specific defendant.

Q. Were you meeting just to discuss generally the concept of using him to represent individuals in New York County that may be arrested and charged with either gravity knives or switchblades?

A. That was part of the discussion. Part of it was to try and get a better understanding --

MR. JENSEN: I'm going to stop him. We have an issue here. We are obviously going into what he discussed with an attorney that they retained. Is there some way we can narrow the question a little bit?

MS. BAILEY: I don't want go into the conversations about -- well, there is no attorney-client privilege if he has hired -- if he has hired somebody for someone else and he is part of that conversation. The privilege is pierced.

MR. JENSEN: Well, there definitely is -- for example, when an insurance company retains counsel for an individual insured, but the insurance company and the individual insured have an attorney-client relationship.

MS. BAILEY: We are going to establish that that's what this is then.

MR. JENSEN: Sure.

MS. BAILEY: Before we go down that road.

Q. Did you have a retainer with him?

A. Yes, we paid him a retainer.

Q. Did you pay the retainer out of Knife Rights Foundation or Knife Rights, Inc.?

A. I assume it was out of Knife Rights, Inc.

MR. JENSEN: Don't assume.

MS. BAILEY: Please stop coaching the Witness.

MR. JENSEN: I'm not coaching the Witness.

MS. BAILEY: You are.

MR. BACH: Do we want him to assume or do you want facts? I apologize.

(Whereupon, an off-the-record discussion was held.)

Q. If you know.

A. I don't know for fact.

Q. Thank you. Looking at again the large exhibit, C, and go to Bates-stamped KR00441.

A. All right.

Q. Was this retainer entered into with Mr. Jasne?

A. No, I think this is a bill -- I mean, the

retainer was the document that I signed.

Q. So the bill -- assuming that it's a bill for professional services and it indicates a retainer was entered on 10/14/2010 for $10,000.

A. Okay.

Q. Is that correct?

A. That's what it says.

Q. Do you recall that being roughly around the time, October 2010, that you entered the retainer agreement with Mr. Jasne?

A. Yes, that's about right.

Q. At the top of it, this is a typed, written, typed report, expense report. It indicates that it was expensed to Knife Rights Foundation Inc., correct?

A. That's who it was made out to.

Q. Can you go to 13, paragraph 13 of your declaration.

The New York Custom Knife Show, is that an annual show?

A. It is.

Q. Had you participated in or attended that show in the past, before 2010?

A. No.

Q. I'm sorry?

A. Never.

Q. Never. Okay.

As a representative of Knife Rights, Inc. or Foundation, is the only show that you would go to the one that was held in Georgia?

A. That's the only knife show we attended, yes. Well, correction, we -- I also as well as Knife Rights generally attend -- Phoenix has a custom knives show and since it's local for us, since we -- you know, we started doing it, when we did knife preemption in Arizona -- (inaudible) because there is no travel and significant expenses involved.

Q. In the other states where you had lobbied for preemption laws, do any of them have knife shows that you recall?

A. I believe there are knife shows in every one of the 50 states.

Q. Really? So in those states where you went and lobbied on behalf of the preemption laws, Kansas I think you said was one, have you ever attended the knife shows there?

A. No.

Q. Getting back to the Secaucus, New Jersey, custom knife show in November of 2010; is it fair to say that you went there to follow up on the concerns that were raised by DA Vance's enforcements against gravity knives and

switchblade knives that you learned about in Georgia?

A. That's the only reason.

Q. You were following up to find out more information about that?

A. To find out more information, to meet with attorneys at the same time, same place. I mean there was no other reason to go to Secaucus.

Q. So now going back to the Exhibit B, the declaration, to paragraph 16. The East Coast Custom Knife Show in Jersey City, New Jersey, that -- from March 2011.

A. Hang on, let me read the paragraph, please.

Q. I'm just directing your attention. That's all.

A. Okay.

Q. This is the first time that you as a representative of Knife Rights, Inc. went to Jersey City, New Jersey, to the East Coast Custom Knife Show?

A. That's the first time I attended the East Coast Custom Knife Show, period.

Q. Looking at Exhibit C, Bates-stamped KR00422.

A. Okay.

Q. And that has the ECCKS, is that for the East Coast Custom Knife Show?

A. East Coast Custom Knife Show, yes.

Q. From March 4th to 6th, 2011?

A. Yes.

Q. Is that a summary of the expenditures during that trip?

A. That would appear to be, yes.

Q. At the top, does to appear that it was expensed to Knife Rights Foundation, Inc.?

A. It does say KRF comma Inc.

Q. Would it be fair to say that the reason you went to Jersey City, New Jersey, to see the East Coast Custom Knife Show was to follow up with the concerns that industry members had related to you in Georgia at the blade show about DA Vance's enforcement on gravity knives and switchblade laws here in New York County?

A. It's the only reason we went to the East Coast Custom Knife Show.

Q. In paragraph 17 on the declaration, Exhibit B --

A. Okay.

Q. -- you reference unnamed manufacturers, designers, distributors and retailers, who have sought clarification or guidance.

A. Reference what? What was the first word you said?

Q. Manufacturers.

A. No, before that.

Q. Unidentified.

A. I don't believe it says unidentified, unless I'm