# EXHIBIT B

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------------------X
   KNIFE RIGHTS, INC., JOHN COPELAND, PEDRO PEREZ,
3  KNIFE RIGHTS FOUNDATION, INC., and
   NATIVE LEATHER, LTD,
4
                                  PLAINTIFFS,
5
                  -against-        Case No.:
6                                  1:11-cv-03918-KBF-RLE
7
   CYRUS VANCE, JR., in his Official as the New York County
8  District Attorney and CITY OF NEW YORK,
9                                  DEFENDANTS.
   ------------------------------------------------X
10
11                    DATE: June 11, 2013
12                    TIME: 10:00 a.m.
13
14         DEPOSITION of an Expert Witness, BRUCE VOYLES,
15  taken by the Respective Parties, pursuant to a Notice and
16  to the Federal Rules of Civil Procedure, held at the
17  offices of Bee Reporting Agency, 315 Madison Avenue, New
18  York, New York, before Gena Nardone, a Notary Public of the
19  State of New York.
20
21
22
23
24
25

```
1    A P P E A R A N C E S :

2

3    DAVID JENSEN, PLLC
            Attorney for the Plaintiffs
4       KNIFE RIGHTS, INC., JOHN COPELAND,
        PEDRO PEREZ, KNIFE RIGHTS FOUNDATION, INC.,
5       and NATIVE LEATHER, LTD
        111 John Street
6       Suite 230
        New York, New York 10038
7       BY: DAVID JENSEN, ESQ.

8

9    NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
            Attorneys for the Defendant
10      CYRUS VANCE, JR., in his Official as the New York
        County District Attorney
11      One Hogan Place
        New York, New York 10013
12      BY: PATRICIA J. BAILEY, ESQ.
        BY: EVA MARIE DOWDELL, ESQ.
13

14
        MICHAEL A. CARDOZO, ESQ.
15      CORPORATION COUNSEL
        NEW YORK CITY LAW DEPARTMENT
16          Attorneys for the Defendant
        CITY OF NEW YORK
17      100 Church Street
        New York, New York 10007
18      BY: LOUISE LIPPIN, ESQ.
        File #: PPP08056
19

20   ALSO PRESENT:
            DOUG RITTER
21

22              *           *           *

23

24

25
```

B. VOYLES

1    Q.    Is there any other reason why you could think of

2   why you couldn't give honest and truthful answers today?

3    A.    No.

4    Q.    No reason to be affected today?

5    A.    (No verbal response.)

6    Q.    Okay.  Thank you.

7         If you could just give a listing of the materials

8   you've reviewed in preparation for the deposition.

9    A.    I reviewed excerpts from the New York Times in

10   their archive.  I reviewed the Congressional record.  I

11   reviewed catalogs, patents, my own historical data from 39

12   years in the cutlery business.

13   Q.    What historical data are you talking about when

14   you say "my own historical data?"

15   A.    I have a large collection of cutlery catalogs,

16   various data.

17   Q.    So, you reviewed those catalogs?

18   A.    Yes.

19   Q.    How far back did those date?

20   A.    Some of them date back to the 1870s.

21   Q.    Are you the author of any of those catalogs?

22   A.    Not the catalogs.

23   Q.    Are you the author of any materials that you

24   reviewed?

25   A.    Yes.

B. VOYLES

1    Q.    Which materials are those?

2    A.    We'll, there's eight volumes of the Official

3    Price Guide To Collector Knives, ABCA Price Guide To

4    Antique Knives and two volumes American Blade Collectors

5    Association Price Guide to Antique knives.  American Blade

6    Collectors Price Guide to Commemorative Knives.

7                MR. JENSEN:  Did you ask what he reviewed

8           for the deposition or for his report?

9                MS. BAILEY:  Well, is that an objection?

10                MR. JENSEN:  No.

11                MS. BAILEY:  Because you're not here to

12           clarify.

13    A.    These were works I consulted.

14    Q.    Yes.  Okay.  You consulted them both prior to

15    issuing your report?

16    A.    Yes.

17    Q.    Did you consult them after you issued your report

18    and in preparing for your deposition today?

19    A.    Yes.

20    Q.    Is it fair to say everything you reviewed before

21    you reached your report you re-reviewed in preparation for

22    today's --

23    A.    Yes.

24    Q.    Did you meet with Mr. Jensen in preparation for

25    today's testimony?

B. VOYLES

1      A.      Yes.

2      Q.      Did you go over what you anticipate to be

3   questions to be asked today?

4      A.      Yes.

5      Q.      Of the materials that you reviewed, what

6   materials came directly from either Mr. Jensen or any one

7   of the plaintiffs?

8      A.      There were some copies of Congressional record.

9   There were --

10     Q.      Which Congressional records, the year?

11     A.      The one concerning the 1958 Switchblade Act.

12     Q.      Okay.

13     A.      There were some excerpts from the New York Times,

14   which I went into the archive and verified that those were

15   from the New York Times.  Some patents.

16     Q.      Anything else?

17     A.      Probably some miscellaneous things, but I can't

18   recall specifically.

19     Q.      If you recall during the course of the testimony,

20   please let us know.

21     A.      I beg your pardon?

22     Q.      If you recall during the course of your testimony

23   today, let us know.

24     A.      Okay.

25     Q.      When were you first contacted by plaintiffs

B. VOYLES

1   regarding this case?

2      A.    I'm not sure exactly.  Probably year, year and a

3   half ago.  I can't remember exactly.

4      Q.    Who first contacted you?

5      A.    Doug Ritter.

6      Q.    Did you know Doug Ritter before that first

7   contact?

8      A.    In passing only.

9      Q.    What do you mean by "in passing?"

10     A.    I knew who he was.  I saw him at the shows.  As

11  far as having any conversations or anything like that,

12  nothing.

13     Q.    Would it be fair to say that he contacted you

14  sometime in 2011?

15     A.    I'm totally blank on the exact time.

16     Q.    Have you read the amended complaint in this case,

17  the filings by the plaintiffs?

18     A.    I'm not -- I'm not sure actually.

19     Q.    Do you know what the basis of the lawsuit is?

20     A.    Yes.

21     Q.    What is your understanding?

22     A.    My understanding is that there is a disagreement

23  over the definition of a gravity knife.

24     Q.    A disagreement between whom and whom?

25     A.    Between the plaintiffs and the district

B. VOYLES

1    attorney's office.

2        Q.    In Manhattan?  You're talking about the Manhattan

3    district attorney, Cyrus Vance?

4        A.    Yes.

5        Q.    Do you know where that disagreement stems from?

6        A.    I understand it was from a confiscation of knives

7    from several companies.

8        Q.    Here in Manhattan?

9        A.    Yes.

10       Q.    Were you aware that that investigation and

11   confiscation by the district attorney's office of the

12   retailers at the time it happened?

13       A.    Very soon thereafter.

14       Q.    From that point when you first became aware of it

15   until you first spoke with someone associated with this

16   litigation, approximately how much time lapsed?

17       A.    Months.

18       Q.    Months?

19       A.    I can't get specific.  I don't know.

20       Q.    But it wasn't at the time?

21       A.    No, no.

22       Q.    Can you give us your educational background?

23       A.    I have attended Georgia State University.

24       Q.    Did you graduate?

25       A.    Yes.

B. VOYLES

1   closed position?"

2      A.      A folding knife typically has a spring or some

3   kind of item of resistance that prevents the blade from

4   opening.

5      Q.      If you're just holding it, you're talking about?

6      A.      If it's in your pocket or whatever.  It's a

7   safety feature.

8      Q.      That tendency of a folding knife to resist

9   opening, is that phrase similar to a bias towards closure?

10  Are they similar phrases or different?

11     A.      I would say they are very similar.

12     Q.      Since you say "very similar," what would be the

13  difference?

14     A.      I'm not sure there's a substantial difference.

15     Q.      What would be the minimal difference then?

16     A.      (No response.)

17     Q.      Is it fair to say that they mean the same thing?

18     A.      Yes, I guess.

19     Q.      So, looking at the second design feature, Mr.

20  Jensen asked you to emphasize.  You say, "Finally, you

21  referred me to several specific historical materials and

22  asked me to explain references to knives."  What specific

23  materials are you referencing there?

24     A.      Patents.

25     Q.      Which patents was your attention directed to?

B. VOYLES

1      A.      The patents concerning gravity knives.

2      Q.      Do you recall which ones?

3      A.      Not specifically by number.

4      Q.      Are they in the materials Mr. Jensen provided

5   this morning?

6      A.      One of them is, yes.

7      Q.      Which one?

8      A.      The one on page two.

9      Q.      Are there any other contained -- that you looked

10  at, that are contained in the materials provided by Mr.

11  Jensen this morning?

12     A.      There are some other patents that are similar.

13  They are all basically the same concept.

14     Q.      You're making the reference to the patent on what

15  is now numbered two of your report?

16     A.      Uh-huh.

17     Q.      That's a patent from 18, what is that, '83?

18     A.      I think so, yes.   1883.

19     Q.      Did you look at any other patents aside from this

20  patent in 1883?

21     A.      Yes.

22     Q.      That's what I'm trying to find out.   Which other

23  patents did you look at?

24     A.      Well, there were several patents on knives and

25  even pens that you depress the lever and the blade falls

1   out.

2      Q.    Did Mr. Jensen provide you with copies of those

3   materials to review?

4      A.    He provided some and some I looked at on the

5   searches.

6      Q.    The ones that you looked at either by Mr. Jensen

7   or the ones you found on your own, are they included in the

8   materials provided by Mr. Jensen to the parties this

9   morning?

10     A.    I think there are some in there, yes.

11     Q.    Are they all in there?

12     A.    (No response.)

13     Q.    If you don't know, just say so.

14     A.    I don't know.

15          MS. BAILEY:  I'm just making a request for

16          production.  For counsel to determine from Mr.

17          Voyles which ones he looked at and then provide

18          them to the parties.

19          MR. JENSEN:  We will take it under

20          advertisement.

21     Q.    Aside from Mr. Jensen providing you copies of

22   patents, what else did he provide you that you're referring

23   to in that particular sentence?

24     A.    Well, he provided some copies of newspaper

25   articles, excerpts from the Congressional record.

57

B. VOYLES

1    Q.    Are those materials contained in the documents --

2    A.    As I recall, they are, yes.

3    Q.    Including the Congressional record?

4    A.    I don't know about the Congressional record.

5          MR. JENSEN:  The Congressional record was

6          produced previously.

7          MS. BAILEY:  David, you really have to stop

8          interrupting like that.

9    Q.    Did you look at the entire Congressional record

10   from the 1958 Switchblade Act?

11   A.    Yes, I did.

12   Q.    From beginning to end?

13   A.    Yes.

14   Q.    The specific New York Times articles, was it,

15   that Mr. Jensen brought to your attention?

16   A.    Yes.

17   Q.    Copies are contained in the materials provided by

18   Mr. Jensen this morning?

19   A.    Yes.

20   Q.    Thank you.

21         Aside from the ones that Mr. Jensen provided you,

22   did you look for any other articles from any other

23   periodicals?

24   A.    Well, yes.  I looked through knife books and

25   publications.  Anything that would be referred to within

DIAMOND REPORTING   (718) 624-7200   info@diamondreporting.com

B. VOYLES

1    that.

2        Q.    Did you look at any of the newspapers from the

3    New York area at the time?

4        A.    No, I did not.

5        Q.    You didn't look at the New York Post?

6        A.    No.

7        Q.    Just the New York Times?

8        A.    Yes.

9        Q.    Did you look beyond what Mr. Jensen had given

10   you?

11       A.    Yes.

12       Q.    Did you find anything in addition to what Mr.

13   Jensen had given you?

14       A.    Not that was pertinent, I felt.

15       Q.    Would it be fair to say that Mr. Jensen asked for

16   a historical review of the term "gravity knife" and not a

17   review of the term or phrase "application of centrifugal

18   force?"

19       A.    Yes.

20       Q.    In your report, you say, "I've been a collector

21   and a dealer of vintage and collectable knives since 1974."

22       A.    Uh-huh.

23       Q.    What makes a knife vintage?

24       A.    Well, within our business, it's basically an

25   outfit roughly 20 years old or older that's not been

B. VOYLES

1   starting with the word "gravity."  If the blade does not

2   open by gravity, it can't be a gravity knife.

3      Q.      Understood.  I understand your opinion.

4              And that is in the context of Mr. Jensen asking

5   you to focus on this historical meaning of gravity knife,

6   correct.

7      A.      That is my response to that question.

8      Q.      Okay.  In preparing or researching before coming

9   to an opinion, did you look or review the New York State

10  penal law with respect to New York's definition of a

11  gravity knife?

12     A.      Yes.

13     Q.      Did you find that that definition states "any

14  knife which has a blade which is released from the handle

15  or sheath thereof by the force of gravity or the

16  application of centrifugal force and which, when released,

17  is locked in place by means of a button, spring, lever or

18  other device?"

19              MR. JENSEN:  Objection.  This goes beyond

20              anything in his report.  He wasn't asked to put

21              an opinion on this.  He can answer, to the extent

22              he's able.  But I want that clear.

23     Q.      You just stated you reviewed that in

24  preparation --

25     A.      I read that.

B. VOYLES

1      Q.      Would it be fair to say, from what I just read to

2   you from the penal law, that New York State statute doesn't

3   require a gravity knife, as New York State defines it, to

4   have a pivot pin?

5              MR. JENSEN:   Objection.   Same objection.

6              This isn't what he was asked to express an

7              opinion on.

8      Q.      Go ahead.   You can answer.

9      A.      From a historical aspect --

10     Q.      I'm not asking from a historical aspect.   I'm

11   asking --

12     A.      That's what I'm here for.

13     Q.      So, let's put it this way.

14             You have no opinion whatsoever on what the New

15   York State law is with respect to the definition of a

16   gravity knife?

17     A.      Yes, I do have an opinion.

18     Q.      Do you know what the definition is of the New

19   York State gravity knife?

20     A.      I have read it.   I have my interpretation of what

21   that reads, yes.   My understanding of that.

22     Q.      Did you read any of the case law by the courts

23   that have interpreted that statute?

24     A.      I looked over some of those, yes.

25     Q.      Which ones did you look over?

B. VOYLES

1    A.    I don't remember.

2    Q.    If I gave you the name of the cases, would it

3    refresh your recollection?

4    A.    Probably not.

5    Q.    Well, we'll try.

6    A.    I didn't spend a lot of times on those.

7    Q.    Why did you look at them if you weren't asked to

8    give an opinion with respect to the legal definition?

9    A.    It was just background.

10   Q.    It's more to understand the context of why you're

11   giving your opinion, do you think, or not?

12   A.    I feel that I understand the context of what a

13   gravity knife is.

14   Q.    Do you think it's important to understand the

15   context of the law of the state where you are giving an

16   opinion?

17        MR. JENSEN:   Same objection.

18   A.    I'm not an attorney.  I was asked to approach

19   this from a historical standpoint and my understanding of

20   that item.

21   Q.    That's fine.  That's all I wanted to know.

22        So, you have not been asked to give any opinion

23   with respect to the legal definition of a gravity knife

24   here in New York?

25   A.    No.

B. VOYLES

1    been important to be familiar with recent legislation

2    dealing with gravity knives or switchblades?

3        A.    I am, in a passing way, familiar with it.  To sit

4    down and digest it word by word and parse it, no.

5        Q.    So, you couldn't describe the changes to the law

6    from the 2009 Federal legislation?

7        A.    I thought I just did earlier.

8        Q.    That's the only one that you're aware of?

9        A.    Primarily to the detent being the resistance and

10   you have to open the blade a certain number of degrees

11   before the spring takes over.

12       Q.    Do you know whether Knife Rights, the plaintiff

13   here, was actively involved in lobbying the legislature to

14   change that law?

15             MR. JENSEN:  Objection as to relevance.

16       Q.    You could answer the question.  If you know.

17       A.    As I recall, they were.

18       Q.    Do you know whether AKTI was involved in lobbying

19   the legislature to change the law?

20             MR. JENSEN:  Same objection.

21       Q.    You can still answer.

22       A.    I think so.  I don't know.

23       Q.    So, earlier you said that you looked at some of

24   the New York case law that interpreted New York's penal

25   code definition of the gravity knife, correct?

B. VOYLES

1      A.     Yes.

2      Q.     I'm going to ask you a series of names of cases.

3    Tell me whether or not it refreshes your recollection as to

4    whether you reviewed that particular case, okay?

5      A.     Okay.

6      Q.     People v. Dolson, D-O-L-S-O-N?  That was an

7    Onondaga County case from 1989.

8      A.     I read over several cases.  To remember by name,

9    I can't.

10     Q.     Okay.  Just let me know if you do or you don't as

11   I read the names off to you, okay?

12     A.     Okay.

13     Q.     People v. Birth, B-I-R-T-H?

14     A.     I don't remember.

15     Q.     People v. Neal, 2010, N-E-A-L?

16     A.     I don't remember.

17     Q.     People v. Jouvert, J-O-U-V-E-R-T, from 2008?

18     A.     As I said, I didn't note them by the case name.

19   So, I don't know -- I can't tell you if I read those or

20   not, to be frank.

21     Q.     That's all I'm asking, if you recall.

22            People v. Smith from 2003, court of appeals case?

23     A.     No.  I don't know.

24     Q.     Do you know what the court of appeals is in New

25   York?

B. VOYLES

1      A.      I just know it's an appeals court that

2      overrules --

3      Q.      Lower courts?

4      A.      Lower courts.

5      Q.      People v. Kong Wang, W-A-N-G, from 2007?

6      A.      No.

7      Q.      Carter v. McCoy from 2010?

8      A.      I don't recall.

9      Q.      People v. Herbin, H-E-R-B-I-N, from 2011?

10     A.      I don't recall.

11     Q.      People v. Voltaire from 2007?

12     A.      I don't recall.

13     Q.      People v. Giles, G-I-L-E-S, from 2012, an

14     appellate decision?

15     A.      I do not recall.

16     Q.      And People v. Brannon and Hernandez from 2011?

17     A.      I do not recall.

18     Q.      You said you looked at patents.  Did you find any

19     patents that have or characterize a folding knife as a

20     gravity knife?

21     A.      Not that I recall.

22             MS. BAILEY:  I ask that this be marked

23             Defendant's Exhibit C.

24             (Whereupon, the aforementioned patent number

25             6477777 B1 was marked as Defendant's Exhibit C

B. VOYLES

1    opener?

2        A.      Bottle opener.

3        Q.      It looks like it has a serrated edge at the top?

4        A.      It's a fish scaler.

5        Q.      So, how does this knife operate?

6        A.      Exactly like the other one.

7        Q.      So, you have to use your thumbnail or fingernail

8    to literally pull it out?

9        A.      And it locks so you can use the fish scaler.

10       Q.      So, these other knives which are numbered on this

11   document as 14, 15, 16, 18, 20 and 21, what types of knives

12   are they; are they some other category altogether?

13       A.      Knife collectors have names specifically for some

14   of the patterns.  Generally they can all pretty well be

15   lumped in as Jackknives.

16       Q.      Or folding knives?

17       A.      Yeah.  They're all folders.

18       Q.      Excuse me?

19       A.      They're all folders.

20       Q.      Final query by Mr. Jensen was with respect to the

21   New York Times articles he gave you or directed your

22   attention to.  You looked at -- do you recall how many?  Or

23   are the ones you listed in your report?

24       A.      I want to say 13.

25       Q.      Not just the ones listed in your report, there

97

B. VOYLES

1    are others?

2        A.    No.

3        Q.    Do you recall, aside from ones listed in the

4    report, the dates of the other articles?  Or would you have

5    a way to find that out?

6        A.    It's all within this time frame, pre '58, or

7    shortly thereafter.

8        Q.    Would you be able to find out, if you don't know

9    off the top of your head, the exact dates of publications

10   for those other articles?

11       A.    Sure.

12       Q.    Would you be able to provide it to Mr. Jensen?

13            MR. JENSEN:  Yeah.  But I'll tell you, all

14            those articles he looked at are in those

15            documents.

16            MS. BAILEY:  Okay.  Fair enough.

17       Q.    So, they're all contained in the documents.  I

18   received all 13?

19       A.    Yes.

20       Q.    Alright.  Terrific.

21            If I'm correct, we've already established you

22   only looked at the New York Times newspapers from that time

23   period, none of the other New York newspapers from that

24   time period, correct?

25       A.    Yes.

114

B. VOYLES

1  definition commonly associated with Jackknife is any knife

2  that folds."  Can you clarify that for me?

3      A.    Yes.  People that don't know diddly-squat about

4  knives call most knives a Jackknife.

5      Q.    Where did you get that definition?

6      A.    Jackknife?

7      Q.    The one I just read, a knife enthusiast see it as

8  swell end knife with two blades coming from the same end?

9      A.    It's common knowledge within the cutlery

10  industry.

11      Q.    No specific source?

12      A.    I guess I'm the specific source.  I've got it in

13  all -- I mean, every knife book in the business has that.

14      Q.    A knife with a single blade would not be a

15  Jackknife; is that correct?

16      A.    It depends -- again, within the cutlery business,

17  a Jackknife is a swell end Jack.  A standard Jackknife has

18  two blades.  More like a boy's knife, they call it.  There

19  are one-blade versions of it.  But somebody -- if you're

20  reading -- if you're reading a piece of fiction from

21  somebody and they call it -- and some boy has a Jackknife,

22  it could be anything.

23      Q.    Anything that folds?

24      A.    Yes.

25      Q.    I think you said you hadn't seen the amended

B. VOYLES

1    complaint.

2            In the amended complaint the plaintiffs refer to

3    something called a common folding knife.  Are you familiar

4    with that term?

5        A.    Not particularly.

6        Q.    Do Jackknives have any kind of tension

7    adjustment?

8        A.    Knives do not have tension adjustments.  There is

9    a spring that presses against the blade that gives it a

10   resistance to opening.

11       Q.    Is there a way to alter the level of resistance?

12       A.    No.  They're set at the factory.

13       Q.    And there's no way to alter that?

14       A.    I mean, short of destruction of the knife, no.

15   There's not -- there's not screws you can adjust for those

16   kind of things for the spring tension.

17       Q.    If over use the blade of a Jackknife starts to

18   exit the handle on its own, is there a way to adjust it so

19   that it won't do that anymore?

20       A.    No.  Not that I know of.

21       Q.    So, you're saying that once a Jackknife loses its

22   resistance, it can't be restored?

23       A.    Well, there's some resistance there till the

24   spring breaks.  The way a knife is made, there's always

25   resistance on that tang of the knife.