# EXHIBIT "H"

# EXHIBIT "H"

06/17/2009  08:58  2027071771      LOC DUPLICATION SERVICES

Plaintiffs' Trial Exhibit
**P-21**

UNITED STATES  OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 85ᵗʰ CONGRESS
SECOND SESSION

## VOLUME 104—PART 9

JUNE 14, 1958 TO JUNE 26, 1958
(PAGES 11155 TO 12422)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1958

KR00023

06/17/2009   08:58   2027071771          LOC DUPLICATION SERVICES          #0534 P.003/008

ing legislation concerning highways. Heretofore various and sundry laws have been scattered all over the statute books and difficult to understand or assimilate.

The act makes no change in existing substantive law but does revise existing law to clarify and reconcile certain provisions, consolidates similar provisions and omits superseded sections.

Since the enactment of the first Federal Aid Road Act of July 11, 1916, some 40 separate laws have been enacted and many well-accepted practices and procedures justify codification in the law, which is the objective of this bill.

Lengthy consideration has been given to this problem. *The bill was considered by the Public Works Committee, the Judiciary Committee that has jurisdiction over recodification has been constantly consulted, and I understand that my subcommittee of the Judiciary Committee is in agreement with this bill.*

I am glad that this rather arduous, time-consuming and painstaking task has been brought to a successful conclusion. As the result of our action the public will have easy access to the very complicated and numerous highway laws and *will have conflicts between those laws resolved for the first time in this bill.*

I am happy to have had a part in this effort which I am sure will prove most valuable.

## ATOMIC ENERGY COMMISSION

Mr. PRICE. Mr. Speaker, I move to suspend the rules and pass the bill (H. R. 12457) to further amend Public Law 85-162 and Public Law 84-141, to increase the authorization for appropriations to the Atomic Energy Commission in accordance with section 261 of the Atomic Energy Act of 1954, as amended, and for other purposes.

The Clerk read as follows:

*Be it enacted, etc., That section 101 of Public Law 85-162, as amended, is further amended by striking therefrom the figure "$257,250,000" and inserting in lieu thereof the figure "$260,480,000."*

*Sec. 2. Section 101 (e) of Public Law 85-162 is amended by striking therefrom the figure "$7,760,000" for project 58-e-0, project Sherwood plant, and substituting therefor the figure "$10,000,000."*

*Sec. 3. Section 101 (c) of Public Law 84-141, as amended, is further amended by striking therefrom the figure "$10,000,000" for project 56-c-1, particle accelerator program, and substituting therefor the figure "$16,406,000."*

The SPEAKER. Is a second demanded?

Mr. VAN ZANDT. Mr. Speaker, I demand a second.

The SPEAKER. Without objection a second will be considered as ordered.

There was no objection.

Mr. PRICE. Mr. Speaker, H. R. 12457 is a bill reported unanimously by the Joint Committee on Atomic Energy to further amend Public Law 85-162 and Public Law 84-141 to increase the authorization for appropriations to the Atomic Energy Commission for two important programs. As chairman of the Research and Development Subcommittee of the Joint Committee, I would like

to make a brief statement of explanation of this bill.

*The first increase is in the amount of $2,250,000 for the project Sherwood plant, which involves research in the field of controlled thermonuclear reactions. Most of these funds will be used for new construction at Princeton University where the new model C stellerator is under construction.*

*The second increase is to provide an additional $6,406,000 authorization for the particle accelerator program. These funds will be used to advance construction of high-energy accelerators now under construction at Cambridge, Mass., by a Harvard University-MIT team, and at Philadelphia, Pa., by a Princeton-University of Pennsylvania team.*

Mr. Speaker, these bills were reported out unanimously by the Joint Committee and construction of these projects may be held up unless increased authorization can be granted as soon as possible.

The gentleman from Pennsylvania [Mr. VAN ZANDT], the ranking House minority member, and I have arranged with the leadership of the House on both sides to consider this bill under suspension of the rules. Because of the importance and the urgency of these projects, from the research and development point of view, and in view of the unanimous support of the members of the Joint Committee, I request that it be approved by the House.

Mr. VAN ZANDT. Mr. Speaker, I yield myself 5 minutes.

Mr. Speaker, I join my colleague the gentleman from Illinois [Mr. PRICE], the chairman of the Subcommittee on Research and Development of the Joint Committee, in urging prompt action by the House on H. R. 12457.

As stated by the gentleman from Illinois [Mr. PRICE], this bill provides increased authorization for two very important projects in our physical research program, namely, the project Sherwood plant at Princeton and the particle accelerator program.

I might point out, Mr. Speaker, that this Sherwood plant at Princeton, housing the so-called model C stellerator, will play a vital role in this country's efforts to achieve a true controlled thermonuclear reaction, or tap a source of heat or energy comparable to that of the sun. The stellerator will be our first large-scale device in the Sherwood program and it is hoped that the machine will achieve temperatures sufficiently high to produce real thermonuclear neutrons. The temperatures required for such reactions reaches the astronomical range of 100,000,000 °.

The Joint Committee has been informed by the Atomic Energy Commission that prompt action on this legislation is most important to insure against delay in carrying out this most important project. In view of the rapid strides being taken by other nations, such as Great Britain and the Soviet Union, in harnessing the energy of the hydrogen atom, I believe it is imperative that we lend every possible support to our own research program in this field.

The SPEAKER. The question is on suspending the rules and passing the bill.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill was passed.

A motion to reconsider was laid on the table.

## SWITCHBLADE KNIVES

Mr. HARRIS. Mr. Speaker, I move to suspend the rules and pass the bill (H. R. 12850) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The Clerk read as follows:

*Be it enacted, etc., That as used in this act—*

*(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.*

*(b) The term "switchblade knife" means any knife having a blade which opens automatically—*

*(1) by hand pressure applied to a button or other device in the handle of the knife, or*

*(2) by operation of inertia, gravity, or both.*

*Sec. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than 5 years, or both.*

*Sec. 3. Whoever, within any Territory or possession of the United States, within Indian country (as defined in sec. 1151 of title 18 of the United States Code), or within the special maritime and territory jurisdiction of the United States (as defined in sec. 7 of title 18 of the United States Code), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than 5 years, or both.*

*Sec. 4. Sections 2 and 3 of this act shall not apply to—*

*(1) any common carrier or contract carrier, with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;*

*(2) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to contract with the Armed Forces;*

*(3) the Armed Forces or any member or employee thereof acting in the performance of his duty; or*

*(4) the possession, and transportation upon his person, of any switchblade knife with a blade 3 inches or less in length by any individual who has only one arm.*

*Sec. 5. Section 1710 of title 18 of the United States Code is amended by inserting immediately after the sixth paragraph thereof the following new paragraph:*

*"All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulation as the Postmaster General shall prescribe—*

*"(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;*

KR00024

**12398**                          **CONGRESSIONAL RECORD — HOUSE**                          *June 26*

"(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

"(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and

"(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3).

The Postmaster General may require, as a condition of conveying any such knife in the mails, that any person proposing to mail such knife explain in writing to the satisfaction of the Postmaster General that the mailing of such knife will not be in violation of this section."

SEC. 2. This act shall take effect on the 90th day after the date of its enactment.

The SPEAKER. Is a second demanded?

Mr. AVERY. Mr. Speaker, I demand a second.

Mr. HOFFMAN. Mr. Speaker, a parliamentary inquiry.

The SPEAKER. The gentleman will state it.

Mr. HOFFMAN. Is it necessary for Members who demand a second to qualify? In the last two cases those demanding a second were in favor of the bill. It was my understanding that in order to demand a second, one must be opposed to the bill; am I correct?

The SPEAKER. If no one else demands a second, the Chair may recognize anyone who rises to demand a second.

Mr. HOFFMAN. Regardless of his position on the bill?

The SPEAKER. That is correct. If the gentleman is opposed to the bill, he may ask for recognition.

Without objection, a second will be considered as ordered.

There was no objection.

Mr. HARRIS. Mr. Speaker, the bill H. R. 12850 would prohibit the introduction, or manufacture for introduction, with certain exceptions, into interstate commerce of switchblade knives. The bill contains a definition of the term "switchblade knife." Hearings were held on this bill by the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce.

This bill has been before the committee and the Congress for a number of years. Several Members of Congress are interested in this type of legislation and have presented to the committee what I think is justification for the legislation. The Committee on Interstate and Foreign Commerce, after considering the recommendation of the subcommittee, unanimously reported the bill.

This is a bill that has been sponsored and supported by the gentleman from Illinois [Mr. DELANEY], the gentleman from Illinois [Mr. YATES], the gentleman from New York [Mr. TELLER], the gentlewoman from New York [Mrs. KELLY], and the gentleman from New Jersey [Mr. ADDONIZIO]. The chairman of the sub-

committee, the gentleman from Illinois [Mr. MACK], held hearings on this proposed legislation and introduced a clean bill as worked out by the subcommittee.

At this time, Mr. Speaker, I am pleased to yield to the gentleman from Illinois [Mr. MACK] for a further explanation of the bill.

Mr. MACK of Illinois. Mr. Speaker, the chairman of the committee has explained the purpose of this bill. He has mentioned that several other Members of Congress had introduced similar legislation earlier. In substance, this is the same type of legislation which was introduced by the gentleman from New York [Mr. DELANEY], the gentleman from Illinois [Mr. YATES], the gentlewoman from New York [Mrs. KELLY], and several others who were particularly concerned with the crime waves in the cities of our country. They felt that the switchblade knife was an even more dangerous weapon than firearms, because it could be concealed so much more easily.

For that reason the committee held hearings, and we felt that this legislation would make a great contribution to controlling juvenile delinquency. The committee reported the bill unanimously.

The purpose of this legislation is to prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, with certain exceptions, of automatic knives, commonly referred to as switchblade knives, the blades of which open automatically either by hand pressure applied to a button or other device, or by the operation of inertia or gravity.

Exceptions from this prohibition are made for first, common or contract carriers which may handle switchblade knives in the ordinary course of their business; second, the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce of switchblade knives pursuant to contract with the Armed Forces; third, the Armed Forces or any member or employee thereof acting in the performance of his duty; or fourth, the possession and transportation upon his person of any switchblade knife with a blade 3 inches or less in length by any individual who has only one arm.

Any person who knowingly violates this act would be fined not more than $2,000 or be imprisoned for not more than 5 years, or both.

Switchblade knives are declared to be nonmailable except to, first, civilian or Armed Forces supply or procurement officers and employees of the Federal Government, second, to supply or procurement officers of the National Guard, the Air National Guard or militia of a State, Territory, or the District of Columbia, and, third, to supply or procurement officers or employees of the municipal government of the District of Columbia, or the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory and, in the exceptions mentioned, they are mailable only when the aforementioned individuals or organiza-

tions, order, procure, or purchase such knives in connection with their official activities. Manufacturers of, or bona fide dealers in, such knives may use the mails to ship to any of the above-designated individuals or organizations pursuant to an order from such individuals or organizations.

The Postmaster General is given authority to require any person proposing to mail such a knife to give a satisfactory explanation in writing that the mailing will not be in violation of the law.

The law will take effect 60 days after the date of its enactment.

Hearings conducted by the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce on this legislation revealed that over 1 million switchblade knives are distributed and sold each year in this country, and that of these some 200,000 are imported. Over 5 million of these knives have been sold in the past 5 years, principally to juveniles. A large proportion of the knives are sold at a price within the reach of teen-agers.

The appalling situation in the cities throughout the Nation should bring home to us the urgent need for action in this field. Every day our newspapers report numerous muggings and attacks, many of them involving knives. Doing away with switchblade knives will not be a cure-all for the crime wave sweeping the Nation, but it will remove one of the favorite weapons of our juvenile and criminal element. It will afford the public some measure of added protection and give valuable assistance to our hard-pressed local law-enforcement agencies.

Federal legislation to prohibit switchblade knives is necessary because only a limited number of States have any laws relating to such knives. As a result, these knives are bootlegged into these States from other States which have no prohibitory statutes, or they are sent through the mails. Elsewhere they are sold openly. City ordinances are somewhat of a deterrent, but they are by no means sufficiently effective. The only solution to the switchblade and gravity knife menace is to pass Federal legislation to prohibit the introduction or manufacture for introduction of these weapons into interstate commerce, to close the mails to them, and to ban their importation.

This legislation is highly meritorious. I urge the House to pass this bill.

Mr. DELANEY. Mr. Speaker, will the gentleman yield?

Mr. MACK of Illinois. I yield to the gentleman from New York.

Mr. DELANEY. Mr. Speaker, I am gratified that at long last the House is acting on legislation to take the vicious switchblade knife away from our juveniles and criminal element.

For a number of years I have been much concerned with the switchblade menace.

It was back in 1953 that a wave of switchblade stabbings in and around New York City brought to my attention the threat to public safety caused by the use of these knives.

To determine whether it was a local or a countrywide problem, I made a one-

Case 1:11-cv-03918-KBF-RLE   Document 134-4   Filed 03/11/16   Page 5 of 33

man review and addressed inquiries to the police heads of some 40 of our largest and medium-sized cities. The response established beyond doubt that switchblades are commonly involved in crime, and in smaller cities as well as in metropolitan centers.

As a result of this survey, in January 1954, I introduced the first bill to prohibit traffic in switchblades. Hearings were held, but no action resulted.

Again, in this Congress, I introduced a bill, H. R. 9020, which is almost identical with the one now before us. This bill dealt not only with switchblades, but also with so-called gravity knives, which are similar to the ones used by German paratroopers in the last World War.

These knives open and lock automatically at a quick flick of the wrist. Technically, they are not switchblades, since they do not open as the result of spring action or by hand pressure applied to a button or other device in the handle, but they are just as dangerous.

It is worthy of note that last year the Senate Subcommittee on Juvenile Delinquency instituted an extensive study and field investigation of the switchblade situation, particularly in relation to juveniles. The results of this study not only confirmed, but emphasized, the findings of my earlier survey.

The committee found that over a million switchblades are distributed and sold each year in this country, and that of these, some 200,000 are imported. It was estimated that over 6 million of these knives have been sold, principally to juveniles, in the past 5 years. A large proportion of the knives are sold at a price well within the reach of teen-agers, and switchblade stabbings are all too common an occurrence in juvenile gang warfare.

The question has been asked: "Why is Federal legislation required on this matter? Will not municipal and State action take care of it?"

The answer is that only a limited number of States have any laws relative to these knives. As a result, the knives are bootlegged into these States or are sent through the mail. Elsewhere, they are sold openly. City ordinances are something of a deterrent, but they are by no means sufficiently effective. Police answers to my survey, and to subsequent surveys, amply substantiate this statement.

The only solution to the switchblade and gravity knife menace is to enact Federal legislation to prohibit their introduction into interstate commerce, to close the mails to them, and to ban their importation.

Switchblades and gravity knives have no possible legitimate use. They can do nothing worthwhile that other types of knives cannot do better. A fish knife is more useful to a fisherman—a hunting knife to a hunter. Switchblades are good for just one thing—sneak attack.

Mr. Speaker, since I introduced my first switchblade bill, the menace of these knives has grown by leaps and bounds. A number of my colleagues became aware of the danger they present, and introduced in this Congress bills for a purpose similar to mine. These bills

were heard in committee on April 17, and H. R. 12850 is the result of these hearings. The main difference between it and H. R. 9020 is that the committee bill will enable one-armed men to use switchblades.

The Interstate and Foreign Commerce Committee has taken a most commendable action in reporting out H. R. 12850. The appalling situation in the cities throughout the country emphasizes the need for affirmative action on it. Can we sit by complacently and ignore the bloodshed in our streets?

Doing away with switchblades will not be a cure-all for the crime wave sweeping the Nation, but it will remove one of the favorite weapons of our juvenile and criminal elements. It will afford the public added protection and give valuable assistance to our hard-pressed local law enforcement agencies.

Mr. Speaker, there is no question as to the need. The time for action is now.

Mr. WHITENER. Mr. Speaker, will the gentleman yield?

Mr. MACK of Illinois. I yield to the gentleman from North Carolina.

Mr. WHITENER. I should like to ask the gentleman from Illinois if it is not true that the Department of Justice, the Department of Commerce, and the Bureau of the Budget have failed to recommend passage of this legislation?

Mr. YATES. Mr. Speaker, will the gentleman yield so that I may answer the question?

Mr. MACK of Illinois. I yield to the gentleman from Illinois.

Mr. YATES. It is true that the Department of Justice did not approve the bill but it did not disapprove the bill. It suggested the matter might be left to local authorities. The Secretary of Commerce did object to the passage of the bill but he objected to the passage of the bill for the reason that such switchblade knives might have proper uses. They might be used by hunters and fishermen. The Bureau of the Budget did not take a position either for or against it. It merely reiterated the arguments the other departments had made.

I should point out in reply to what the Secretary of Commerce said that these knives may be used by hunters and fishermen that I asked the Secretary of the Izaak Walton League whether these knives were used by hunters or fishermen, and I introduced into the record before the subcommittee the reply I received. The Secretary stated that he knew of no hunter or fisherman who ever used a switchblade knife, that they used sheath knives instead.

Mr. HARRIS. Mr. Speaker, in order that it may be well understood, in the report on pages 8, 9, 10, 11, 12, 13, and 14 you will find letters and reports from the various departments as to their positions. Each one of those letters contains the position of the department concerned.

Mr. WHITENER. Did not the Attorney General indicate in the letter that he felt that this was a matter that could well be left to the States to regulate?

Mr. HARRIS. The Department of Justice had considered in 1957 similar bills

as referred to by the gentleman from New York [Mr. DELANEY] and the gentleman from Illinois [Mr. YATES]. The views expressed in that report were contained in the copy that was included at that time. The Department did take the position as reported, and I shall read the sentence to which the gentleman has reference. You will find it on page 9 of the report:

However, since they serve useful and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

That is precisely what the Department of Justice said about it.

Mr. WHITENER. Mr. Speaker, will the gentleman yield for the purpose of explaining subsection (4) of section 4 of this bill. It says that sections 2 and 3 of this act shall not apply to "(4) the possession and transportation upon his person, of any switchblade knife with a blade 3 inches or less in length by any individual who has only the arm."

Mr. MACK of Illinois. Yes; I would be glad to explain that. This exemption is for the people who have one arm.

Mr. WHITENER. Well, it does not say one arm; does it?

Mr. MACK of Illinois. That applies to people who have only one arm.

Mr. WHITENER. It says only "the arm." Is that the arm of the knife or the arm of the man?

Mr. MACK of Illinois. I am sure that is a technical error in the legislation.

Mr. WHITENER. I have asked several other lawyers to assist me in interpreting that, and we decided it must be an error. As I understand it, this bill does not apply to razors and other weapons such as pistols, used by delinquents; is that right? Does it apply to razors, straight razors, or pistols, or sheath knives?

Mr. HARRIS. It does not apply to pistols, but it could apply to certain types of razors, the razors you call the straight razors, the kind that can be immediately opened with a flip of the wrist. It includes that kind.

Mr. WHITENER. So if a barber carried one across a State line, he might have to serve 2 years in prison?

Mr. MACK of Illinois. If I may answer the gentleman's question, I will say that it does not apply to razors as we know the razors referred to. This applies only to switchblade knives and applies to switchblade knives that open by gravity or inertia. It does not apply and would not limit the transportation of razors in interstate commerce.

Mr. WHITENER. Is it not true that in section 2 you purport to prohibit the transportation of any switchblade knife and say the punishment shall be a fine of not more than $2,000 or imprisonment for not more than 5 years?

Mr. MACK of Illinois. That is correct.

Mr. WHITENER. But in section 4 you exempt from the provisions of this act those who would normally transport them to wit: the common carriers and the contract carriers. So the bill does

KR00026

not apply to wholesale transportation but just to what you might loosely refer to as retail or hip pocket transportation; is that right?

Mr. HARRIS. If it is in the ordinary course of business.

Mr. WHITENER. The ordinary course of business for a transportation firm is to haul freight, and if a thug wanted to send a truckload of them across the line by common carrier or contract carrier he would not be subject to any penalty. On the other hand, if a barber with one of these switchblade razors carried his razor across the line in his valise, he would be subject to imprisonment for 2 years.

Mr. MACK of Illinois. I want to point out to the gentleman that that would be a legitimate shipment, if it was being shipped under the exempt category of this bill and, certainly, this section should be included to exempt the carrier who carries an exempt commodity.

Mr. WHITENER. Well, if the carrier carried it as a general commodity within the rights granted him by the Interstate Commerce Commission, he could carry a switchblade knife anywhere in the United States without penalty; could he not?

Mr. MACK of Illinois. Yes, we are not making the common carrier liable because he could be carrying a legitimate shipment of switchblade knives and it would be inappropriate to make him liable.

Mr. WHITENER. But, if the driver of the truck carried with him a switchblade knife in his pocket as he rode in the cab of his truck, he would be subject to imprisonment for up to 5 years; is that not correct?

Mr. MACK of Illinois. Yes; I think it would also prohibit a gang from carrying the knives themselves across a State line to make a raid in some other town, and they have been doing that.

Mr. WHITENER. I thank the gentleman.

Mr. YATES. Mr. Speaker, will the gentleman yield?

Mr. HARRIS. I yield.

Mr. YATES. Lest there be any misunderstanding about the question of razors and switchblade knives, let me point out to the gentleman that this is a switchblade knife and this is the type of device that we are seeking to prohibit the shipment of by the passage of this bill. This was taken by the police of the District of Columbia from one of the members of a teen-age gang. This is the type of lethal weapon sought to be prohibited by this legislation.

Mr. WHITENER. Under this bill, could a one-armed man carry the weapon that you have exhibited to the House?

Mr. YATES. No; he could not, because this knife has a blade which exceeds 3 inches in length.

Mr. Speaker, this is a good bill, this is a necessary bill. The switchblade knife has become the symbol, as well as the weapon of the teen-age gang. You can see from the weapon that I hold in my hand that this is not the type of a knife that we used when we were boys or that the Boy Scouts now use. This weapon is designed to be used exclusively for strong-arm purposes.

Advertisements by mail-order houses, in sports magazines, in outdoor magazines, all suggest that these knives can be used for hunting or fishing. The Secretary of the Izaak Walton League of America whom I asked the question, wrote to me and said that he had never seen a sportsman in Western States use a switchblade knife for either hunting or fishing, that most sportsmen prefer the sheath-type knife which is much easier to keep clean.

The advertisements also say that these knives can be used in self-defense. Has the time come when we have to carry weapons for self-defense? We are a law-abiding people. We do not have to carry weapons. We still have police departments for the purpose of protecting the community. Certainly we do not want our youth to be armed for their own defense or to resort to weapons of this type, or to cunning or to brute strength rather than relying upon the police. In short, we do not want our children to take the law into their own hands and to convert our communities into jungles for warfare. Invitations to our children to meet violence with violence, particularly through the use of weapons which may inflict mayhem or death are most harmful.

The Attorney General has suggested that this is a problem that should be left to local authorities. I don't believe he has given the matter the attention it deserves. The local authorities are coping with the problem now. They are finding switchblade knives in every teen-age gang war within their jurisdiction. They know the psychology—the bravado which possession of a weapon of this type brings. That is why they support this bill.

What the Attorney General overlooks is the fact that even though a State wants to bar the use or possession of such weapons, such legislation means very little inasmuch as they can still be shipped in from places outside the State. Since such shipments are in interstate commerce, only the Federal Government has jurisdiction and can take steps to block this loophole.

Mr. Speaker, I urge that this bill be passed.

Mr. AVERY. Mr. Speaker, I yield 1 minute to the gentleman from New York [Mr. KEATING].

Mr. KEATING. Mr. Speaker, H. R. 13850 has my enthusiastic backing. It is similar in nature to H. R. 9869, which I introduced January 7 of this year.

This measure represents one sound, positive means by which the Federal Government can help localities combat juvenile delinquency. The weapons which would fall under this act—switchblade knives and gravity knives—are in many cases the favorite weapon of the teen-age gangs which today terrorize sections of our larger cities. But because of the inadequacy of our present laws, these cities are not able to cope with the influx of these tools adequately.

Certainly the recent rash of teen-age crimes and violence in various sections of the country emphasizes once again the magnitude of the challenge of juvenile delinquency. Increasingly, we hear demands that the Federal Government should take a more active role in coping with these problems.

Unfortunately, there are few areas in which the National Government can legitimately assist local groups in combating youthful terrorism. However, by helping to curb the sale and availability of switchblade and gravity knives—through the proper exercise of its power over interstate commerce—the Government can play a decisive role in depriving teen-age hoodlums of their favorite weapon.

Statistics indicate that in the last 5 years, 5 million of these insidious tools have been sold in this country. Their cheap price—95 cents to $1.29—brings them readily within the buying range of our younger people, and as a result they have become standard equipment with teen-age gangs.

When you consider that 43 percent of the total robberies in the United States last year were by people under 21 years of age, or that last year in New York City 40 percent of the felonious assaults were perpetrated by those under 16, the importance of juvenile crime cannot be discounted. In many of these cases, the switchblades or gravity knife, was the chief weapon.

These lethal, vicious weapons can be concealed in the palm of the hand and then, by pressing a button or by a quick flick of the wrist, the blade can be suddenly extended toward the victim. There are practically no useful purposes for the switchblade or gravity knives. Clearly, the few useful purposes for these articles are insignificant compared to the obvious criminal use to which they are put in most cases. Their presence should be stamped off the face of our Nation as soon as possible.

My only reservation at all about this measure is that it does not spell out, specifically, prohibitions on interstate commerce in stilettos. My bill did define these weapons and include them in the prohibition. Stilettos have no utilitarian purpose whatsoever. They have no cutting edge, only a sharp dangerous point.

However, I believe that stilettos would fall under the definition of switchblade knives as set forth in H. R. 13850, so their dissemination should be effectively curbed under this measure.

It is true that 12 States, including New York, have enacted laws in an attempt to curtail the sale and possession of these knives. Already Congress has banned them in the District of Columbia. But through nuances in design and by advertising and sale through the mails, these local laws are today being effectively circumvented. When local laws cannot effectively cope with a problem, the Federal Government is required to take up the slack. By vigorous application of the powers granted by this bill, the Federal power over interstate commerce can end this influx of switchblade and gravity knives.

This proposal has the strong approval of local law enforcement officials all over the country who are, after all, in the best position to evaluate the need.

By prohibiting the interstate transportation and sale of switchblade and

KR00027

06/17/2009   09:03   2027071771                    LOC DUPLICATION SERVICES                    #0534 P.007/008

gravity knives, we will at least be depriving teen-age gangs of their favorite weapon. Though this is by no means an answer to the deep challenges of juvenile delinquency, it is one way in which the effectiveness of youthful terrorists can be blunted.

I commend the committee for reporting this bill and hope it will gain the overwhelming support of this body.

Mr. HARRIS. Mr. Speaker, I ask unanimous consent that on page 3, line 6, the word "the" be corrected to read "one."

The SPEAKER. Is there objection?

There was no objection.

Mr. AVERY. Mr. Speaker, I yield 2 minutes to the gentleman from Michigan [Mr. HOFFMAN].

Mr. HOFFMAN. Mr. Speaker, the purpose of this bill is all right, of course, but it should go back to the committee for redrafting. The gentleman held up a long toad stabber here and said that was the thing we were trying to get at. True. You are trying to get at a specific bad situation with general legislation. The other gentleman also said that the Secretary of the Izaak Walton League said that no fisherman or hunter ever carried a switchblade knife. He just does not know what he is talking about. I do not care what office he holds. You can go up and down the river and on Chesapeake Bay and you will find dozens of switchblade knives in the fishing boxes. A fly fisherman will have a small knife to cut off the end of a line, or something. Look at this section on page 3:

Sections 2 and 3 of this act shall not apply to (4) the possession, and transportation upon his person, of any switchblade knife with a blade 3 inches or less in length by any individual who has only the arm.

What nonsense. Can anybody tell me what that means?

Mr. AVERY. The gentleman from Arkansas asked to substitute the word "one" for the word "the" just a moment ago.

Mr. HOFFMAN. In any event, it is a nonsensical bill. You might just as well say "a baseball bat." Up in Michigan, when you want to get rid of a district convention in one county, what they do there is to have the CIO boys go in with these short-length baseball bats, and they throw the Democrats out. You might just as well have a bill for that. This bill should not be passed. I have a little knife, 3 or 3½ inches. It is a little bit of a thing, using it to shorten a line or something. Can't have it? Just because some crook down here has a long butcherknife that he carries. That is no way to cure a thing of that kind.

Mr. FORRESTER. Mr. Speaker, I notice under the terms of this bill that in line 7, switchblade knives means any knife; it does not just mean a large knife such as the gentleman from Illinois [Mr. YATES] produced; but it can mean one the size of your fingernail, if it opens automatically. There happen to be some people in this country who on account of infirmity, and so forth, in all probability, cannot have any knife at all unless it opens automatically, for that is the only

CIV—780

way they could open one for use in an ordinary manner.

I notice that if any person introduces or manufactures any of these knives, no matter how small they are, he is going to be fined not more than $2,000 or imprisoned not more than 5 years, or both. I am inclined to think that punishment is entirely too drastic.

I notice under this bill that the poor Indian, that all on earth he has got to do is to either manufacture, sell, or possess a switchblade knife, and that means whether it is the size of your fingernail or the size of a butcher knife, he can be fined up to $2,000 or be imprisoned up to 5 years, or both. I think that is a little drastic on the Indians. The punishment is too heavy for such offenses.

I think I am right about this, but I want to ask the gentleman of the committee to listen to me now. On pages 3 and 4 you have amended section 1716 of title 18; on pages 3, 6, and 7 of your report you have set out in full section 1716 of title 18. That old title provided that if you sent poison through the mail or if you sent bombs through the mail, and so forth, it was against the law; and if it resulted in death the sender could be punished as for murder. I want to ask you to notice particularly now on page 7 where you have included this section: whoever is convicted of any crime prohibited by this section which resulted in the death of any person it would be also subject to the death penalty or to imprisonment for life if the jury in its discretion so provided, and so forth.

Now, Mr. Speaker, I want to ask seriously if a person is convicted for a homicide, committed by the use of a switchblade knife, but the evidence, actually shows that it was involuntary manslaughter or voluntary manslaughter, do you mean to tell me that because the weapon was a switchblade knife sent through the mails instead of a shotgun or a pistol, that irrespective of the fact that he was almost justified, just guilty of a lower degree of homicide, that the jury could inflict the death penalty upon that person?

Would the gentleman elaborate on that?

Mr. HARRIS. Of course, the gentleman knows that our committee was not responsible for section 1716 of title 18 of the United States Code. This amends the United States Code which contains the provision the gentleman has just read; and, quite naturally, it was not the responsibility of this committee.

Mr. FORRESTER. Of course, I certainly recognize that your committee did not pass that section 1716, but did the gentleman know when he was presenting this legislation to us that under its terms if a person is killed with a switchblade knife that was sent through the mail, that if the jury sees fit they can execute him despite the fact that probably his offense was just that of involuntary manslaughter or even voluntary manslaughter, and that if he enters a plea of guilty to a lower grade of homicide the judge can sentence him to be executed even though the offense be one of a very low grade? That is this bill.

Mr. HARRIS. The gentleman does raise a very important question, which he has raised it in a way to make it seem as if something terrible is going to happen to the American public. That is not true at all. The Post Office Department itself asked for this amendment. The Department said it should have it, which is what we did. I refer the gentleman to the report of the Post Office Department shown on page 11 of the committee report on this bill.

Mr. FORRESTER. Certainly I am not criticizing the committee; certainly I am not. But that is just exactly what your bill does. There ought to have been some provision to take care of that and you should not ask us to pass a bill amending section 1716 which provides that a judge or jury can order a person executed for a homicide which was not murder, but a lower grade of offense, simply because the weapon used to commit the offense was a switchblade knife received through the mail.

Mr. AVERY. Mr. Speaker, I yield such time as he may desire to the gentleman from Massachusetts [Mr. MARTIN].

Mr. MARTIN. Mr. Speaker, I would like to inquire of the majority leader as to the program for tomorrow.

Mr. McCORMACK. I am very glad the gentleman did so because I can then advise the House.

The first business tomorrow will be a continuing resolution on the 1959 appropriations. That will come up under suspension of the rules.

Second. The tax bill conference report.

Third. The mutual assistance conference report.

Fourth. The railroad transportation bill which will come up under a rule.

Then whatever suspensions might remain. If they are not all disposed of, those not on the list will continue tomorrow. I may also add, having consulted with the gentleman from Massachusetts [Mr. MARTIN], H. J. Res. 221, the Interstate Compact Commission on Safety, to be brought up under suspension of the rules.

Mr. MARTIN. I do not suppose the gentleman can tell us about Monday. There is an inquiry as to what will happen on Monday.

Mr. McCORMACK. Without complimitting myself, but as an indication, Monday is also a day on which suspensions may be taken up. And on Monday, being June 30, if there are any rollcalls in connection with resolutions extending existing laws we would have to have them.

On Monday, I can see a bill to meet the Mallory decision. I am programing that for Monday. Then there is the diversity of citizenship bill. There is a bill out of the Ways and Means Committee, H. R. 11650, an unemployment bill, relating to veterans; I think, to the Korean veterans.

I do not want to confine myself to those, but projecting my mind I can see those three bills, with any further suspensions to be brought up.

Projecting my mind into Tuesday, but again not being bound now—I will know definitely tomorrow when I announce

KR00028

the program—I see the mutual assistance appropriation bill.

Any votes on Tuesday will go over until Wednesday because there is a primary down in Oklahoma.

Mr. AVERY. Mr. Speaker, I yield 1 minute to the gentleman from Iowa [Mr. GROSS].

Mr. GROSS. Mr. Speaker, I note in the report that some 200,000 of these switchblade knives are imported each year from foreign countries. I wonder if the committee in formulating this legislation, which I presume would cut off this flow of foreign switchblade knives, consulted with the State Department to find out if this would injure the feelings of any of our foreign friends?

Mr. HARRIS. I may say to the gentleman that we did not receive any information on that.

The CHAIRMAN. The time of the gentleman from Iowa has expired.

Mr. HARRIS. Mr. Speaker, I yield 1 minute to the gentleman from Illinois [Mr. YATES].

Mr. YATES. Mr. Speaker, with respect to what the gentleman from Georgia [Mr. FORRESTER] just stated, I believe his objection is not to this bill as such, but to section 1716, title 18, United States Code, as was so ably pointed out by the distinguished chairman of this committee.

This bill does not enact section 1716 to which the gentleman referred. That is now the law. It deals with death-inflicting devices or instrumentalities sent through the mails. If the Members will read that section as it appears on pages 5 and 6, they will learn that if any kind of poison, or poisonous animals or the other possible death-dealing devices listed there are sent through the mail and death results from such action, an indictment for murder is possible.

The section reads:

Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life.

Furthermore, there is this section on page 6:

All spirituous, vinous, malted, fermented, or other intoxicating liquors of any kind are nonmailable and shall not be deposited in or carried through the mails.

If a violation of this section resulted in the death of a person, the person sending the liquors would be subject to prosecution and possibly to the death penalty. The point I make is that the section already deals with dangerous instruments of different kinds, weapons which may result in death. We know that switchblade knives are indeed lethal weapons. I just showed you one which was almost a bayonet. Those of us who come from the big cities of the country and are familiar with the gang wars which take place among the teen-agers know that the switchblade knife and the gravity knife are the weapons of the teen-age gang. This is being recognized widely as more and more States throughout this country are enacting legislation to ban switchblade knives within their borders. However,

the States themselves cannot control the shipment of these knives except within their borders. They cannot control their shipment in interstate commerce. That is the province of the Congress. That is the reason for this bill, to assist the States which do not want the knives to come within their borders from having them shipped in. The States are powerless to protect themselves from such shipments. That is a Federal matter, and this is a necessary bill.

Mr. HARRIS. Mr. Speaker, I yield 1 minute to the gentleman from Georgia [Mr. FORRESTER].

Mr. FORRESTER. Mr. Speaker, I want to ask the gentleman from Illinois, am I correct in the assertion I made or not?

Mr. YATES. The gentleman is correct.

Mr. FORRESTER. All right, sir. Is it not an elementary principle of law that there cannot be any equation of errors? I will say to the gentleman that I have looked and seen that if you send any spirtuous liquors through the mail and death results, we can punish them for murder.

Mr. YATES. That is correct.

Mr. FORRESTER. And execute them.

Mr. YATES. Yes.

Mr. FORRESTER. But is that to be used as a defense to the infirmity I pointed out? And, do we want to legislate in this kind of manner and provide that if a person sends a switchblade knife through the mail and it is used in a homicide, although the homicide was of the lowest degree, that a judge or jury could execute him?

Mr. YATES. If the gentleman examines the bill, he will note that any person who knowingly and willfully does ship such a switchblade knife through the mail and it does result in a homicide, then that gentleman is subject to the penalties of the law as any other person who handles lethal weapons.

Mr. HARRIS. Mr. Speaker, I yield 2 minutes to the gentleman from North Carolina [Mr. WHITENER].

Mr. WHITENER. Mr. Speaker, I appreciate the gentleman from Arkansas [Mr. HARRIS] yielding further to me in order that I may undertake to summarize what I sought to bring out by my questions.

It seems that this bill does not do what it is intended to do for the reason that it exempts wholesale shipments of lethal weapons and merely inveighs against the pocket-carrying violator.

And then, too, I think that we should be well advised that, if we pass this bill today, we are creating a new capital felony, as has been pointed out by the gentleman from Georgia [Mr. FORRESTER]. Now, if we are going to exempt the transportation of these weapons by common carriers and by contract carriers, we are not giving the assistance of the Federal Government to the problem at all. In reality we are still placing and keeping the burden where I think it should stay, on the law-enforcement officers within the respective States, to ferret out these teen-agers that my good friend from Illinois says they have up there carrying switchblade knives. If

my distinguished friend from Illinois has the idea that no one knows how to use switchblade knives except teen-agers I imagine we would find some down in our part of the country who could do pretty well in the use of a switchblade knife.

Mr. YATES. Mr. Speaker, will the gentleman yield?

Mr. WHITENER. I yield to the gentleman from Illinois.

Mr. YATES. The gentleman asserts that the local officers are the ones who should handle this situation. I suggest to the gentleman—and he will find it in the hearings—that the police chiefs in every jurisdiction which was contacted—and there were many—without exception supported the passage of this legislation. They cannot prevent the entry of these knives into their jurisdiction or into their States.

Mr. WHITENER. I say this, and I say it earnestly, that, if you are seeking to eliminate this alleged evil, the way to do it is to stop the wholesale transportation of these instruments of death. You cannot do it with the present legislation.

I am of the opinion that the type of Federal intervention embraced in this bill is unwarranted. The bill should be voted down and a different approach to the problem should be had.

Mr. HARRIS. Mr. Speaker, I yield myself 1 minute.

Mr. Speaker, I appreciate the sincerity of the gentleman from North Carolina and his interest and concern; but the gentleman is not correct when he says the wholesaler is exempt. The wholesaler is not exempt. He did refer to the exemption of the common and contract carriers. That is correct. The reason for that is, that when a carrier receives a shipment it does not know what is in the container. The carrier is not permitted to open up the container to examine the contents. Therefore, we provide an exemption, so far as carriers are concerned when performing their duty to the general public as carriers. That is precisely the reason why this exemption is included.

The SPEAKER. The question is on suspending the rule and passing the bill.

The question was taken; and (two-thirds having voted in favor thereof) the rules were suspended and the bill was passed.

## LICENSES TO NONCITIZENS FOR RADIO STATIONS ON AIRCRAFT

Mr. HARRIS. Mr. Speaker, I move to suspend the rules and pass the bill (H. R. 6849) to amend the Communications Act of 1934 to authorize, in certain cases, the issuance of licenses to noncitizens for radio stations on aircraft and for the operation thereof, as amended.

The Clerk read as follows:

Be it enacted, etc., That section 303 (1) of the Communications Act of 1934 is amended by inserting immediately before the semicolon at the end thereof the following: ", except that in issuing licenses for the operation of radio stations on aircraft the Commission may, if it finds that the public interest will be served thereby and that security considerations have been satisfied,

KR00029

# SWITCHBLADE KNIVES

UNIVERSITY
OF MICHIGAN

JUN 1 9 1958

MAIN
READING ROOM

# HEARING

BEFORE A

## SUBCOMMITTEE OF THE

## COMMITTEE ON

## INTERSTATE AND FOREIGN COMMERCE

## HOUSE OF REPRESENTATIVES

EIGHTY-FIFTH CONGRESS

SECOND SESSION

ON

BILLS TO PROHIBIT THE INTRODUCTION, OR MANUFACTURE
FOR INTRODUCTION, INTO INTERSTATE COMMERCE OF
SWITCHBLADE KNIVES, AND FOR OTHER PURPOSES

APRIL 17, 1958

Printed for the use of the Committee on Interstate and Foreign Commerce



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1958

24527

KR00030

## COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE

*OREN HARRIS, Arkansas, Chairman*

JOHN BELL WILLIAMS, Mississippi
PETER F. MACK, Jr., Illinois
KENNETH A. ROBERTS, Alabama
MORGAN M. MOULDER, Missouri
HARLEY O. STAGGERS, West Virginia
ISIDORE DOLLINGER, New York
WALTER ROGERS, Texas
MARTIN DIES, Texas
SAMUEL N. FRIEDEL, Maryland
JOHN J. FLYNT, Jr., Georgia
TORBERT MACDONALD, Massachusetts
GEORGE M. RHODES, Pennsylvania
JOHN JARMAN, Oklahoma
LEO W. O'BRIEN, New York
JOHN E. MOSS, California
JOHN D. DINGELL, Michigan
J. CARLTON LOSER, Tennessee

CHARLES A. WOLVERTON, New Jersey
JOSEPH P. O'HARA, Minnesota
ROBERT HALE, Maine
JOHN W. HESELTON, Massachusetts
JOHN B. BENNETT, Michigan
JOHN V. BEAMER, Indiana
WILLIAM L. SPRINGER, Illinois
ALVIN R. BUSH, Pennsylvania
PAUL F. SCHENCK, Ohio
JOSEPH L. CARRIGG, Pennsylvania
STEVEN B. DEROUNIAN, New York
J. ARTHUR YOUNGER, California
WILLIAM H. AVERY, Kansas
BRUCE ALGER, Texas
WILL E. NEAL, West Virginia

W. E. WILLIAMSON, *Clerk*
KENNETH J. PAINTER, *Assistant Clerk*

*Professional Staff*

ANDREW STEVENSON
KURT BORCHARDT

SAM G. SPAL
MARTIN W. CUNNINGHAM

## SUBCOMMITTEE ON COMMERCE AND FINANCE

PETER F. MACK, Jr., Illinois, *Chairman*

MORGAN M. MOULDER, Missouri
ISIDORE DOLLINGER, New York
JOHN JARMAN, Oklahoma
JOHN E. MOSS, California

JOHN B. BENNETT, Michigan
JOHN V. BEAMER, Indiana
WILLIAM H. AVERY, Kansas
BRUCE ALGER, Texas

II

KR00031

DEPOSITED BY THE
UNITED STATES OF AMERICA

# CONTENTS

| | Page |
|---|---|
| Text of— | |
| H. R. 4956 | 1 |
| H. R. 7258 | 2 |
| H. R. 9820 | 3 |
| H. R. 10618 | 4 |
| H. R. 11289 | 5 |
| Report of— | |
| Army Department on— | |
| H. R. 7258 | 7 |
| H. R. 9820 | 10 |
| H. R. 10618 | 11 |
| Bureau of the Budget on— | |
| H. R. 7258 | 7 |
| H. R. 9820 and H. R. 10618 | 10 |
| Commerce Department on— | |
| H. R. 7258 | 7 |
| H. R. 9820 and H. R. 10618 | 9 |
| Justice Department on— | |
| H. R. 7258 | 6 |
| H. R. 9820 and H. R. 10618 | 9 |
| Post Office Department on H. R. 7258, H. R. 9820, and H. R. 10618 | 8 |
| Statement of— | |
| Addonizio, Hon. Hugh J., a Representative in Congress from the State of New Jersey | 31 |
| Delaney, Hon. James J., a Representative in Congress from the State of New York | 12 |
| Kelly, Hon. Edna F., a Representative in Congress from the State of New York | 28 |
| Yates, Hon. Sidney R., a Representative in Congress from the State of Illinois | 16 |
| Additional information submitted for the record by— | |
| Izaak Walton League of America, Inc., letter from J. W. Penfold, conservation director | 19 |

III

KR00032

# SWITCHBLADE KNIVES

## THURSDAY, APRIL 17, 1958

House of Representatives,
Subcommittee on Commerce and Finance, of the
Committee on Interstate and Foreign Commerce,
*Washington, D. C.*

The subcommittee met at 10 a. m., pursuant to call, in room 414, Old House Office Building, Hon. Peter F. Mack, Jr. (chairman of the subcommittee) presiding.

Mr. Mack. The committee will come to order.

The Commerce and Finance Subcommittee of the Committee on Interstate and Foreign Commerce is meeting this morning to hold hearings on H. R. 4956 by Mr. Teller, H. R. 7258 by Mr. Yates, H. R. 9820 by Mr. Delaney, H. R. 10618 by Mrs. Kelly of New York, and H. R. 11259 by Mr. Addonizio, bills to prohibit the introduction, or manufacture for introduction, into interstate commerce, of switchblade knives. The latter three bills are identical.

As the title of these bills indicates, the purpose of the legislation is to prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, of automatic knives, commonly referred to as switchblade knives, the blades of which open automatically either by hand pressure applied to a button or other device or by the operation of inertia or gravity.

A copy of these bills will be inserted in the record at this point, together with all the reports from the executive departments and agencies.

(The material referred to follows:)

[H. R. 4956, 85th Cong., 1st sess.]

A BILL To prohibit the introduction, or manufacture for introduction, into interstate commerce, of switchblade knives, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, as used in this Act—

(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

(b) The term "switchblade knife" means any knife having a blade which opens automatically by hand pressure applied to a button or other device in the handle of the knife.

Sec. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

Sec. 3. Whoever, within any Territory or possession of the United States within Indian country (as defined in section 1151 of title 18 of the United States Code), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18 of the United States Code), manufac-

1

2                          SWITCHBLADE KNIVES

tures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

Sec. 4. Sections 2 and 3 of this Act shall not apply to any common carrier, contract carrier, or freight forwarder with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business.

Sec. 5. This Act shall take effect on the sixtieth day after the date of its enactment.

---

[H. R. 7258, 85th Cong., 1st sess.]

A BILL To prohibit the introduction, or manufacture for introduction, into interstate commerce, of switchblade knives, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, as used in this Act—

(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

(b) The term "switchblade knife" means any knife having a blade which opens automatically by hand pressure applied to a button or other device in the handle of the knife.

Sec. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

Sec. 3. Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18 of the United States Code), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18 of the United tSates Code), manufactures, sells, or possesses any switchblade knife, shall be fined not more than $2,000 or imprisoned not morethan five years, or both.

Sec. 4. Sections 2 and 3 of this Act shall not apply—

(1) to any common carrier, contract carrier, or freight forwarder with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;

(2) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;

(3) to supply and procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

(4) to supply and procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such governments; and

(5) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3).

Sec. 5. Section 1716 of title 18 of the United States Code is amended by inserting immediately after the sixth paragraph thereof the following new paragraph:

"All knives having a blade which opens automatically by hand pressure applied to a button or other device in the handle of the knife are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—

"(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;

"(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

KR00034

"(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and

"(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3)."

SEC. 6. This Act shall take effect on the sixtieth day after the date of its enactment.

[H. R. 9820, 85th Cong., 2d sess.]

A BILL To prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

(b) The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both.

SEC. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 3. Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18 of the United States Code), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18 of the United States Code), manufactures, sells, or processes any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 4. Sections 2 and 3 of this Act shall not apply to—

(a) any common carrier, contract carrier, or freight forwarder with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;

(b) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to contract with the Armed Forces; or

(c) possession by a member of the Armed Forces of a switchblade knife issued to him by the Federal Government.

SEC. 5. Section 1716 of title 18 of the United States Code is amended by inserting immediately after the sixth paragraph thereof the following new paragraph:

"All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—

"(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;

"(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

"(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and

KR00035

4                              SWITCHBLADE KNIVES

"(4) to manufactures of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3)."

SEC. 6. This Act shall take effect on the sixtieth day after the date of its enactment.

———

[H. R. 10018, 85th Cong., 2d sess.]

A BILL To prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

(b) The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both.

SEC. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 3. Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18 of the United States Code), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18 of the United States Code), manufactures, sells, or processes any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 4. Sections 2 and 3 of this Act shall not apply to—

(a) any common carrier, contract carrier, or freight forwarder with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;

(b) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to contract with the Armed Forces; or

(c) possession by a member of the Armed Forces of a switchblade knife issued to him by the Federal Government.

SEC. 5. Section 1716 of title 18 of the United States Code is amended by inserting immediately after the sixth paragraph thereof the following new paragraph:

"All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—

"(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;

"(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

"(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and

"(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3)."

SEC. 6. This Act shall take effect on the sixtieth day after the date of its enactment.

KR00036

Case 1:11-cv-03918-KBF-RLE   Document 134-4   Filed 03/11/16   Page 16 of 33

[H. R. 11259, 85th Cong., 2d sess.]

A BILL To prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

(a) The term "interstate commerce" means commerce between any State, Territory, possession of the United States, or the District of Columbia, and any place outside thereof.

(b) The term "switchblade knife" means any knife having a blade which opens automatically—

(1) by hand pressure applied to a button or other device in the handle of the knife, or

(2) by operation of inertia, gravity, or both.

SEC. 2. Whoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 3. Whoever, within any Territory or possession of the United States, within Indian country (as defined in section 1151 of title 18 of the United States Code), or within the special maritime and territorial jurisdiction of the United States (as defined in section 7 of title 18 of the United States Code), manufactures, sells, or processes any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both.

SEC. 4. Sections 2 and 3 of this Act shall not apply to—

(a) any common carrier, contract carrier, or freight forwarder with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business;

(b) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce, of switchblade knives pursuant to contract with the Armed Forces; or

(c) possession by a member of the Armed Forces of a switchblade knife issued to him by the Federal Government.

SEC. 5. Section 1716 of title 18 of the United States Code is amended by inserting immediately after the sixth paragraph thereof the following new paragraph:

"All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—

"(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;

"(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;

"(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and

"(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3)."

SEC. 6. This Act shall take effect on the sixtieth day after the date of its enactment.

KR00037

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., May 20, 1957.*

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce,*
      *House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 7258) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 12, 1957, the Department of Justice reported to the committee on two similar bills, H. R. 2849 and H. R. 4013. The views expressed in that report, copies of which are enclosed, are equally applicable to the bill now under consideration.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

     Sincerely,

                             WILLIAM P. ROGERS,
                             *Deputy Attorney General.*

                             APRIL 12, 1957.

Hon. OREN HARRIS,
   *Chairman, Committee on Interstate and Foreign Commerce,*
      *House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the bills (H. R. 2849 and H. R. 4013) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The bills would prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, of switchblade knives. They would also prohibit the manufacture, sale, or possession of switchblade knives within Indian country as defined in section 1151 of title 18 of the United States Code, or within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18. Violators would be subject to a maximum fine of $2,000 and/or imprisonment for not more than 5 years. Section 4 of H. R. 2849 would exempt from its application common carriers, contract carriers, and freight forwarders with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business. Section 4 of H. R. 4013 would provide a similar exemption, plus two others. It would exempt the manufacture, sale, transportation, distribution, possession, or introduction of switchblade knives into interstate commerce pursuant to contract with the Armed Forces. Also, it would exempt the possession of switchblade knives by members of the Armed Forces to whom such knives were issued by the Federal Government.

The Department of Justice is unable to recommend enactment of this legislation.

The Committee may wish to consider whether the problem to which this legislation is addressed is one properly within the police powers of the various States. As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is not inherently dangerous but requires the introduction of a wrongful human element to make it so.

Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful, and even essential, purposes in the hands of persons such as sportsman, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

     Sincerely,

                             WILLIAM P. ROGERS,
                             *Deputy Attorney General.*

KR00038

7

THE SECRETARY OF COMMERCE,
*Washington, D. C., June 25, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated May 8, 1957, for the views of this Department with respect to H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

H. R. 7258 would prohibit and prescribe penalties for the manufacture, sale, or possession of switchblade knives, and their mailing or their introduction into interstate commerce. Exemptions from these prohibitions would include supply or procurement officers and employees of the Federal Government, of the municipal government of the District of Columbia, of the government of any State, Territory, county, city, or other subdivision of a State or Territory; supply and procurement officers (but not the members, it appears) of the National Guard, the militia of a State, Territory, or the District of Columbia, when any of these persons are acting in connection with the activities of such governments and organizations. The Department of Commerce does not recommend enactment of H. R. 7258.

While this proposed legislation recognizes that there are legitimate uses that have need for switchblade knives, the exemptions would appear to assume that the most significant of those uses lie in Government activities. To us, this ignores the needs of those who derive and augment their livelihood from the "outdoor" pursuits of hunting, fishing, trapping, and of the country's sportsmen, and many others. In our opinion, there are sufficient of these that their needs must be considered.

Again, we feel that the problem of enforcement posed by the many exemptions would be huge under the proposed legislation.

For these reasons, the Department of Commerce feels it cannot support enactment of H. R. 7258.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., June 13, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, House Office Building, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in reply to your letter of May 8, 1957, requesting the views of the Bureau of the Budget on H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 1, 1957, in reporting to your committee on two similar bills, H. R. 2849 and H. R. 4013, the Bureau of the Budget pointed out that the Departments of Commerce and Justice had raised serious questions as to whether this problem is more properly a subject for the police powers of the States.

The Bureau of the Budget believes that these questions are equally applicable to H. R. 7258 and has no further comment to offer at this time.

Sincerely yours,

PERCY RAPPAPORT,
*Assistant Director.*

DEPARTMENT OF THE ARMY,
*Washington, D. C., July 16, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 7258, 85th Congress, a bill to pro-

hibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.  The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army on behalf of the Department of Defense would interpose no objection to enactment of the bill, provided it is amended to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation or distribution of switchblade knives by the Armed Forces or members and employees thereof acting in the performance of their duties, thereby expanding the exemption pertaining to the ordering, procuring, or purchasing of such weapons by those persons which now appears in section 4 (2) of the bill. This amendment could be accomplished by amending section 4 (2) of the bill to read as follows: "(2) to the Armed Forces or any member or employee thereof acting in the performance of his duty."

It is noted also that section 4 (5) does not extend the exemption to manufacturers of or bona fide dealers in switchblade knives in connection with shipments to persons designated in section 4 (4).

Subject to the foregoing, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 7258, 85th Congress, which is similar to H. R. 4013, 85th Congress, on which this Department submitted a similar report to your committee on April 12, 1957.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
Secretary of the Army.

POST OFFICE DEPARTMENT,
OFFICE OF THE GENERAL COUNSEL,
Washington, D. C., April 16, 1958.

Hon. OREN HARRIS,
Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.

DEAR MR. CHAIRMAN: Reference is made to your request for a report on H. R. 7258, H. R. 9820, and H. R. 10618, similar bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The attention of this Department has been directed to advertisements in newspapers and magazines with respect to knives which, according to the advertisements may be ordered for transmission through the mails collect-on-delivery. Obviously, weapons advertised in this manner can be purchased by anyone. The so-called Army surplus stores, hardware and other stores, carry similar weapons. The question of how to prevent their reaching the wrong hands is more than a Federal problem and difficult of solution. Many States have laws prohibiting concealed carrying of knives with blades over designated lengths.

Although the mailing of firearms is controlled by statute (18 U. S. C. 1715), the mailing of hunting knives, switchblade knives, and other similar weapons is not so controlled.  Any one of the subject bills would do much to correct this situation.  However, in order to eliminate controversy as to the procedure to be followed in the enforcement of this proposed law, it is believed that section 5 of the bill should be supplemented by the addition of the following paragraph:

"The mailability of any such knife may be determined by the Postmaster General by inspection thereof and upon the failure or refusal of the sender to explain satisfactorily to the Postmaster General, in writing, why the postal regulations prescribed in accordance with this act were not complied with."

This Department recommends enactment of the legislation contained in section 5 of the measures, amended as suggested.

In advising this Department with respect to this report the Bureau of the Budget called attention to the fact that it had cleared the reports of the Departments of Commerce and Justice which objected to those portions of the subject

KR00040

SWITCHBLADE KNIVES 19

bills which would prohibit the introduction of switchblade knives into interstate commerce.

The Department of Justice has raised the question as to whether the amendment suggested by this Department would be broad enough to authorize the inspection of first-class mails without a search warrant. It is the opinion of this Department that the language would not authorize such inspection, nor was such procedure intended.

Sincerely yours,

HERBERT B. WARBURTON,
*Acting General Counsel.*

THE SECRETARY OF COMMERCE,
*Washington, D. C., April 21, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated January 9, 1958, for the views of this Department with respect to H. R. 9820, and your request of February 13, 1958, with respect to H. R. 10618, identical bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

These bills differ only slightly from H. R. 7528, which was introduced for the same general purposes during the 1st session of the 85th Congress. In the present bills the definition includes knives which open automatically "by operation of inertia, gravity, or both." Also, the present bills prescribe penalties for the manufacture, sale, or processing of switchblade knives, whereas the earlier bill dealt with manufacture, sale, or possession.

The general intent of these legislative proposals appears to be to improve crime prevention by control of the use of the switchblade knife as a weapon of assault. This approach gives rise to certain objections. One is that, at best, it is an indirect approach which addresses itself to only one of many implements usable by an assailant. This casts doubt upon the resulting effectiveness in the reduction of crime in relation to its enforcement problems. Another objection is that it could lead to the elimination of the legitimate supply of switchblade knives in this country. This would ignore the legitimate needs and uses for these knives on the part of those who derive and augment their livelihood from "outdoor" pursuits, such as hunting, fishing, trapping, etc., as well as those of the country's sportsmen, and many others. We feel that these objections are valid.

In thus expressing our views we do not wish to be construed as taking a light view regarding the widespread use of the switchblade knife as a dangerous and lethal weapon. In view of the apparent relation between the switchblade knife and juvenile delinquency, we would strongly support the enactment and vigorous enforcement of appropriate legislation prohibiting sale of switchblade knives to, and their possession by, juveniles, to the extent such sale and possession can be found to be subject to Federal jurisdiction.

Not being convinced that H. R. 9820 and H. R. 10618 would yield desirable results outweighing their undesirable ones, this Department recommends against enactment of these bills.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS, *Secretary of Commerce.*

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., March 14, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the identical bills (H. R. 9820 and H. R. 10618) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

KR00041

Except as to section 5 and except for two other minor differences, these bills are identical with H. R. 2849 and H. R. 4013 on which the Department reported to the committee on April 12, 1957. The views expressed in that report, copies of which are enclosed, are equally applicable to the bills under consideration.

As for section 5 of the instant bills, it is noted that section 1716 of title 18, United States Code, which it would amend, deals with the mailability of articles intrinsically dangerous. Section 1715, on the other hand, deals with the mailability of firearms, items more analogous to switchblade knives in that both require the introduction of a wrongful element to make them dangerous. Therefore, if the committee is favorably disposed to recommend the amendment of title 18 with respect to the mailability of switchblade knives, section 1715 would seem to be the more appropriate section for such amendment.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely yours,

LAWRENCE E. WALSH,
*Deputy Attorney General.*

(NOTE.—The report on H. R. 2849 and H. R. 4013, referred to in the above letter, appears on p. 6.)

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., April 15, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, House Office Building, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This will acknowledge your letters of January 9, 1958, and February 13, 1958, requesting the views of this Office with respect to H. R. 9820 and H. R. 10618, bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The Bureau has previously reported to your committee in connection with H. R. 2849 and H. R. 4013 on April 1, 1957, and H. R. 7238 on June 13, 1957. On those occasions, we pointed out that the Departments of Commerce and Justice had raised serious questions as to whether the problem is not more properly a subject for the police powers of the various States. These questions appear to be equally applicable to those sections of the subject bills controlling the introduction of switchblade knives in interstate commerce.

With respect to section 5 of the bills which would make such knives nonmailable, the Postmaster General, in the reports which he is making to your committee, recommends enactment subject to certain procedural amendments set forth in his report.

While we have doubts as to the effectiveness of such limitation in controlling the wrongful use of switchblade knives, this Bureau would have no objection to the enactment of those provisions of the bills dealing with mailability of switchblade knives if amended as suggested by the Postmaster General.

Sincerely yours,

PHILLIP S. HUGHES,
*Acting Assistant Director for Legislative Reference.*

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 9820, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above-mentioned bill provided it is amended to

KR00042

## SWITCHBLADE KNIVES

exempt Armed Forces operations from the prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) By the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) Pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 9820, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

DEPARTMENT OF THE ARMY,
*Washington 25, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 10618, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above mentioned bill provided it is amended to exempt Armed Forces operations from the prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives.

(1) By the Armed Forces or any member or employee thereof acting in the performance of his duty or

(2) Pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, section 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 10618, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

KR00043

Mr. MACK. Our first witness this morning is our colleague from New York, Mr. Delaney, who has had a long, continuing interest in the problem.

We are very happy to have you testify, Mr. Delaney.

## STATEMENT OF HON. JAMES J. DELANEY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK

Mr. DELANEY. Mr. Chairman and members of the committee, I appreciate this opportunity to appear before you in support of H. R. 9820. This bill would prohibit the manufacture of switchblade and gravity knives for the purpose of introduction into interstate commerce. It would prohibit their transportation or distribution in interstate commerce and their importation from abroad. It would close the mails to them.

It was back in 1953 that a wave of switchblade stabbings in and around the New York area brought to my attention the threat to public safety caused by the use of these knives. To determine whether it was a local or a countrywide problem, I made a 1-man review and addressed inquiries to the police heads of some 40 of our largest and medium-sized cities. The response established beyond doubt that switchblades are commonly involved in crimes in smaller cities as well as in the metropolitan areas.

As a result of this survey, in January 1954, I introduced the first bill to prohibit traffic in switchblades. Hearings were held but no action resulted.

Since that time the menace of the switchblades has grown by leaps and bounds. Several of my colleagues have become aware of the danger that the switchblade knives present and have introduced bills for a purpose similar to mine.

It is worthy of note that last year the Senate Subcommittee on Juvenile Delinquency instituted an extensive study and field investigation of the switchblade situation particularly in relation to juveniles. The results of this study not only confirmed but emphasized the findings of my earlier survey. The committee found that over a million switchblades are distributed and sold each year in this country and that of these some 200,000 are imported. It was estimated that over 5 million of these knives have been sold principally to juveniles in the past 5 years. A large proportion of the knives are sold at a price within the reach of teen-agers.

As a result of the Senate subcommittee investigation, Senator Kefauver, Senator Hennings, Senator Clark, and Senator Butler introduced S. 2558, which is designed for much the same purpose as the House bills.

On July 16, 1957, Senator Kefauver addressed the Senate emphasizing the need for such legislation. In his remarks he gave much of the information gathered in the committee study. Since it was a recent investigation and national in scope, I believe the information should be of interest to this committee. I have here a copy of the Senator's remarks if the committee wishes to have it for reference. If not, the statement may be found in the Congressional Record of July 16, 1957, on pages 10648, 10649, and 10650. There has been no action on the Senate bill, but I believe the Senate committee performed a service in its research on the subject.

KR00044

Mr. Chairman, I believe an examination of the information contained in Senator Kefauver's remarks, plus a review of the police statements which I submitted at the 1954 hearings, will convince the committee of the necessity of Federal action.

Here I might add that it came to my attention just this morning that the latest report of the Senate Juvenile Deliquency Committee was issued last week and contains a summary of the switchblade investigation. For some reason a copy failed to reach my office, but your committee may wish to refer to it for additional data.

My present bill deals not only with switchblades but is also designed to meet a situation which has developed in New York and other States which already have switchblade legislation on the books.

In order to get around the switchblade prohibition in these States so-called gravity knives are coming into circulation. These knives are similar to the ones used by the German paratroopers in the last war. They open and lock automatically at a quick flick of the wrist. Technically they are not switchblades since they do not open as the result of spring action or by hand pressure applied to a button or other devices in the handle.

H. R. 9820 covers these gravity knives as well as the switchblades. The question has been asked, why is Federal legislation required on this matter? Will not municipal and State action take care of it? The answer is that only a limited number of States have any laws relative to these knives. As a result, the knives are bootlegged into these States from other States that have no prohibitory statutes, or are sent through the mails. Elsewhere they are sold openly. City ordinances are somewhat of a deterrent but they are by no means sufficiently effective. Police answers to my survey and to subsequent surveys amply substantiate this statement. The only solution to the switchblade and gravity knife menace is to pass Federal legislation to prohibit the introduction, or the manufacture for introduction, of these weapons into interstate commerce, to close the mails to them, and to ban their importation.

Switchblade and gravity knives have no possible legitimate use. They can do nothing worthwhile that other types of knives cannot do better. A fish knife is more useful to a fisherman and a hunting knife to a hunter. Switchblades are good for just one thing and that is a sneak attack.

The appalling situation in the cities throughout the country should bring home to us the urgent need for action. Every day our newspapers report numerous muggings and attacks, most of them involving knives. Can we sit by complacently and ignore the bloodshed in our streets? Doing away with switchblades will not be a cure-all for the crimewave sweeping the Nation, but it will remove one of the favorite weapons of our juvenile and criminal element. This will afford the public added protection and give valuable assistance to our hard-pressed local law-enforcement agencies.

Mr. Chairman, there is no question as to the need. The time for the action is now.

Mr. MACK. Thank you, Mr. Delaney.

Senator Kefauver's statement, to which you referred, will be received for our files if that is agreeable to you.

Mr. Dollinger, do you have questions?

26527—58——3

KR00045

Mr. DOLLINGER. I think Mr. Delaney made a very fine statement. I am in full accord with his views. I know that the problem is in the city of New York.

The only question I want to ask you, Mr. Delaney, is that on page 2 of your bill, section 4, you say that the act shall not apply to any common carrier, contract carrier, or freight forwarder. Now, it has been brought to my attention that the freight forwarders are included in common carriers. There is no distinction between the two. Why do you use the words "freight forwarder?" Would there be any objection on your part to eliminating the words "freight forwarder?"

Mr. DELANEY. I would consent to that. It was to cover all avenues that that was inserted.

Mr. DOLLINGER. They felt that there was no reason to put that in because if you include freight forwarders you have to include railroads and express companies and all others.

Mr. DELANEY. We can move right now to amend that or when you consider the bill to strike out those words. I have no objection.

Mr. DOLLINGER. I have no further questions.

Mr. MACK. Which section is that?

Mr. DOLLINGER. Section 4, page 2, line 17. It says:

any common carrier, contract carrier, or freight forwarder * * *.

Freight forwarders are common carriers by law.

I have no further questions.

Mr. MACK. Mr. Alger?

Mr. ALGER. I have no questions, Mr. Chairman.

Mr. MACK. Mr. Jarman?

Mr. JARMAN. Mr. Chairman, I would like to join in welcoming our colleague to the committee session today and complimenting him on his very effective testimony.

The one question I would like to ask, Congressman Delaney, is what opposition if any would you anticipate?

Mr. DELANEY. The only opposition that I ran across was that in 1 or 2 States there were manufacturers who claimed that it would interfere with their business.

At the hearings in 1954 one member suggested that fishermen find switchblades useful.

I am a fisherman and all a fisherman has to do is strap on a holder and put his regular knife in that. I do some surf casting and know the necessity of having a knife ready. Take a fisherman's knife—you do not have to flick it open. These switchblades, as a rule, get rusty along the salt water or the fresh water so that a plain open hunting knife or fishing knife will do the job much more efficiently.

I might say that prior to coming to Congress I was assistant district attorney in Queens County. For many years I was in charge of the county court which tries all the major cases and during the year before I came here I took over cases before the grand jury. There I would have maybe 40 or 50 of them; every major case in that county of 1,800,000 passed through my hands, and I made every presentment to the grand jury. At that time we had few switchblade cases and it was not until about 1949 or 1950 that these things came into common usage. In the gathering of juvenile gangs and clans, nearly every one of them has a switchblade. It is a ritual with some of them to carry switchblades. It is not only the boys, but I was

Case 1:11-cv-03918-KBF-RLE   Document 134-4   Filed 03/11/16   Page 26 of 33

surprised to find that a great number of girls carry them also. They carry them in their purses. It is unbelievable.

The last time I testified here I had the Washington police send up switchblades that they had taken right here in the District from people arrested and some of them had very long and sharp blades. I want to tell you that they are formidable weapons—particularly when they are pushed in front of you and put at your throat. You can imagine the fright, particularly of elderly people.

I think that we need this legislation. I can find no possible objection except that 1 or 2 people thought that it might work a hardship to some of the manufacturers. There would not be more than two manufacturers, I think, in the whole United States.

Mr. JARMAN. Does the New York State law prohibit the manufacture in New York of these knives?

Mr. DELANEY. Within New York, yes, and also the sale, and so forth. They used to be sold at Grand Central right there at, I think, Hoffritz. They would have these big bright blades in the window.

A bill was introduced by one of my local assemblymen and it finally passed in the Legislature of the State of New York.

Mr. DOLLINGER. Would you not admit that the hoodlums also would oppose the passage of this law?

Mr. DELANEY. Of course, they would be opposed to anything that might interfere with their activities. I think that the real menace for the most part is with the teen-agers. The knives are not only used in crimes but in the youngsters own wars against one another.

We had a conviction only yesterday in New York and the judge that conducted the case was a former member, Irwin Davidson, who is now a judge in general sessions. There were some 15 or 20 boys that were up for murder. Some of them were convicted of murder in the second degree, some of manslaughter, and some acquitted. A paralyzed boy had been attacked by them.

Day after day I pick up the papers. Formerly, whenever there was a switchblade occurrence I used to cut out the report; but I had so many of them that I eventually had to throw them out. You cannot read the newspapers any day and not find some reference to a switchblade attack. I suppose, Mr. Yates, that in Chicago you must have a similar situation. It is not only in the big cities but this has spread in the small places.

Mr. ALGER. The thought occurred to me that obviously denying one weapon to kids bent on mischief will not stop the mischief. This will be partly a concealment factor, the fact that another weapon will be harder to conceal.

Mr. DELANEY. That is right. I am sorry I did not bring some switchblades along. Some of them are that long when they are folded, of course, they are half the size. Youngsters can put them in a bag or in their coat pocket or jacket pocket. As they take them out the thing springs open. The gravity knife was something that the German paratroopers used. By a flick of the wrist and gravity it opens without the switchblade mechanism.

Mr. ALGER. They would be easier to apprehend with another weapon rather than a switchblade?

In these gang wars, you see the crowd of boys or girls gathering, and then up a few more streets you can see them there. Often, when

the police raid them, nearly all have switchblades.  In addition, they now have these great heavy buckled belts and switch them back and forth.  They have learned how to do that pretty well.

Mr. DOLLINGER. They also use guns that have been made unworkable.  They take the old barrel off and put on new barrels, do they not?

Mr. DELANEY. They do everything.  I have seen guns like a fountain pen or a syringe.

Mr. DOLLINGER. They are home-made guns.

Mr. DELANEY. They are almost all home-made guns.  You exert pressure and a spring device lets go and fires a bullet.  The kids get into these wars and pull a gun and the first thing a bullet is exploded and hits one of the opponents.

Mr. DOLLINGER. They show the things on TV so that the kids can watch it.

Mr. DELANEY. I think the TV has something to do with it because it shows them how to operate.

Mr. MACK. I hesitate to detain you, Mr. Delaney.

I wanted to ask, is this a similar bill to the one you have in the State of New York?

Mr. DELANEY. Well, I have not compared them in detail.

Mr. MACK. My question is this:  Are you operating in New York on the concealed-weapon arrangement or on transportation?

Mr. DELANEY. Not on transportation but on sale and also manufacturing.  The sale is the principal thing.

Mr. MACK. You do not approach the problem by concealment.

Mr. DELANEY. I am not sure whether it is included.  I have not looked at the bill for some time.  It has been some 4 years since it was passed in New York.

Mr. MACK. You did not point out the differences between your bill and Mr. Yates' bill.

Mr. DELANEY. I have not analyzed any one else's bill.

Mr. MACK. We will leave that to Mr. Yates.

Thank you.

Our next witness is my very good friend and colleague from the State of Illinois, who has been long interested in the problem of juvenile delinquency in Chicago as well as throughout the entire country.  At this time we would like to hear from Congressman Sidney Yates.

## STATEMENT OF HON. SIDNEY R. YATES, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF ILLINOIS

Mr. YATES. Thank you very much for your gracious remarks.

I deeply appreciate the opportunity to make a statement on behalf of H. R. 7258, which I introduced in the first session of the present Congress.

My bill would prohibit the introduction into interstate commerce of switchblade knives.

I want, too, to pay my respects to your preceding witness, Congressman Delaney from New York, who told such a graphic story today about the need for this legislation.  Everything he said is valid.

These bills are important. They will prohibit the manufacture of switchblade knives for introduction into interstate commerce and the subsequent transportation and distribution of such weapons.

Whoever knowingly violates the provisions of the law will be subject to a maximum penalty of $2,000 or 2 years in prison, or both.

The same punishment would be meted out to any persons manufacturing, or possessing any switchblades knife within any Territory or possession of the United States, within Indian country, or within the special maritime and territorial jurisdiction of the United States as defined in the United States Code.

When I introduced this bill during the last session of Congress, I reminded the House of the vicious trend that juvenile crime was taking. This trend, unfortunately, has continued unabated. I am more than ever convinced that H. R. 7258 deserves more urgent consideration at this time than when it was first introduced.

Mr. Chairman frequently, as Congressman Delaney pointed out—much too frequently—newspapers and magazines are filled with descriptions of gang fights, holdups and stabbings, committed by teen-agers, and running through almost all such stories is the switchblade knife. The gruesome similarity in detail related by these stories is relieved only by the horror that each one reflects individually—the terror of the victim, the revulsion of the newspaper reader, and the terrifying realization that the perpetrators of these crimes are still in their teens. The switchblade knife has become the symbol, as well as the weapon of the teen-age gang.

Some of you may not be as familiar with the switchblade knives and I brought some along which I requested from the Metropolitan Police Department of the District of Columbia. When I delivered my speech on the floor of the House last year I had a switchblade knife that was fully 9 inches long. I asked the Metropolitan Police Department for some knives that I could show to the committee this year, and they came up and gave me six of them, which I have on the table.

One of the most common is the Italian stiletto form. You can see how this thing works. It is a very ugly knife, as you can see.

Mr. AVERY. I am convinced about these.

Mr. YATES. This is fundamentally a problem of the big towns and cities. I had to sign a receipt to obtain these knives because it is illegal to possess knives of this type in the District of Columbia. If I were not a Member of Congress I would have to be deputized as a member of the police force in order to get them.

How did the people in the District get these knives? The District does not want them. They are outlawed by the code of the District of Columbia. But they are shipped in via the mail or by some other carrier. That is why, of course, the bill has been introduced to prevent their being shipped in interstate commerce and to prevent their being manufactured for shipment in interstate commerce.

Obviously, as you look at these knives you see that this is not the type of knife we used as boys or that the Boy Scouts use.

This is a weapon used almost exclusively for strongarm purposes.

The addition of the spring mechanism changes the character of the knife from any Dr. Jekyll pocket blade quality to the Mr. Hyde instrument of violence.

18                                SWITCHBLADE KNIVES

Today there is no legal barrier whatever to ordering a knife of this type through the mail or by any common carrier operating in interstate commerce. As a matter of fact, we find them being advertised by mail-order houses, in sports magazines, and in outdoor magazines.

Mr. DOLLINGER. Would you call this a switchblade knife?

Mr. YATES. No; it has no automatic mechanism.

Mr. AVERY. Mr. Chairman, while the gentleman is interrupted, there is a question which has come up from the statements you made just now.

Would your bill, and very frankly I have not read it, preclude the advertising as well as the shipment of the switchblades?

Mr. YATES. No, it does not preclude advertising. It precludes the shipment and manufacture for shipment in interstate commerce of switchblade knives.

Mr. AVERY. When you conclude your statement, would you comment on what your views might be on including the advertising?

Mr. YATES. Well, I can state now that if it is illegal to ship these knives in interstate commerce I would think that there would be no advertising for that purpose and I would think that there would be no necessity for the prohibition.

Mr. AVERY. Yes, because conceivably they could advertise them in a comic book in New York City and manufacture them in New York and could distribute them in interstate commerce.

Mr. YATES. If it is not in interstate commerce there is nothing we can do about it.

Mr. AVERY. Except that you could preclude the advertising that might flow in interstate commerce, could you not?

Mr. YATES. I think that is likely except that I think that this would tend to give leads as to those who were violating this law if passed. I would not think that any person would want to subject himself to possible criminal violation and harassment under those circumstances.

Mr. AVERY. Thank you.

Mr. YATES. You are welcome.

Now, I have seen some of these advertisements. I have not brought them along. The advertisements for switchblade knives in popular magazines state that its purpose is for self-defense or for hunting or fishing emergencies. For what reason would a youngster, or even an adult for that matter, have to carry weapons for self-defense? Our country is not a bloody battlefield. In spite of the stories we read every day we are still a law-abiding citizenry. We do not condone gang warfare. We have not reached the point where we want our youth to be armed for their own defense or resort to weapons of this type or to cunning or brute strength for protection rather than relying upon the police.

The police are and must continue to be our guardians. Invitations to our children such as appear in such advertisements, to meet violence with violence, are very harmful.

I think your suggestion is good, but I think this is something that the newspapers and advertisers have to go into. They increase tremendously the work of the police departments.

What kind of hunting or fishing emergencies could possibly require an instrument of that type?

KR00050

As Congressman Delaney pointed out, the usual hunting or fishing knife is carried in a sheath on a belt. As a matter of fact, I checked this matter with the Izaak Walton League of America. I wrote a letter to them last year and received a reply on May 27, 1957. I would like to read it to you.

DEAR MR. YATES: We have your recent letter with respect to H. R. 7258, the legislation which you have introduced to ban the shipping of switchblade knives in interstate commerce. You asked what the league's position on this bill would be, and if its enactment would place a burden on sportsmen's clubs.

The Izaak Walton League has no policy on this matter to my knowledge. Many of our State divisions and local chapters have firmly resisted State or municipal legislation which would restrict the ownership and use of sporting arms in efforts to control the ownership of weapons by thugs. Generally, I believe our membership does not believe that such legislation would achieve its objective but would hinder and thwart the law-abiding citizen in his use of arms for sporting purposes. Whether the membership would carry that same thinking over to legislation on other items which could be used as weapons, I do not know, and cannot until it comes before our national convention. Consequently the following comments are personal strictly.

I have never seen a sportsman in Western States use a switchblade knife for either hunting or fishing.

This is the conservation director of the Izaak Walton League.

Most sportsmen prefer the sheath-type knife as they are much easier to keep clean. Since getting your letter I've talked with a good many others out here, and they think the same. I am not as familiar with sportsmen habits in the East, so have talked with many of them recently. I understand that there are quite a few switchblade knives used in the East, many or perhaps most of them purchased mostly as souvenirs while in the armed services in Europe.

I desire to introduce this letter in the record, Mr. Chairman, rather than reading the whole thing at this time.

Mr. MACK. The letter will be received.

(The letter referred to follows:)

THE IZAAK WALTON LEAGUE OF AMERICA, INC.,
*Chicago, Ill., May 27, 1957.*

Hon. SIDNEY R. YATES,
*House of Representatives, Washington, D. C.*

DEAR MR. YATES: We have your recent letter with respect to H. R. 7258, the legislation which you have introduced to ban the shipping of switchblade knives in interstate commerce. You asked what the league's position on this bill would be, and if its enactment would place a burden on sportsmen's clubs.

The Izaak Walton League has no policy on this matter to my knowledge. Many of our State divisions and local chapters have firmly resisted State or municipal legislation which would restrict the ownership and use of sporting arms in efforts to control the ownership of weapons by thugs. Generally, I believe our membership does not believe that such legislation would achieve its objective but would hinder and thwart the law-abiding citizen in his use of arms for sporting purposes. Whether the membership would carry that same thinking over to legislation on other items which could be used as weapons, I do not know, and cannot until it comes before our national convention. Consequently the following comments are personal, strictly.

I have never seen a sportsman in Western States use a switchblade knife for either hunting or fishing.

Most sportsmen prefer the sheath-type knife as they are much easier to keep clean. Since getting your letter I've talked with a good many others out here, and they think the same. I am not as familiar with sportsmen habits in the East, so have talked with many of them recently. I understand that there are quite a few switchblade knives used in the East, many or perhaps most of them purchased mostly as souvenirs while in the armed services in Europe.

Should sportsmen clubs be exempt under such legislation as proposed, I would think it entirely unworkable. I understand some States already have com-

KR00051

parable intrastate legislation; I'd be curious to know how it's working out in such States.

Appreciate your invitation to comment on your legislation and am sorry I cannot give a more helpful reply.

Sincerely,

J. W. PENFOLD, *Conservation Director.*

Mr. YATES. To obtain more basic information on the relationship of switchblade knives to juvenile delinquency, I caused a questionnaire to be sent to the police departments of the cities of Chicago, Los Angeles, Detroit, Cincinnati, Boston, New York, and Philadelphia. The questions I asked were:

1. How many juvenile delinquents had switchblade knives in their possession when arrested?

2. Would this legislation in your opinion assist in the reduction of juvenile delinquency?  If so, in what way?

3. Has your city considered, or does it now ban the sale of such knives?

4. Have any studies on the subject been done by your department or city?

5. Do you feel that there is any legitimate need for such a knife?

Unfortunately, we discovered when we received the replies from the police departments that they do not have a statistical survey on some of the questions that I asked.  However, answers to my questionnaire brought forth certain interesting replies and points of view. For example, in Boston, Police Commissioner Thomas F. Sullivan pointed out, and I quote from his reply:

> It would seem obvious to anyone who has had the opportunity to observe the mechanism of these knives that they are specifically devised as a vicious, insidious weapon of assault and can be devoted to no legitimate use in the everyday life of law-abiding citizens.



Commissioner Edward S. Piggins, of the Detroit Police Department, said this:

> Primary use of a switchblade knife is a dangerous weapon and therefore constitutes a hazard if readily available to youth.  We know of no legitimate use for which this type of knife is so particularly suited that a more conventional type of knife could not be utilized.

Michael J. Delaney, director of the crime prevention division of the Chicago Police Department, stated:

> Legislation banning the interstate shipment of these knives would cause a reduction in juvenile delinquency, as many offenses committed by juveniles are done with the knowledge that he has a deadly weapon in his possession, which gives the juvenile the courage to perpetrate crimes.

The chief of police of Los Angeles, W. H. Parker, indicated complete approval of the bill and said this:

> Most offenders are youthful and in the past we have found that a great number of juveniles involved in gang activities favor this type of weapon.  A complete prohibition on manufacturing, transporting, and sales should be beneficial.

Stanley R. Schrotel, chief of the Cincinnati Police Department, said:

> [The] legislation as proposed would reduce the likelihood of some serious forms of delinquency, especially in group conflict or aggravated assault situations.

You can see that clearly the switchblade knife is recognized by the police departments as a dangerous weapon. You can see by the knives that I have on the table how readily available they are as weapons. The blade snaps out in a flash with a sickening click. This is not some toy for a young boy to play games or carve with. It is not a jackknife you may give to a boy when he begins to grow up. This knife is in the same class as a bayonet—its use is limited to murder and mayhem. And yet we allow them to be sold to our children.

In my own city of Chicago the PTA is very much interested in this legislation.

I think it is important that we consider this legislation now because the teen-age population is rising again, which reflects the upsurge in the birthrate of the early 1940's. The expected increase is one of the highest in any age classification. By 1965 the 14 to 17 age group is due to grow to 155 percent of its present size.

The possession of these switchblade knives is outlawed in many communities. It is outlawed in the District of Columbia. It is outlawed in the city of Chicago. As Congressman Delaney pointed out, it is outlawed in the State of New York. It is outlawed in the State of Illinois, where a bill prohibiting its possession was passed last year unanimously by both houses.

In the State of Massachusetts it is illegal to sell switchblade knives. In Ohio it is outlawed similarly.

In New York, incidentally, if you want to carry a switchblade knife you must be licensed to do so as you are for any other kind of a deadly weapon and you must prove that your purpose in possessing the switchblade knife is legitimate.

This committee a few years ago passed legislation prohibiting the interstate shipment of fireworks. You will recall that many States outlawed the use and sale of fireworks. Because fireworks were bootlegged from one State into another the Congress passed a law prohibiting the interstate transportation of fireworks.

I think this perhaps this bill is comparable.

Now, the States, the municipalities who are interested in curbing this menace cannot do so without the help of the Federal Government. The bill which I have filed prohibits the interstate shipments of switchblade knives and it also prohibits its shipment in the mails except under the same regulations as exist presently for the shipment of deadly weapons under the mails. Our postal laws prohibit the mailing of guns and other weapons capable of being concealed except under certain circumstances.

I feel confident that had those who drafted that legislation foreseen the extensive use and violence to which these knives were going to be put, they would have included in the definition a restriction upon their shipment. That legislation was designed to bar the shipment of concealable weapons as pointed out by Congressman Alger when Mr. Delaney was on the stand here.

One of the most dangerous features of these knives, as Congressman Alger pointed out, is the quality of concealment.

The bill which I have filed does not apply to a common carrier who, in the ordinary course of his business, happens to ship a switchblade knife in interstate commerce. If he does not know about it, it

KR00053

does not apply to him.   This bill does not apply to civilian or Armed
Forces supply or procurement officers or employees of the Federal
Government so that this knife which is a paratrooper knife may still
be manufactured by the armed services in accordance with their re-
quirements.   It does not apply to supply officers or procurement offi-
cers, the National Guard, the militia of a State, Territory, or the
District of Columbia ordering, procuring, or purchasing such knives
in connection with the activities of their organization.

The bill does not affect the supply and procurement officers or em-
ployees of the municipal government of the District of Columbia or
the government of any State or Territory which may desire to procure
these knives in connection with governmental activity.

Manufacturers of switchblade knives or bona fide dealers in the
trade of such knives who fill the requirements of those who are exempt
are also permitted to manufacture the knives only for those purposes.

There is a slight technical error in my bill.   On page 3, on line 15,
where the words "paragraphs (1), (2), and (3)" appear should be
amended to read "paragraphs (2), (3), and (4)."

This is not a cure-all for all of society's total problems arising out
of juvenile delinquency.   Juvenile delinquency is much too complex
a problem to be dealt with by a single piece of legislation except that
a bill of this type can certainly help in taking away some of the seeds
which give birth to juvenile delinquency problems.

I think psychiatrists would tell us that the cult of the weapon
propagates a shocking variety of abnormal behavior.   It is hard for
those of us not professionally trained in psychology to imagine vividly
enough its corrosive effects upon young disturbed minds.   Vicious
fantasies of omnipotence, idolatry of those who have inflicted upon
mankind the most barbaric and sadistic atrocities, and monstrous vio-
lations of accepted values spring from the cult of the weapon and the
switchblade knife is included in this.

Minus switchblade knives and the distorted feeling of power they
beget—power that is swaggering, reckless, and itching to express itself
in violence—our delinquent adolescents would be shorn of one of their
most potent means of incitement to crime.

Mr. Chairman, I say it is time that we put a halt to the peddling
of violence and to the barter of tools of mayhem and murder.   I think
we must help the States in their efforts to reduce juvenile delinquency
and teen-age gang warfare.   We must take action now to recognize
switchblade knives as a deadly weapon and to be regulated as such.

My own bill does not contain the gravity knife menace.   I agree
with Congressman Delaney on that portion of his bill which would
seek to regulate the manufacture and shipment of gravity knives in
the same way as we do switchblade knives.

Again, Mr. Chairman, let me express my gratitude to this commit-
tee and to you for giving us a hearing on our bill and for listening so
graciously and courteously to our presentation.

Mr. MACK. Thank you, Mr. Yates.

Mr. Dollinger?

Mr. DOLLINGER. I have no questions.

I should like to compliment the gentleman on his usual fine state-
ment.   It was very well done.

Mr. YATES. Thank you.