Case 1:11-cv-03918-KBF-RLE   Document 134-5   Filed 03/11/16   Page 1 of 34

Mr. DOLLINGER. You have no objection to the exclusion of the words "freight forwarder?"

Mr. YATES. No.

Mr. DOLLINGER. I have no further questions.

Mr. MACK. Mr. Avery?

Mr. AVERY. I, too, would like to compliment Mr. Yates on the statement he made.

Mr. Yates, I observed that you made a reference to the State of New York. I believe I understood you to say that they presently have legislation that precludes the manufacture and sale of switchblade knives.

Mr. YATES. Yes.

Mr. AVERY. From the reports that we had from their high school situation up there recently, as I recall, there were quite a number of switchblades found among these offenders.

Could we conclude from that, then, that most of those switchblades flow into the State of New York through interstate commerce?

Mr. YATES. Yes.

Mr. AVERY. Would that be a reasonable conclusion?

Mr. YATES. Yes. Many of them come from foreign countries. For example, this stiletto type switchblade knife which I have here comes from Italy. Many are manufactured in foreign countries. I think there are a few manufacturers in this country who manufacture switchblade knives, too.

Mr. AVERY. From the practical standpoint, these young men assuming the law was enforced in New York, would have to mail order them from New Jersey or somewhere and probably would not mail order them from Italy.

Mr. YATES. That is correct.

Mr. AVERY. Assuming that New York enforces its statute if we had a bill such as yours or one similar to it passed, we could reasonably assume that it would perhaps negate that situation that was so dramatized up there.

Mr. AVERY. It would do much to negate that. I think that is true.

Mr. YATES. You named Illinois, I believe, and New York.

Mr. YATES. Illinois last year passed a law which prohibited the manufacture and sale of switchblade knives in the State of Illinois.

Mr. AVERY. Has there been enough experience on the State level there after they passed legislation? Has it had a perceptible effect on the number of offenders?

Mr. YATES. I do not know that there are statistics on it. I tried to obtain those statistics from the police chiefs to whom I wrote my letters. They do not gather statistics of that type.

The best reply I can give you is the attitude of the police chiefs themselves who believe that there is no possible legal use for these knives and that they do constitute a menace in the hands of juvenile delinquents.

Mr. AVERY. Do not get the impression that I am opposed to your bill. I am not. I am inclined to go along with it wholeheartedly but these questions do come to my mind.

Obviously, there was something before switchblades. It is not the first time that teen-agers had weapons.



KR00055

Mr. YATES. They had knuckles and bottles. They will still have other weapons that can be used for lethal purposes.

This week's Life magazine had a story of gang warfare in the city of New York which was one of the most graphic and blood-curdling articles that I have read in many years. They have the spring guns that Congressman Delaney spoke about that they used in gang warfare that they manufacture themselves. They have what they call "shiv" knives, which they make themselves by sharpening pieces of steel or some other kind of metal. They use broken bottles. They use clubs. They use whatever type of weapon will serve their purposes in defending what they conceive to be the honor of their particular group.

As I stated, I do not know that this bill will do away with many of the complicated bases for juvenile delinquency. I think there are too many causes for it.

I happen to believe that the causes for it are found in city conditions which have seen family units just jammed together in slums and in filth and disease.

I think that broken families are another cause of juvenile delinquency. I think that perhaps the basic cause is the broken home and the attitudes of parents.

This is something that this committee might want to explore with psychiatrists. I think one of the most serious problems our country faces is how to deal with the problem of juvenile delinquency.

I do know, as the result of having read the studies of some psychiatrists that the juvenile gangs do have the cult of the weapon. They do get a feeling of power when they possess a knife or club or some other lethal weapon.

I think that if society shows that it does not condone the shipment of weapons of this type to be used in gang warfare but rather says, "We don't want these shipped because they are used in gang warfare," we will be making progress.

Mr. AVERY. Would you agree with me that perhaps in defense of teen-agers we should say that thinking back 30 years ago there is a sort of a crescendo that builds up after a period of war? About so many years later we get into a situation like this. I think that was somewhat illustrated just last week when the murderer of Bobby Franks was released from jail. That was a climax back in the middle twenties which was again about 5 or 6 years after World War I. It appears certain wartime conditions seem to serve as a spawning ground, shall we say, for the type of gang warfare that always follows.

Mr. YATES. I agree. When I first came to Congress I had my first contact with 4-H Clubs. I have not had much experience in farm communities. I do not know very much about them but coming to the Appropriations Committee and going into the agricultural appropriations bill and listening to various farm bills, I got to know about 4-H Clubs and what they were doing in rural communities and, frankly, I wished very much there were some way for the organization of these 4-H Clubs in urban communities.

We have our boys' clubs in the metropolitan areas. I wish there was some way in which we could transplant the spirit or organization of those 4-H Clubs into the city communities in some way on a national basis, such as the 4-H Clubs. I think this would be a very salutary thing.

KR00056

Mr. DOLLINGER. Would you yield?

Mr. AVERY. Yes.

Mr. DOLLINGER. Is it not a fact that in the days after World War I the weapons used were entirely different than those used today? They used the bats and other things, but they did not use firearms or knives.

Mr. AVERY. What was the violence?

Mr. DOLLINGER. The violence still exists, but they did not have the weapons used today.

Mr. YATES. I think we have a real problem. It is a problem that we must face.

Mr. AVERY. I will not consume further time.

I appreciate your response.

Mr. YATES. Mr. Jarman asked Congressman Delaney who was opposed to the bill. I understand that the Attorney General's Office has indicated some opposition to the bill as possibly being the type of legislation which should be handled locally.

I do not think this is true. I do not think that problem can be handled exclusively within the States. I think that only the Federal Government can prohibit the interstate shipment of weapons of this type. The Attorney General's report on the bill, dated April 12, 1957, stated:

> Switchblade knives in the hands of criminals are, of course, potentially danger-ous weapons. However, since they serve useful, and even essential, purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

I do not know why a shipping clerk cannot use an ordinary knife.

As I read from this letter from the Izaak Walton League most sportsmen do not use knives of this type. I think perhaps this may have been a hasty consideration of the bill by the Attorney General. I think probably he might want to reconsider it.

Also there was a letter that was written to Congressman Fogarty by the Colonial Knife Co. of Providence, R. I., which manufactures the switchblade knives and thinks that this bill should not be passed.

I answered by saying that I thought it was enough of a menace to warrant congressional attention.

I have letters here of support of the bill by responsible people, ministers, and organizations in the city of Chicago. I think it is a necessary bill.

Mr. MACK. Mr. Jarman, do you have other questions?

Mr. JARMAN. I have no questions, Mr. Chairman.

I would like to join in tribute to our colleague for a very able presentation.

Mr. YATES. Thank you.

Mr. MACK. Mr. Alger?

Mr. ALGER. You mentioned something of a precedent on deadly weapons, firearms.

Mr. YATES. Yes, sir.

Mr. ALGER. I think we are all particularly sensitive on the invasion of States rights through the interstate commerce clause of the Constitution and that alone prompts this question.

Mr. YATES. Yes.

KR00057

Mr. ALGER. I am very much in sympathy with this problem. What is the precedent, then, on deadly weapons and firearms and so forth in interstate shipment? There is a precedent already, is there not?

Mr. YATES. Yes, there is a precedent already on firearms shipped in interstate commerce.

Mr. MACK. I am of the opinion that there is no law on interstate shipment of firearms.

Mr. YATES. I asked the Library of Congress to check that for me and they gave me a reference yesterday to title 15, I think it is, sections 712 to 791, in which there was a prohibition for the interstate shipment of firearms except under certain conditions.

Mr. ALGER. You mentioned "concealment" in your statement.

Mr. MACK. I am not familiar with that. I have done no research on it.

Mr. YATES. It was an oral opinion given over the telephone.

I asked them to check it. I would be happy to get that in writing and furnish it for the committee.

Mr. ALGER. I was not suggesting, Mr. Chairman, that a precedent was necessary. The originating idea may be good enough without a precedent.

I was checking to see if there was a precedent in concealed or deadly weapons or firearms which I think of the youth using as a deadly weapon.

Mr. YATES. I do know that you cannot ship them through the mail except under the regulation established by the Post Office Department.

Mr. MACK. To the best of my knowledge, we have no similar legislation to control the interstate shipment of firearms.

Mr. YATES. By common carriers other than through the mails. There is this regulation for the Post Office Department. This I know specifically. As a matter of fact, I have a letter from the postal authorities.

Mr. MACK. Mr. Yates, I am advised that we do have such postal legislation.

Mr. YATES. I know that we have postal legislation, and my attention was referred yesterday afternoon by counsel in the Legal Division of the Legislative Reference Service to, I think, title 15, sections 712 to 719, which also regulate in interstate commerce of deadly weapons.

Mr. AVERY. I am sure the committee members are besieged over a certain administrative directive issued by the Treasury Department last fall on small arms.

Mr. YATES. That was required registration, I think. That would have required numbering the arms.

Mr. AVERY. The point I was going to make is that there are undoubtedly several different facets of control of firearms outside of the post office, as such. They may be regulated more than we realize indirectly.

Mr. YATES. I think that is true.

Mr. MACK. The committee would certainly appreciate having that.

Mr. YATES. I must say that I feel I was derelict in not having come to the committee with that information.

I was told over the phone that it was regulated, and I was ready to present it. I will be more careful and get that opinion from the Department.

KR00058

Mr. ALGER. I would like to conclude by joining with the others in commending you for a good statement. I could not help but think when you were talking about broken homes and that this was the same old expression of insecurity that goes with delinquency.

We are a long way from solving a problem by denying a knife, although this may be a step in the right direction.

Mr. YATES. I would like to introduce these knives into the record, but I do not think the police department would permit it.

Mr. MACK. I do not intend to detain you very long, Mr. Yates.

I have a copy of the letter sent from the Justice Department. We requested a supplemental report eventually and the letter was sent on the 14th of March 1958. They stated in this letter that they still subscribe to the earlier views.

Mr. YATES. For the same reasons?

Mr. MACK. They refer to their earlier report. I presume that they oppose the bill. I believe this is about the only Government agency opposing the legislation.

The Department of Defense has suggested an amendment to exclude the transportation of the switchblade knives for that purpose and to exclude the members of the armed services.

Mr. YATES. We have no objection to that. That is in this bill. It was not in the original bill.

Mr. MACK. Is it in the bill submitted by Mr. Delaney?

Mr. YATES. Yes.

Mr. MACK. Is there any limit to the size of the knife in this legislation.

Mr. YATES. The limitation is as to the mechanism and the type of knife.

Mr. MACK. It has occurred to me that there are certain areas where these knives might have some utilization in industry and elsewhere. I think that those areas should be considered. One of them, of course, is for the handicapped people.

Mr. YATES. Yes. I agree with that. I received a letter from a one-armed person saying that he needed a knife like that in his business. I assume he would require help of this type.

Mr. MACK. I have been informed recently that there are also electricians and linemen who work on telephone poles in various places who use this type of gadget in their work.

Mr. YATES. I was not aware of that. I do not know how they would use it.

Mr. MACK. Those were the only areas I thought about. I was wondering if you would have a suggested amendment to cover that.

Mr. YATES. It would seem to me that those who would require the use of knives of that type should be able to use them under proper registration. I think this is the way it could be done.

Mr. MACK. You do not provide for it in your bill?

Mr. YATES. No, I have not provided for it, but I think it would be a suitable amendment by this committee.

Mr. MACK. I wanted to join with all of my colleagues in commending you on the fine statement you have made, and on your continuing interest in the control of juvenile delinquency in Chicago and elsewhere in the country.

Mr. YATES. Thank you.

KR00059

Mr. MACK. I have one other thing I want to ask about. Do you have an information of how many manufacturers are involved?

Mr. YATES. I have received letters from two of them. A report by the Library of Congress indicates that there are three major ones.

Mr. MACK. One is in Connecticut?

Mr. YATES. One is in Connecticut and one is in Rhode Island, and I think there may be one in New York. It is not a significant number.

I think that this portion of their business is relatively a minor part. They are mostly in the manufacture of cutlery and knives of the standard type.

Mr. MACK. You do not have any information as to how many switchblade knives are produced or imported into this country?

Mr. YATES. I do not, but I will try to get it. I do not see how we can know how many knives are imported because I think visitors going abroad may buy them as souvenirs.

Do you mean through official channels?

Mr. MACK. Yes.

Mr. YATES. I do not believe you are required to register them.

Mr. DOLLINGER. There is duty and there is a record of the number of packages or shipments.

Mr. YATES. We will check it.

Is there a separate category in switchblade knives in customs? I agree there is a customs duty on flatware and knives of various kinds, but I do not know that they keep count on switchblade knives.

Mr. MACK. I was asking for the general information of the committee. I would not be of the opinion that the juvenile delinquent made a special trip to Europe to purchase the knife. I wanted to ask if you feel that this legislation would be necessary if all the States enacted similar legislation.

Mr. YATES. Yes, I do, because there is no way that a State can prevent a knife from entering the State.

Mr. MACK. You would still not have control over the imports.

Mr. YATES. That is right. You would still not have any control over the interstate shipment of the knives and unless the Federal Government acts to supplement the action of the States this loophole exists.

Mr. MACK. Are there any further questions?

Thank you.

Mr. YATES. Thank you.

Mr. MACK. The next witness is our colleague from New York, the Honorable Edna F. Kelly. Mrs. Kelly, we will be glad to hear you at this time.

## STATEMENT OF HON. EDNA F. KELLY, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW YORK

Mrs. KELLY. Mr. Chairman, each day we read of many sordid crimes of violence, perpetrated by youth. The bloodshed and brutality have written a sad page in the history of our cities and our Nation. The problem of juvenile delinquency threatens to rip the very fabric of our wholesome society.

I believe it is the duty of Congress to take an active and forceful step in meeting this problem. We must get away from the vague generalities, and concentrate our attack on specific problems, on both an immediate and a long-range basis.

One glaring situation which cries for immediate attention is the flood of switchblade and gravity knives inundating the American market. Most of us are aware of the lethal switchblade knife. This weapon springs open at the slightest touch and is ready for instant violence. The blade often has no cutting edge. It merely has a sharp stiletto point, and can serve no useful purpose.

In 1954 New York City was plagued by a tremendous outbreak of juvenile gang violence. The switchblade knife was the favorite weapon of the young hoodlums. Deaths were frequently caused by a youth wielding a switchblade knife.

An aroused New York City population took notice of the problem. Under the direction of State Supreme Court Justice John E. Cone, a former prosecutor, a committee was formed to help ban the manufacture, sale, or possession of the switchblade weapon. A petition campaign was launched, and appropriate legislation was enacted to outlaw the weapon. The New York City Police Department today reports that the crimes of violence involving the switchblade knife have been sharply reduced. They assert that this reduction is as high as 80 percent.

However, the rapid encroachment of a new threat arose. Unscrupulous importers and manufacturers in other States began shipping thousands of these switchblade knives into New York. This State—1 of 12 which have banned the switchblade knife—found itself faced with an insurmountable problem. The local law was rendered ineffective in the face of the mail-order barrage of knives.

It is estimated that over 1,200,000 switchblade knives are distributed and sold each year in this country. This includes approximately 200,000 imported pushbutton knives. These weapons are sold primarily to youths, bent on excitement. The bulk of the knives sell for popular prices, from 95 cents to approximately $1.29, placing them within easy reach of the youths' pocketbooks.

But the problem is not limited to the switchblade knife. Only recently a new weapon—the gravity knife—has become a popular weapon with the lawless youth. This knife was devised to circumvent the laws prohibiting the switchblade. The gravity knife, or drop knife as it is sometimes called, does not open with a spring. The deadly blade is embedded in the hollow handle of the knife. A flick of the wrist sends the blade darting forth. It anchors in place automatically. Every bit as fast as the switchblade, it has proved to be as effective a killer. Two months ago, several youngsters were picked up for possession of the weapon. However, the law as written at that time, did not make possession of the knife illegal.

Police reports indicated that the word spread fast. The gravity knife had made its successful debut.

Once again, the spirited New York committee, including Members of Congress and members of the New York State Legislature, headed by Judge Cone, initiated a legislative attack on the gravity knife. With the editorial support of the New York Herald Tribune, New York Journal-American, and New York Mirror, as well as radio sta-

KR00061

tion WMGM, a petition campaign was launched, which included as one objective the banning of the gravity knife. To date, over 175,000 persons signed the petitions. As a direct result of the effort, legislation sponsored by State Assemblyman Stanley Steingut and State Senator Joseph Zaretzki was passed overwhelmingly in this session of the legislature. The manufacturers were castigated for preying upon the immature youths.

Any one of us can walk into a neighborhood newsstand and look through the so-called adventure magazines, or "art" magazines. Vividly displayed are ads for these gravity knives and switchblade knives. They bid the youngster to write in for these bargains. The vicious character of the blades is self-evident.

So, despite our law, and despite the efforts of thousands of parents, the weapons continue to flow freely across State borders.

The blood baths continue. The gangs point with pride to the fact that they can readily obtain these weapons. And the crime statistics among youths point up the serious nature of the problem.

I believe Federal legislation controlling the manufacture, sale, and possession of both switchblade and gravity knives is essential. Such legislation is the only way we can effectively prevent the knives from falling into the hands of the teen-agers.

I believe it is beyond dispute that the negative and criminal use of this weapon far overshadows any value it may have to the huntsman. There are only a few constructive uses for the switchblade and gravity knives. An easy substitution could be made for them.

The damage to our society in terms of human lives and injuries in itself warrants our immediate attention to this problem. If we turn our backs and say the youths will use can openers or other weapons if we outlaw the gravity and switchblade knives, we fall victim to a complete misconception. The wrong inherent in these weapons and the damage they are intended to inflict require Congress to ban them. Permitting one wrong to flourish is not excused by saying another wrong may take its place.

I must caution you, too, that most bills now introduced fail to take note of the gravity knife, though they do cope with the switchblade. New York State's experience should prove of value to us. We must not permit a large loophole to exist, through which the gravity knife will enter.

Sadly enough, the bills to outlaw the switchblade knife have been sidetracked for several years. I believe it is an obligation we owe to our families, and to our people, not to permit this to happen again. We must take action now, and throw an insurmountable roadblock in the way of certain knife manufacturers, who are seeking to carve out their fortunes at the expense of our youthful population.

I urge you to act favorably on H. R. 10618 which I have introduced. Similar bills have been introduced by Representatives Delaney and Teller, of New York; Yates, of Illinois; and Addonizio, of New Jersey.

Mr. MACK. Thank you for your appearance, Mrs. Kelly.

Mrs. KELLY. Thank you, Mr. Chairman.

Mr. MACK. The next witness is our colleague from New Jersey, the Honorable Hugh J. Addonizio. Mr. Addonizio, we will be glad to hear you.

KR00062

## STATEMENT OF HON. HUGH J. ADDONIZIO, A REPRESENTATIVE IN CONGRESS FROM THE STATE OF NEW JERSEY

Mr. ADDONIZIO. Mr. Chairman and members of the committee, it is a distinct honor to testify before the committee for a few moments on a subject which demands our very serious attention—the subject of the switchblade knife and its relation to juvenile delinquency.

There is obviously no clear-cut solution that will miraculously cause delinquency or its symptoms to disappear. I firmly believe, however, that those factors which are clearly recognized as agents contributing to the corruption of our youth must be eliminated as soon as they are uncovered. Banning switchblade knives from interstate commerce will not rid us of the unfortunate affliction of juvenile crime. The factors causing delinquency are highly complex and will require considerable effort and concentration before the total problem is reduced to manageable proportions. But the effort to remove the switchblade knife from too easy accessibility is one step we can take. For the switchblade, with its long, handsomely shaped handle and discreetly concealed but fast-opening blade, is a favored weapon of the juvenile gang. It is a symbol of terror.

At the present time, there are no Federal restraints prohibiting the sale, possession, or transportation of this agent of crime. It is available, on a whim, to impressionable adolescents, the mentally unbalanced or to anyone who may wish to purchase one. While some States have specific legislation forbidding the sale, possession, or transportation of this knife within its borders, they have found it impossible to control the situation because switchblades are available across State lines. The recent (March 1958) report on juvenile delinquency of the Senate Committee on the Judiciary states:

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States, 2 manufacturers have a combined production of over 1 million switchblade knives a year. * * * It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

Out of several hundred questionnaires sent by the subcommittee to purchasers of switchblade knives, whose names were derived from a distributor's mailing list, 133 responses have been received. Seventy-five percent of the purchasers were under 20 years of age, and of this group, 43 percent were between 11 and 15 years of age. Of the persons responding to the questionnaire, only a small portion claimed that the knives were secured for a constructive purpose.

My bill, H. R. 11289, is designed to prohibit the manufacture, transportation, or distribution in interstate commerce of the switchblade

KR00063

knife, or the manufacturing, sale, or processing of any switchblade knife within any territory or possession of the United States.

Across America today, a significant minority of teen-agers is on the rampage. Almost daily we read of their escapades, robbery, vandalism, and, on occasion, murder. Crime statistics collected over the past 8 years show that the number of juvenile delinquency cases before juvenile courts more than doubled between 1948 and 1956. Present juvenile crimes are gruesome, wanton, and brutal in many cases. It is hard to imagine the heartless compulsion that led a 19-year-old New York youth to kill a 15-year-old polio victim. It is hard to imagine what kind of temperament led three other youths to dump a derelict old man into a river.

Yet we must bring ourselves to face the truth. Police chiefs and law-enforcement officers all over the country report that in many instances of juvenile crime, switchblade knives are frequently among the weapons used by juveniles. The enactment of my bill, H. R. 11289, will do much to prevent the current widespread distribution of these articles. By imposing criminal sanctions on malefactors, we will be able to save our youth and curb the manufacturers and distributors who thoughtlessly undermine our national integrity.

Every conceivable kind of action that will reduce this problem deserves careful consideration. Our concern for the relationship of the switchblade knife to the total picture of juvenile crime represents only one aspect of the total consideration and, the ultimate solution of the problem. Our problem today is, what are we going to do to prevent the incidence of delinquency in so many of our young people? Various proposals have been discussed but no revolutionary suggestions have been put forward. We all have a responsibility for the healthy development of our youth. If we allow the situation to remain as it is, then we are not doing the best we can. We are, instead, permitting the people of our country to be endangered by an item that, in its misuse, can cause a great deal of harm. Just as any weapon designed to do harm is restricted to privileged use, I feel that restrictions should also be placed on the switchblade knife. If by supporting its illegality we can eliminate its free distribution, prevent its careless use, and reduce its widespread popularity, we will be making a tremendous gain.

For, as Dr. Northbert Grunbaum, a departmental psychiatrist attached to the Brooklyn prison, has said:

Juvenile delinquency is a disease, an infectious disease. It has its own spread factor and epidemiology. We must learn to treat and control it in the same way we treat the deadly fevers—first we invented the microscope, then we found the bugs.

Mr. Chairman, by isolating switchblade knives so that they no longer act as one of the infecting agents which help produce juvenile delinquency, we shall have made an important step toward wiping out this disease.

I earnestly appeal to all of you to support this bill. Regard for our youth and concern for our own well-being should sufficiently motivate us to support this legislation. As soon as we permit our young people to acquire, in an easy manner, the destructive devices they desire, we too are as guilty as the youngster who uses the switchblade to perform his act of violence.

Authorities tell us that the juvenile delinquent is a trouble apathetic youngster, suffering from many things. He has no sense of personal identity developed through healthy relationships and communication with others. He has no sense of value or worth. Thus, he affiliates with gangs and identifies himself with cults, adopting their distorted values. It is because of his apparent weaknesses that society must make decisions for him that he is incapable of making for himself.

It is because of these considerations that I sincerely and strongly urge your support of this bill. Thank you for scheduling these hearings on by bill, H. R. 11289, and similar measures.

Mr. MACK. Thank you, Mr. Addonizio.

Mr. ADDONIZIO. Thank you, Mr. Chairman.

Mr. MACK. Are there any other witnesses present this morning who desire to be heard?

Evidently there is no one appearing in opposition to the legislation. The committee will stand adjourned subject to the call of the Chair.

(Whereupon, at 11:10 a. m., Thursday, April 17, 1958, the hearing was adjourned, subject to the call of the Chair.)

85TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
2d Session }                                  { No. 1945

# SWITCHBLADE KNIVES

JUNE 23, 1958.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. MACK of Illinois, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

### [To accompany H. R. 12850]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 12850) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

#### EXPLANATION OF BILL

The purpose of this legislation is to prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, with certain exceptions, of automatic knives, commonly referred to as switchblade knives, the blades of which open automatically either by hand pressure applied to a button or other device, or by the operation of inertia or gravity.

Exceptions from this prohibition are made for (1) common or contract carriers which may handle switchblade knives in the ordinary course of their business; (2) the manufacture, sale, transportation, distribution, possession, or introduction into interstate commerce of switchblade knives pursuant to contract with the Armed Forces; (3) the Armed Forces or any member or employee thereof acting in the performance of his duty; or (4) the possession and transportation upon his person of any switchblade knife with a blade 3 inches or less in length by any individual who has only 1 arm (sec. 4 of bill).

Any person who knowingly violates this act would be fined not more than $2,000 or be imprisoned for not more than 5 years, or both (sec. 2 of the bill).

Whoever manufactures, sells, or possesses any switchblade knife within any Territory or possession of the United States, within

20006

KR00066

2                          SWITCHBLADE KNIVES

Indian country (as defined in sec. 1151, title 18, U. S. C.) or within the special maritime and territorial jurisdiction of the United States (as defined in sec. 7, title 18, U. S. C.) shall be fined not more than $2,000 or imprisoned not more than 5 years, or both (sec. 3 of bill).

Switchblade knives are declared to be nonmailable except to (1) civilian or Armed Forces supply or procurement officers and employees of the Federal Government, (2) to supply or procurement officers of the National Guard, the Air National Guard or militia of a State, Territory, or the District of Columbia, and (3) to supply or procurement officers or employees of the municipal government of the District of Columbia, or the Government of any State or Territory, or any county, city, or other political subdivision of a State or Territory and, in the exceptions mentioned, they are mailable only when the aforementioned individuals or organizations order, procure, or purchase such knives in connection with their official activities. Manufacturers of, or bona fide dealers in, such knives may use the mails to ship to any of the above-designated individuals or organizations pursuant to an order from such individuals or organizations.

The Postmaster General is given authority to require any person proposing to mail such a knife to give a satisfactory explanation in writing that the mailing will not be in violation of the law (sec. 5 of the bill).

The law will take effect 60 days after the date of its enactment (sec. 6 of bill).

NEED FOR LEGISLATION

Hearings on this legislation revealed that over 1 million switchblade knives are distributed and sold each year in this country, and that of these some 200,000 are imported. Over 5 million of these knives have been sold in the past 5 years, principally to juveniles. A large proportion of the knives are sold at a price within the reach of teen-agers.

The appalling situation in the cities throughout the Nation should bring home to us the urgent need for action in this field. Every day our newspapers report numerous muggings and attacks, many of them involving knives. Doing away with switchblade knives will not be a cureall for the crimewave sweeping the Nation, but it will

---

¹ Sec. 1151 of title 18, U. S. C.:
"§ 1151. Indian country defined
"'The term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a State, and (c) all Indian allotments, the Indian title to which have not been extinguished, including rights-of-way running through the same."
Sec. 7 of title 18, U. S. C.:
"§ 7. Special maritime and territorial jurisdiction of the United States defined
"'The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes:
"(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.
"(2) Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line.
"(3) Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.
"(4) Any island, rock, or key containing deposits of guano, which may, at the discretion of the President, be considered as appertaining to the United States."

KR00067

remove one of the favorite weapons of our juvenile and criminal element. It will afford the public some measure of added protection and give valuable assistance to our hard-pressed local law-enforcement agencies.

Federal legislation to prohibit switchblade knives is necessary because only a limited number of States have any laws relating to such knives. As a result, these knives are bootlegged into these States from other States which have no prohibitory statutes, or they are sent through the mails. Elsewhere, they are sold openly. City ordinances are somewhat of a deterrent, but they are by no means sufficiently effective. The only solution to the switchblade and gravity knife menace is to pass Federal legislation to prohibit the introduction or manufacture for introduction of these weapons into interstate commerce, to close the mails to them and to ban their importation.

The Subcommittee To Investigate Juvenile Delinquency in the United States, a subcommittee of the Committee on the Judiciary of the United States Senate, recently conducted an investigation into the use of dangerous weapons by juveniles, with special emphasis on the interstate traffic and importation of switchblade knives. In an effort to determine the severity of the problem on a community level, the subcommittee sent questionnaires to the major police departments of the United States, and others. Following are excerpts from the subcommittee's report (85th Cong., 2d sess., S. Rept. No. 1429, pp. 6–7):

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under

16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

In response to the subcommittee's questionnaire, police chiefs from all sizable communities, with few exceptions, uniformly supported the enactment of legislation prohibiting the interstate traffic in these articles.

Although over 20 States have an explicit prohibition against the sale of the automatic-opening knife, and many more have a general kind of prohibition against possession with intent to use any kind of dangerous article, the dissemination of approximately 1,200,000 of these articles, many of them going into the States where there are local prohibitions against their distribution and many of them getting into the hands of juveniles, shows the need for Federal controls.

The proposed legislation directed against the interstate traffic in these articles provides for a maximum fine of $2,000 and/or a 5-year prison sentence, with a maximum fine of $5,000 if an interstate sale is made to a juvenile under 18.

### HEARINGS

Five bills to prohibit traffic in switchblade knives were introduced in this Congress. They are H. R. 4956, by Mr. Teller of New York; H. R. 7258, by Mr. Yates of Illinois; H. R. 9820, by Mr. Delaney of New York; H. R. 10618, by Mrs. Kelly of New York; and H. R. 11289, by Mr. Addonizio of New Jersey.[2] The latter three bills are identical. A hearing on these bills was held on April 17, 1958, by the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce at which time Messrs. Delaney, Yates, Addonizio, and Mrs. Kelly testified in favor of this legislation. The subcommittee considered these bills and made some amendments thereto. A clean bill incorporating the amendments was introduced by Mr. Mack of Illinois, subcommittee chairman, which is the bill hereby being reported, H. R. 12850.

### REPORTS OF EXECUTIVE DEPARTMENTS AND AGENCIES

The reports of executive departments and agencies on this legislation are set forth in the appendix to this report.

The Department of Justice did not recommend enactment of this legislation. The Secretary of Commerce recommended against enactment of this legislation. The Bureau of the Budget shared the views of the Department of Justice and the Department of Commerce but had no objection to the enactment of those provisions of the bill dealing with the mailability of such knives. The Secretary of the Army, speaking for the Department of Defense, had no objection to the enactment of the legislation provided it was amended to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation, distribution, or introduction into interstate commerce of switchblade knives by the Armed Forces or members and employees

[2] Mr. Yates also introduced H. R. 2349, which was superseded by H. R. 7258, and Mr. Delaney also introduced H. R. 4615, which was superseded by H. R. 9820.

KR00069

thereof, acting in the performance of their duties. The Post Office Department recommended enactment of the legislation with respect to the mailability of switchblade knives if an appropriate amendment were made giving the Postmaster General the right to request an explanation from the sender, in writing, that the law is being complied with. The committee adopted such an amendment.

No estimate is available as to the cost which this legislation would result in to the Federal Government.

## CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as introduced, are shown as follows (new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### SECTION 1716 OF TITLE 18 OF THE UNITED STATES CODE

§ 1716. Injurious articles as nonmailable

All kinds of poison, and all articles and compositions containing poison, and all poisonous animals, insects, reptiles, and all explosives, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode, and all disease germs or scabs, and all other natural or artificial articles, compositions, or material which may kill or injure another, or injure the mails or other property, whether or not sealed as first-class matter, are nonmailable matter and shall not be conveyed in the mails or delivered from any post office or station thereof, nor by any letter carrier.

The Postmaster General may permit the transmission in the mails, under such rules and regulations as he shall prescribe as to preparation and packing, of any such articles which are not outwardly or of their own force dangerous or injurious to life, health, or property.

The Postmaster General is authorized and directed to permit the transmission in the mails, under regulations to be prescribed by him, of live scorpions which are to be used for purposes of medical research or for the manufacture of antivenin. Such regulations shall include such provisions with respect to the packaging of such live scorpions for transmission in the mails as the Postmaster General deems necessary or advisable for the protection of Post Office Department personnel and of the public generally and for ease of handling by such personnel and by any individual connected with such research or manufacture. Nothing contained in this paragraph shall be construed to authorize the transmission in the mails of live scorpions by means of aircraft engaged in the carriage of passengers for compensation or hire.

The transmission in the mails of poisonous drugs and medicines may be limited by the Postmaster General to shipments of such articles from the manufacturer thereof or dealer therein to licensed physicians, surgeons, dentists, pharmacists, druggists, cosmetologists, barbers, and veterinarians, under such rules and regulations as he shall prescribe.

The transmission in the mails of poisons, for scientific use, and which are not outwardly dangerous or of their own force dangerous or injurious to life, health, or property, may be limited by the Post-

**6**                    SWITCHBLADE KNIVES

master General to shipments of such articles between the manufacturers thereof, dealers therein, bona fide research or experimental scientific laboratories, and such other persons who are employees of the Federal, a State or local government, whose official duties are comprised, in whole or in part, of the use of such poisons, and who are designated by the head of the agency in which they are employed to receive or send such articles, under such rules and regulations as the Postmaster General shall prescribe.

All spirituous, vinous, malted, fermented, or other intoxicating liquors of any kind are nonmailable and shall not be deposited in or carried through the mails.

*All knives having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, are nonmailable and shall not be deposited in or carried by the mails or delivered by any postmaster, letter carrier, or other person in the postal service. Such knives may be conveyed in the mails, under such regulations as the Postmaster General shall prescribe—*

*(1) to civilian or Armed Forces supply or procurement officers and employees of the Federal Government ordering, procuring, or purchasing such knives in connection with the activities of the Federal Government;*

*(2) to supply or procurement officers of the National Guard, the Air National Guard, or militia of a State, Territory, or the District of Columbia ordering, procuring, or purchasing such knives in connection with the activities of such organizations;*

*(3) to supply or procurement officers or employees of the municipal government of the District of Columbia or of the government of any State or Territory, or any county, city, or other political subdivision of a State or Territory, ordering, procuring, or purchasing such knives in connection with the activities of such government; and*

*(4) to manufacturers of such knives or bona fide dealers therein in connection with any shipment made pursuant to an order from any person designated in paragraphs (1), (2), and (3).*

*The Postmaster General may require, as a condition of conveying any such knife in the mails, that any person proposing to mail such knife explain in writing to the satisfaction of the Postmaster General that the mailing of such knife will not be in violation of this section.*

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon, or at any place at which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section unless in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, according to the direction thereon or at any place to which it is directed to be delivered by the person to whom it is addressed, anything declared nonmailable by this section, whether or not transmitted in accordance with the rules and regulations authorized to be prescribed by the Postmaster General, with intent to kill or injure another, or injure the mails or other property, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

KR00071

Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct, or, in the case of a plea of guilty, or a plea of not guilty where the defendant has waived a trial by jury, if the court in its discretion, shall so order.

KR00072

# APPENDIX

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., May 20, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 7258) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 12, 1957, the Department of Justice reported to the committee on two similar bills, H. R. 2849 and H. R. 4013. The views expressed in that report, copies of which are enclosed, are equally applicable to the bill now under consideration.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

WILLIAM P. ROGERS,
*Deputy Attorney General.*

———

APRIL 12, 1957.

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the bill (H. R. 2849 and H. R. 4013) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The bills would prohibit the introduction, or manufacture for introduction, into interstate commerce, or the transportation or distribution in interstate commerce, of switchblade knives. They would also prohibit the manufacture, sale, or possession of switchblade knives within Indian country as defined in section 1151 of title 18 of the United States Code, or within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18. Violators would be subject to a maximum fine of $2,000 and/or imprisonment for not more than 5 years. Section 4 of H. R. 2849 would exempt from its application common carriers, contract carriers, and freight forwarders with respect to any switchblade knife shipped, transported, or delivered for shipment in interstate commerce in the ordinary course of business. Section 4 of H. R. 4013 would provide a similar exemption, plus two others. It would exempt the manufacture, sale, transportation, distribution, possession, or introduction of switchblade knives into interstate commerce pursuant

8

to contract with the Armed Forces. Also, it would exempt the possession of switchblade knives by members of the Armed Forces to whom such knives were issued by the Federal Government.

The Department of Justice is unable to recommend enactment of this legislation.

The committee may wish to consider whether the problem to which this legislation is addressed is one properly within the police powers of the various States. As you know, Federal law now prohibits the interstate transportation of certain inherently dangerous articles such as dynamite and nitroglycerin on carriers also transporting passengers. The instant measures would extend the doctrine upon which such prohibitions are based by prohibiting the transportation of a single item which is not inherently dangerous but requires the introduction of a wrongful human element to make it so.

Switchblade knives in the hands of criminals are, of course, potentially dangerous weapons. However, since they serve useful and even essential purposes in the hands of persons such as sportsmen, shipping clerks, and others engaged in lawful pursuits, the committee may deem it preferable that they be regulated at the State rather than the Federal level.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely,

WILLIAM P. ROGERS,
*Deputy Attorney General.*

THE SECRETARY OF COMMERCE,
*Washington, D. C., June 25, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This letter is in reply to your request dated May 8, 1957, for the views of this Department with respect to H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

H. R. 7258 would prohibit and prescribe penalities for the manufacture, sale, or possession of switchblade knives, and their mailing or their introduction into interstate commerce. Exemptions from these prohibitions would include supply or procurement officers and employees of the Federal Government, of the municipal government of the District of Columbia, of the government of any State, Territory, county, city, or other subdivision of a State or Territory; supply and procurement officers (but not the members, it appears) of the National Guard, the militia of a State, Territory, or the District of Columbia, when any of these persons are acting in connection with the activities of such governments and organizations. The Department of Commerce does not recommend enactment of H. R. 7258.

While this proposed legislation recognizes that there are legitimate uses that have need for switchblade knives, the exemptions would appear to assume that the most significant of those uses lie in Government activities. To us, this ignores the needs of those who derive and augment their livelihood from the "outdoor" pursuits of hunting,

KR00074

fishing, trapping, and of the country's sportsmen, and many others. In our opinion, there are sufficient of these that their needs must be considered.

Again, we feel that the problem of enforcement posed by the many exemptions would be huge under the proposed legislation.

For these reasons, the Department of Commerce feels it cannot support enactment of H. R. 7258.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., June 13, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, House Office Building,*
*Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in reply to your letter of May 8, 1957, requesting the views of the Bureau of the Budget on H. R. 7258, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

On April 1, 1957, in reporting to your committee on two similar bills, H. R. 2849 and H. R. 4013, the Bureau of the Budget pointed out that the Departments of Commerce and Justice had raised serious questions as to whether this problem is more properly a subject for the police powers of the States.

The Bureau of the Budget believes that these questions are equally applicable to H. R. 7258 and has no further comment to offer at this time.

Sincerely yours,

PERCY RAPPAPORT,
*Assistant Director.*

DEPARTMENT OF THE ARMY,
*Washington, D. C., July 16, 1957.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 7258, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense would interpose no objection to enactment of the bill, pro-

vided it is amended to exempt from the prohibitions contained therein the manufacture, sale, possession, transportation or distribution of switchblade knives by the Armed Forces or members and employees thereof acting in the performance of their duties, thereby expanding the exemption pertaining to the ordering, procuring, or purchasing of such weapons by those persons which now appears in section 4 (2) of the bill. This amendment could be accomplished by amending section 4 (2) of the bill to read as follows: "(2) to the Armed Forces or any member or employee thereof acting in the performance of his duty."

It is noted also that section 4 (5) does not extend the exemption to manufacturers of or bona fide dealers in switchblade knives in connection with shipments to persons designated in section 4 (4).

Subject to the foregoing, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 7258, 85th Congress, which is similar to H. R. 4013, 85th Congress, on which this Department submitted a similar report to your committee on April 12, 1957.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

POST OFFICE DEPARTMENT,
OFFICE OF THE GENERAL COUNSEL,
*Washington, D. C., April 16, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for a report on H. R. 7258, H. R. 9820, and H. R. 10618, similar bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switch-blade knives, and for other purposes.

The attention of this Department has been directed to advertisements in newspapers and magazines with respect to knives, which, according to the advertisements may be ordered for transmission through the mails collect-on-delivery. Obviously, weapons advertised in this manner can be purchased by anyone. The so-called Army surplus stores, hardware and other stores, carry similar weapons. The question of how to prevent their reaching the wrong hands is more than a Federal problem and difficult of solution. Many States have laws prohibiting concealed carrying of knives with blades or of designated lengths.

Although the mailing of firearms is controlled by statute (18 U. S. C. 1715), the mailing of hunting knives, switch-blade knives, and other similar weapons is not so controlled. Any one of the subject bills would do much to correct this situation. However, in order to eliminate controversy as to the procedure to be followed in the en-

KR00076

forcement of this proposed law, it is believed that section 5 of the bill should be supplemented by the addition of the following paragraph:

"The mailability of any such knife may be determined by the Postmaster General by inspection thereof and upon the failure or refusal of the sender to explain satisfactorily to the Postmaster General, in writing, why the postal regulations prescribed in accordance with this act were not complied with."

This Department recommends enactment of the legislation contained in section 5 of the measures, amended as suggested.

In advising this Department with respect to this report the Bureau of the Budget called attention to the fact that it had cleared the reports of the Departments of Commerce and Justice which objected to those portions of the subject bills which would prohibit the introduction of switchblade knives into interstate commerce.

The Department of Justice has raised the question as to whether the amendment suggested by this Department would be broad enough to authorize the inspection of first-class mails without a search warrant. It is the opinion of this Department that the language would not authorize such inspection, nor was such procedure intended.

Sincerely yours,

HERBERT B. WARBURTON,
Acting General Counsel.

THE SECRETARY OF COMMERCE,
Washington, D. C., April 21, 1958.

Hon. OREN HARRIS,
Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.

DEAR MR. CHAIRMAN: This letter is in reply to your request dated January 9, 1958, for the views of this Department with respect to H. R. 9820, and your request of February 13, 1958, with respect to H. R. 10618, identical bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

These bills differ only slightly from H. R. 7528, which was introduced for the same general purposes during the 1st session of the 85th Congress. In the present bills the definition includes knives which open automatically "by operation of inertia, gravity, or both." Also, the present bills prescribe penalties for the manufacture, sale, or processing of switchblade knives, whereas the earlier bill dealt with manufacture, sale, or possession.

The general intent of these legislative proposals appears to be to improve crime prevention by control of the use of the switchblade knife as a weapon of assault. This approach gives rise to certain objections. One is that, at best, it is an indirect approach which addresses itself to only one of many implements usable by an assailant. This casts doubt upon the resulting effectiveness in the reduction of crime in relation to its enforcement problems. Another objection is that it could lead to the elimination of the legitimate supply of switchblade knives in this country. This would ignore the legitimate needs and uses for these knives on the part of those who derive and augment their livelihood from "outdoor" pursuits, such as hunting, fishing, trapping, etc., as well as those of the country's sportsmen, and many others. We feel that these objections are valid.

KR00077

In thus expressing our views we do not wish to be construed as taking a light view regarding the widespread use of the switchblade knife as a dangerous and lethal weapon. In view of the apparent relation between the switchblade knife and juvenile delinquency, we would strongly support the enactment and vigorous enforcement of appropriate legislation prohibiting sale of switchblade knives to, and their possession by, juveniles, to the extent such sale and possession can be found to be subject to Federal jurisdiction.

Not being convinced that H. R. 9820 and H. R. 10618 would yield desirable results outweighing their undesirable ones, this Department recommends against enactment of these bills.

We have been advised by the Bureau of the Budget that there would be no objection to the submission of this report to your committee.

Sincerely yours,

SINCLAIR WEEKS,
*Secretary of Commerce.*

UNITED STATES DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, D. C., March 14, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice relative to the identical bills (H. R. 9820 and H. R. 10618) to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

Except as to section 5 and except for two other minor differences, these bills are identical with H. R. 2849 and H. R. 4013 on which the Department reported to the committee on April 12, 1957. The views expressed in that report, copies of which are enclosed, are equally applicable to the bills under consideration.

As for section 5 of the instant bills, it is noted that section 1716 of title 18, United States Code, which it would amend, deals with the mailability of articles intrinsically dangerous. Section 1715, on the other hand, deals with the mailability of firearms, items more analogous to switchblade knives in that both require the introduction of a wrongful element to make them dangerous. Therefore, if the committee is favorably disposed to recommend the amendment of title 18 with respect to the mailability of switchblade knives, section 1715 would seem to be the more appropriate section for such amendment.

The Bureau of the Budget has advised that there is no objection to the submission of this report.

Sincerely yours,

LAWRENCE E. WALSH,
*Deputy Attorney General.*

KR00078

EXECUTIVE OFFICE OF THE PRESIDENT,
BUREAU OF THE BUDGET,
*Washington, D. C., April 15, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce, House of Representatives, House Office Building, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This will acknowledge your letters of January 9, 1958, and February 13, 1958, requesting the views of this Office with respect to H. R. 9820 and H. R. 10618, bills to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes.

The Bureau has previously reported to your committee in connection with H. R. 2849 and H. R. 4013 on April 1, 1957, and H. R. 7258 on June 13, 1957. On those occasions, we pointed out that the Departments of Commerce and Justice had raised serious questions as to whether the problem is not more properly a subject for the police powers of the various States. These questions appear to be equally applicable to those sections of the subject bills controlling the introduction of switchblade knives in interstate commerce.

With respect to section 5 of the bills which would make such knives nonmailable, the Postmaster General, in the reports which he is making to your committee, recommends enactment subject to certain procedural amendments set forth in his report.

While we have doubts as to the effectiveness of such limitation in controlling the wrongful use of switchblade knives, this Bureau would have no objection to the enactment of those provisions of the bills dealing with mailability of switchblade knives if amended as suggested by the Postmaster General.

Sincerely yours,

PHILLIP S. HUGHES,
*Acting Assistant Director for Legislative Reference.*

---

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce, House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 9820, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above-mentioned bill provided it is amended to exempt Armed Forces operations from the

prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong., in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 9820, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

————

DEPARTMENT OF THE ARMY,
*Washington, D. C., April 18, 1958.*

Hon. OREN HARRIS,
*Chairman, Committee on Interstate and Foreign Commerce,
House of Representatives, Washington, D. C.*

DEAR MR. CHAIRMAN: Reference is made to your request for the views of the Department of Defense with respect to H. R. 10618, 85th Congress, a bill to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes. The Secretary of Defense has delegated to the Department of the Army the responsibility for expressing the views of the Department of Defense thereon.

The purpose of the bill is generally as stated in its title.

The Department of the Army, on behalf of the Department of Defense, would interpose no objection to the above mentioned bill provided it is amended to exempt Armed Forces operations from the prohibitions contained therein. This could be accomplished by amending section 4 (b) of the bill to read as follows:

"(b) The manufacture, sale, transportation, distribution, possession or introduction into interstate commerce of switchblade knives—

"(1) by the Armed Forces or any member or employee thereof acting in the performance of his duty; or

"(2) pursuant to contract with the Armed Forces."

KR00080

16                    SWITCHBLADE KNIVES

It is also noted that there appears to be a technical error on page 2 of the bill. In line 12 of that page, the word "processes" should be "possesses." (See, in this connection, sec. 3 of H. R. 4013 and H. R. 7258, 85th Cong.; in which the word "possesses" is used.)

Subject to the foregoing comments, the Department of the Army on behalf of the Department of Defense has no objection to enactment of H. R. 10618, which is similar to H. R. 4013 and H. R. 7258, 85th Congress, and on which this Department submitted similar reports to your committee on April 12, 1957, and July 16, 1957, respectively.

The enactment of this proposal would result in no additional cost to the Department of Defense.

This report has been coordinated within the Department of Defense in accordance with procedures prescribed by the Secretary of Defense.

The Bureau of the Budget advises that there is no objection to the submission of this report.

Sincerely yours,

WILBER M. BRUCKER,
*Secretary of the Army.*

# SWITCHBLADE KNIVES

# HEARING

BEFORE THE

## COMMITTEE ON
## INTERSTATE AND FOREIGN COMMERCE
## UNITED STATES SENATE

EIGHTY-FIFTH CONGRESS

SECOND SESSION

ON

# H. R. 12850

AN ACT TO PROHIBIT THE INTRODUCTION, OR MANUFAC-
TURE FOR INTRODUCTION, INTO INTERSTATE COMMERCE
OF SWITCHBLADE KNIVES, AND FOR OTHER PURPOSES

AND

# S. 2558

A BILL TO AMEND TITLE 18 OF THE UNITED STATES CODE
IN ORDER TO PROHIBIT THE SALE TO JUVENILES OF
SWITCHBLADE KNIVES WHICH HAVE BEEN TRANSPORTED
OR DISTRIBUTED IN INTERSTATE COMMERCE, AND FOR
OTHER PURPOSES

---

JULY 23, 1958

---

Printed for the use of the Committee on Interstate and Foreign Commerce



UN     PO
OF MICHIGAN

OCT

MAIN
READING ROOM

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1958

28041

# SWITCHBLADE KNIVES

## WEDNESDAY, JULY 23, 1958

### UNITED STATES SENATE,
### COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,
*Washington, D. C.*

The committee met at 10 a. m., Hon. Warren G. Magnuson (chairman of the committee) presiding.

The CHAIRMAN. The committee will come to order.

There are several other Senators coming, but we have so much work this morning we had better get started.

Mr. Bernstone, Senator Kefauver has a statement, I understand, that he wants to put in the record?

Mr. BERNSTONE. That is correct.

The CHAIRMAN. We will put that in the record in full.

(The statement of Senator Kefauver is as follows:)

### STATEMENT BY SENATOR ESTES KEFAUVER

Gentlemen, I should like to make some remarks for the record in favor of the general purposes of the legislation under discussion today—H. R. 12850 prohibiting interstate traffic in switchblade knives—and I should also like to suggest two amendments to this act. There are no Federal controls at present of the interstate movement of these articles, or of the large-scale importation of them into this country.

An extensive staff study and field investigation by the Senate Subcommittee To Investigate Juvenile Delinquency, of which I am a member, was aimed at determining whether switchblade knives were falling into the hands of juveniles; whether they were being used in an antisocial and injurious fashion by juveniles; and to determine if the controls on the State and local level were adequate.

Up to the time of this national study, estimates as to the impact of switchblade knives and stilettos on the community have been based, at least in part, on conjecture and speculation.

As a result of the subcommittee's study, it is now known that over a million switchblade knives are distributed and sold each year in the United States. This figure includes approximately 200,000 imported pushbutton knives, of which 150,000 are vicious automatic-opening stilettos with blades up to 6 inches long. It is estimated that over 5 million of these dangerous knives have been sold, principally to juveniles, in this country during a recent 5-year period.

The 2 major manufacturers are producing over 800,000 of these automatically opening knives each year. A heavy proportion of them are sold for between 95 cents and $1.29, a popular price, making the article available and accessible to juveniles.

One overseas manufacturer, who until recently employed over 120 persons in his European factory, made 12,000 automatically opening stilettos a month, 144,000 a year, almost exclusively for importation into the United States. In this same small European community, there are 14 other concerns at present turning out stilettos, most of them being distributed in the United States. Ironically, the country where these factories are located has outlawed the use of these deadly instruments within its own borders.

At the moment literally hundreds of thousands of knives of various design are pouring into the American market, and they all approximate the pushbutton knife in most respects. This variation in design is the result of the importers' efforts to circumvent recent State statutes which attempt to outlaw the automatic-opening knife.

NOTE.—Staff member assigned to this hearing, John W. Black.

At the time of our subcommittee investigation of this matter, 13 States (Colorado, Connecticut, Delaware, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, and Virginia) had specifically outlawed the sale and possession of these articles. Numerous other States have some legislation, varying in degrees of effectiveness. But the variation in State statutes concerning carrying of these knives varies to such an extent that a transient would be unable to have a clear insight into the law of the State he is in. And as a result of the absence of Federal legislation and the use of a substantial amount of advertising in national magazines, any person—criminal, insane, or child—can come into possession of one of these vicious articles through the mails.

Advertising of these knives appears in nationally circulated magazines. One such magazine that I have in mind is an adventure-type publication which would appeal to young boys. The article advertised is called Black Beauty. It is, reading from the ad, an Italian stiletto. Reading further, the advertisement states, "holding Black Beauty about 12 inches from object, press mystic button and flashing steel blade will open with the speed of sound."

One of these knives was received through the mails by a psychopathic individual in San Francisco, who recently used it to threaten doctors and nurses in the ward of a San Francisco hospital. This knife was mailed by a northern Florida firm, which advertises and distributes these stilettos.

An examination of the knife revealed an object which could logically be used for only one purpose; i. e., the inflicting of serious injury to another human being. It differs from some of the other switchblade knives in that it has no cutting edge, and hence does not serve even the purpose attributed to the normal pocket knife.

Accompanying the stiletto, which was manufactured overseas by a manufacturer who distributes most of the stilettos in the United States, was a knife catalog.

The catalog, which is partially devoted to advertising sports equipment to boys from 10 to 14 years old, contains the following ad for a European knife for sale with "deep blood groove": A jet-spring knife which "opens with lightning speed when lock is released * * * beautifully constructed knife for use when speed is vital."

One New York distributor who imports stilettos from abroad, using a warehouse in the South as a mailing point, has conceded that he ships and sells to retailers throughout the United States over 12,000 of the stilettos a year, many of which are larger than the one described in the advertisement to which I refer.

All of this activity, of course, occurs without violating any Federal statute at present.

As a result of many interviews and the response to a large number of questionnaires sent to police departments, provost marshals, and sheriffs throughout the United States, it has been established that the pushbutton knife and stiletto are attractive and appealing to the juvenile. It was further established that many of the sales are made to juveniles.

I am inserting in these remarks excerpts from some of the questionnaires that were sent by the subcommittee not only to show that these articles are being sold to juveniles, but also to show the problem is not confined to large urban areas, as many have previously thought.

In a letter dated April 3, 1957, Roy Stone, chief of police, Longview, Tex., stated: "The people who sell these knives say that teen-agers are the ones who are buying most of these knives * * *"

In a letter dated March 27, 1957, W. B. Murray, detective sergeant of Burlington, N. C., includes a report on an interview with a local concern selling switchblade knives. The owner of the concern stated that he "sells them to the 8- and 9-year-old groups of children and up * * *"

Walter F. Johnson, chief of police, Denver, Colo., writes: "It has been my experience in dealing with the juvenile gang problem that the snap-blade knife is one of the favorite weapons of the gang members."

As to the antisocial use that these articles are put to by juveniles, Francis J. Ahern, chief of police, San Francisco, Calif., stated on June 7, 1957: "* * * that a substantial amount of our juvenile crimes of violence involve the use of this type of knife." He further stated that since the enactment of a local ordinance, the use of such knives in crimes has diminished.

R. T. Runyan, chief of police of Corpus Christi, Tex., wrote regarding an interview with the owner of a store that sells stilettos: "The owner of the company also stated that the persons who buy the stiletto knife are usually the criminal type. He also stated that he would like to see the stiletto outlawed. He stated that his regular good steel nonswitchblade knives were top sellers to adults. The cheap $1 switchblade knives were second, and most of these were more attractive to juveniles, on an average of 14 years of age."

KR00084

SWITCHBLADE KNIVES
3

Harry J. Krieg, chief of police, Waterloo, Iowa, stated in a letter dated July 2, 1957, that a storeowner who sells switchblade knives said, "* * * and most of the cheap knives going to young people."

A letter from the police department in Des Moines, Iowa, dated July 8, 1957, regarding a local store which sells switchblade knives, states that the proprietor "estimates that the average age of the purchaser would run from 14 to 18 years."

A Kentucky Army and Navy surplus supply operator stated he could unload his supply of switchblade knives to teen-agers within a half hour, the demand was so heavy. However, he followed the policy of requiring the parents to be present.

These statements corroborate the interviews conducted by staff members with store proprietors, who in some instances have freely admitted that much of their demand comes from juveniles as young as 11 years old.

Members of youth gangs who were interviewed revealed that it was standard practice for most of their group to carry switchblade knives, allegedly for protection. However, we all know, or have read about, the numerous assaults resulting from the eruption of gang wars among these juveniles and the injuries inflicted by the knives. Many retailers selling stilettos stated that members of the Pachucos gang, a loosely knit, aggressive youth gang, purchased these articles.

The following statistics give a general indication of the increase in the use of weapons by juveniles. Although no statistics are available as to the ratio of these switchblade knives and stilettos to other weapons, it is believed to be substantial:

In New York City in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common kind being the switchblade knife; and also in in New York 36.9 of the felonious assaults, many involving use of switchblade knives, were committed by those under 16. On the national level, 29.6 percent of the total arrested for carrying dangerous weapons was attributable to young persons under the age of 18. A more shocking and striking figure is that 43.2 percent of the total robberies committed in the United States last year were by persons under 21 years of age. A switchblade knife is very often part of the perpetrator's equipment in a robbery.

Additional confirmation of the connection between criminal assaults and other antisocial conduct and the possession of these knives is disclosed by the following facts:

In Milwaukee, in the course of 1 year, more than 300 automatically opening knives were confiscated from prisoners after arrest. In Kansas City 15 switchblade knives were used in assaults and robberies in 1956, and 80 of these knives were taken from suspects who had been booked for investigation during the same period. In addition, there were 10 to 12 cases in which these knives were used by 1 juvenile to take money from another, and during the same period, there were 6 cases of cuttings as well as several cases where the knives were thrown by 1 juvenile at another.

During 1956 at Fort Bragg, N. C., it was necessary for the military police to confiscate from military personnel 161 switchblade knives—an average of 3 a week. At Fort Sill, Okla., in 1956, 75 of these knives were confiscated as a result of aggravated assault. In the area of Fort Bliss, Tex., there are more than 20 establishments selling these articles. The only military use for switchblade knives is for parachutists, and they receive their knives through army issue. All other sales to military personnel usually culminate in a violation of post regulations when the article is carried on the post.

A specious argument advanced by some of the switchblade knife dealers is that these articles are frequently sent to military supply stores in the vicinity of Army installations for use by military personnel. This fact was corroborated by visits to some of these installations, but it was further learned through interviews and questionnaires that not only was the possession of these articles contrary to post regulations, but with uniformity the provost marshals supported the measure now being introduced. Rather than feeling that the switchblade knife and stiletto were useful in the operation of an Army installation, the provost marshals, without exception, expressed the view that it was an undesirable and dangerous article.

The act does not apply to common carriers who may inadvertently transport these articles. When arriving from abroad, the stilettos are classified and marked "folding blades," and the carrier is not in a position to know the contents of the package. In the United States the carrier is normally not privileged to open a package to determine the exact article contained within. It is, therefore, only equitable and fair that he be given immunity from the enforcement provisions of this measure. The Army has on two occasions placed orders for parachutists to use these knives and Army issue is exempt from the impact of this statute. The act mentions other areas that are exempt from the statute, but in the case of

KR00085

huntsmen and sportsmen, it has been learned that the switchblade knife is not an indispensable article and that an alternate and safer kind of knife can be effectively used.

The following excerpts from questionnaires sent to police chiefs reflect the sentiment of law enforcement agencies with respect to the ideas embraced in this type of legislation:

From Clifford G. Baily, captain of the Crime Prevention Bureau of Minneapolis, Minn.:

"I believe Federal legislation controlling the manufacture, sale, and distribution of switchblade or automatic-opening knives would be most desirable. We have attempted to control this in our own city by local legislation, but the juveniles continue to get possession of this type of weapon through the mails, over which we have no control. We have outlawed the manufacture, sale, and possession of automatic-opening knives by local legislation; yet we are continually picking up youngsters who have obtained them through mail order advertisements."

From the acting chief of police, Lt. Col. W. E. Parker of Kansas City, Mo.:

"Federal legislation on sale and distribution in interstate commerce of automatic (switchblade) knives would control such weapons getting into the hands of teen-agers. On this basis alone, it would be extremely important that consideration be given this proposed legislation."

From Chief James F. Daley of the Boston Police Department:

"It is my opinion that this (a Federal law prohibiting the interstate traffic in switchblade knives) would be desirable; however, it would be much more effective if the manufacture of such knives was stopped entirely. The reason being that from a law-enforcement viewpoint, these weapons are specifically devised as a vicious, insidious weapon of assault and can be devoted to no legitimate use in the everyday life of law-abiding citizens. Federal legislation that would prohibit their manufacture and interstate shipment would certainly have my approval."

In order to evaluate possible constructive and helpful uses that these articles are put to, an inquiry was made of sporting and hunting organizations. Although some fishermen and huntsmen indicated that they have used switchblade knives, the majority felt that the standard hunting knives were much more effective for their purposes.

The conservation director of a national sportsman's league stated that he had never seen a sportsman in Western States use a switchblade knife for either hunting or fishing and that most sportsmen prefer the sheath-type knife, as they are much easier to keep clean.

A value judgment must be exercised in determining whether a ban should be imposed on the transportation and distribution of an article. In the case of the switchblade knife, the question resolves itself to whether the antisocial, negative, and criminal uses this knife is put to sufficiently outweigh the occasional constructive uses that can be made of the knife to justify the prohibition contained in the suggested legislation. In the case of the automatic-opening stiletto, there is no conceivable positive community use. This article can only be used for stabbing and assault.

There are only a few isolated and constructive established uses of the switchblade knife, and these uses can be equally well fulfilled by another kind of safer instrument.

Certainly, the damage in terms of assaults and threats and the unhealthy, aggressive, psychological role this article now has far outweighed the rare positive use that the knife can be put to.

The elimination of these knives from the production schedule of several of the manufacturers would not be unduly injurious to them. The largest manufacturer and distributor has stated that these knives constitute only 10 percent of his production—the rest being standard pocketknives. The second largest manufacturer has taken the same position.

Invented by George Schrade in 1808, the pushbutton opening knife was a useful article produced on a limited scale. In the past 10 years, however, the large-scale manufacture of these articles, the reduction in price of the pushbutton knife so that it is easily available to juveniles, and the psychological effect of these articles in antisocial and aggressive conduct has made such legislation necessary.

Aside from overt criminal activity, the dissemination of more than 1 million switchblade knives and stilettos in the American community each year represents a latent reservoir for future antisocial and criminal conduct. The answer to juvenile delinquency goes much deeper, of course, than curtailing the availability of these articles. However, it is necessary to protect society from the destruction that can result from the placing of these articles into the hands of immature, emotionally disturbed, and antisocial youngsters and adults.

KR00086

SWITCHBLADE KNIVES                5

In view of the serious nature of the importing of such knives, I submit that it would clarify and strengthen H. R. 12850 to amend it so that it clearly would make illegal the importing of such knives. This amendment can be made as follows:

On page 2, line 4, between the comma and the word "any" insert the following: "or whoever imports from a foreign country."

Inasmuch as the study of the Subcommittee To Investigate Juvenile Delinquency previously referred to has indicated the grave importance of preventing such knives from reaching the hands of juveniles, I further submit that H. R. 12850 be amended by the addition of another section reading as follows:

"Whoever sells or offers for sale to any person any switchblade knife knowing the same to have been transported or distributed in interstate commerce or to have been imported from a foreign country shall be fined not more than $2,000 or imprisoned not more than two years, or both, except that whoever sells or offers for sale a switchblade knife to any person who has not attained his eighteenth birthday knowing such knife to have been transported or distributed in interstate commerce or to have been imported from a foreign country shall be fined not more than $5,000 or imprisoned not more than five years, or both."

## STATEMENT OF ARTHUR H. BERNSTONE, CHIEF COUNSEL, SENATE JUDICIARY SUBCOMMITTEE TO STUDY JUVENILE DELINQUENCY

The CHAIRMAN. For the purpose of the record, your committee held some hearings on this matter, too; did it not?

Mr. BERNSTONE. We made an investigation.

The CHAIRMAN. But you did not hold public hearings?

Mr. BERNSTONE. No.

The CHAIRMAN. Is there a report available?

Mr. BERNSTONE. We do not have a report, as such. However, in our Report No. 1429, a section is devoted to switchblade knives. We will make that available to this committee.

The CHAIRMAN. I would like to have that a part of the record, too.

Mr. BERNSTONE. I shall see that it is made available.

(Following are excerpts from the subcommittee's report (85th Cong., 2d sess., S. Rept. No. 1429, pp. 6–7)):

The subcommittee's investigation disclosed that many of these knives were manufactured abroad and distributed by firms in this country who handle numerous items in addition to switchblade knives.

It was established that these items were being widely distributed through the mail by distributors to the various States that had local laws prohibiting possession, sale, or distribution of switchblade knives. This fact, the subcommittee feels, points out the need for Federal control of the interstate shipment of these instruments, since local legislation is being systematically circumvented through the mail-order device.

In the United States 2 manufacturers have a combined production of over 1 million switchblade knives a year. Both concerns are important cutlery manufacturers and the manufacture of switchblade knives represents only a small part of their business. It is estimated that the total traffic in this country in switchblade knives exceeds 1,200,000 per year.

The questionnaires returned by police chiefs throughout the country indicate that many switchblade knives have been confiscated from juveniles. The police chiefs, almost without exception, indicate that these vicious weapons are on many occasions the instrument used by juveniles in the commission of robberies and assaults. Of the robberies committed in 1956, 43.2 percent were by persons under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

* * * * *

In response to the subcommittee's questionnaire, police chiefs from all sizable communities, with few exceptions, uniformly supported the enactment of legislation prohibiting the interstate traffic in these articles.

28941—58———2

KR00087

6                                SWITCHBLADE KNIVES

Although over 20 States have an explicit prohibition against the sale of the automatic-opening knife, and many more have a general kind of prohibition against possession with intent to use any kind of dangerous article, the dissemination of approximately 1,200,000 of these articles, many of them going into the States where there are local prohibitions against their distribution and many of them getting into the hands of juveniles, shows the need for Federal controls.

The proposed legislation directed against the interstate traffic in these articles provides for a maximum fine of $2,000 and/or a 5-year prison sentence, with a maximum fine of $5,000 if an interstate sale is made to a juvenile under 18.

The CHAIRMAN. Our first witness is Justice Cone.

We will be glad to hear from you at this time.

Mr. CONE. All right.

The CHAIRMAN. This is Justice John E. Cone, of the New York State Supreme Court, Brooklyn.

Mr. CONE. Shall I address you sitting down or standing?

The CHAIRMAN. As you wish, Judge.

Mr. CONE. All right, good.

The CHAIRMAN. Most judges sit down most of the time.

Mr. CONE. That is why we get a little rotund.

Senator POTTER. And Chairmen of committees.   [Laughter.]

Senator PAYNE. And members.   [Further laughter.]

The CHAIRMAN. You can see what juvenile delinquency I have in this committee.   [Further laughter.]

Mr. CONE. I had better not say anything about that. I might prejudice my stand.

Shall I go ahead?

The CHAIRMAN. Go right ahead.

## STATEMENT OF JUSTICE JOHN E. CONE, NEW YORK STATE SUPREME COURT, BROOKLYN, N. Y.

Mr. CONE. Senator Magnuson, and other members of the committee, we are delighted to have this opportunity to come down here to Washington and present our campaign for legislation to ban the interstate shipment of switchblade knives, gravity knives, and other knives that operate on a mechanical spring or by gravity or inertia.

For that purpose, back at the beginning of last year, in the city of New York we formed a committee known as the Committee To Ban Teen-Age Weapons, with our headquarters at 714 Fifth Avenue, New York City. That committee had four purposes; the one we are immediately concerned with here is the outlawing of the gravity knife; and secondly, to ban the importation and shipment in interstate commerce of switchblade and gravity knives. Serving on this committee we had the district attorneys of each of the metropolitan counties comprising our city; we had two Members of Congress, we had the corporation counsel of the city, we also had representatives of each faith; and, in addition to that, we had some 200 outstanding people in public and private life.

Four years ago, in the city of New York, the switchblade knife was a deadly menace to life and limb. Our teen-age gangs used it as their favorite weapon at the time. We pressed a campaign then and we had the switchblade knife banned by the New York State Legislature.

As a result of that, a good deal of the possession of these knives disappeared. We found them less frequently, but they were still coming in, because there is no ban on interstate shipment, there is no ban on

KR00088