# EXHIBIT "I"

# EXHIBIT "I"

Plaintiffs' Trial Exhibit

**P-22**

# GROUP SEEKS BAN ON GRAVITY KNIFE

## Successor to Switchblade Is Called a New Tool of Teen-Age Crime

### By EMMA HARRISON

The "gravity knife" was introduced here yesterday as the "legal" successor to the outlawed switchblade. The purpose was to announce a campaign to outlaw the gravity knife as a tool of teen-age crime.

Several of the knives, recently confiscated by the police, were shown by the new Committee to Ban Teen-age Weapons as it opened its drive for legislation to ban the knives. They were said to be flooding the city.

By a technicality in the construction of the knife, manufacturers and distributors are able to sell it with impunity here, said Supreme Court Justice John E. Cone, committee chairman. He was interviewed at the stration was attended by committee members and other citizens pledged to sponsor or support several types of legislation to outlaw the knife and other weapons used by young-sters. They announced the following legislative program for state, city and national action:

¶A state law to outlaw the gravity knife.

¶A state law making it unlawful to sell or give away any ammunition in New York City without the recipient's showing of a gun permit, hunting license or authorization from a nation-al rifle association.

¶A measure to create a temporary state commission to study and recommend revision of the Sullivan Law relating to dangerous weapons, to eliminate "contradictory and outmoded provisions" and accurately to redefine dangerous weapons.

¶Federal legislation to prohibit interstate traffic in switchblade and gravity knives.

It was estimated that 1,000,000 switchblade and gravity knives were either sold in or brought into the city yearly, and that they had figured in "many mail order purchases of the switchblade,

Representatives Edna F. Kelly

man. He was interviewed at the New Yorker Hotel.

Judge Cone selected a sleek, silverish object from weapons that the committee had on display. He flicked his wrist sharply downward and the long blade shot forth and anchored firmly in position.

"You see," he said, "the blade leaps out with a flip of the wrist and circumvents the law on switchblade knives. There is no button needed to open it."

The knife circumvents the state law banning the sale of the switchblade, which opens by a spring mechanism. The law was passed in 1954.

Teen-agers have become aware that the knife can be purchased legally and have openly chased legally and have openly taunted the police when it has been found in their possession. Judge Cone reported. He said the knife was readily obtainable all over the city.

Ralph Whelan, executive director of the Youth Board, declared "the easy purchase of these knives is a contributing factor to the increase in juvenile and youth crime in the city" and of the most vicious crimes by young people."

Judge Cone's knife demon-

and Victor L. Anfuso, Brooklyn Democrat-Liberals, will introduce the Federal legislation.

Senate minority leader Joseph Zaretzki and Assemblyman Stanley Steingut, both Democrats, will sponsor the bill to outlaw the gravity knife. Senator Frank J. Pino and Assemblyman John J. Ryan, also Democrats, will sponsor measures to limit sale of ammunition and to establish the temporary commission.

The committee is composed of about 100 public officials and civic, welfare and religious leaders.

The New York Times

Published: December 19, 1957
Copyright © The New York Times

KR01473

# COURT BANS SALES OF GRAVITY KNIVES

The Court of Special Sessions ruled yesterday that gravity knives were in the same category as switchblade knives, and their sale or possession was a violation of the Sullivan law.

A gravity knife is one with a button that keeps the blade concealed. When the button is pushed, disengaging the blade, a flip of the wrist or simply holding the knife pointed down will set the blade in place for cutting.

After the outlawing of switchblade knives, which operate with a spring mechanism, some hoodlums took to carrying gravity knives.

The ruling, handed down by Justices Edward T. Galloway, John V. Flood and Magistrate J. Randall Creel, who is sitting in Special Sessions temporarily, came in the case of a novelty store salesman.

The salesman, Terry Powell, 25 years old, of 305 East Twenty-fourth Street, was arrested last May in the Funny Store, Inc., at 1481 Broadway. He had sold a gravity knife to Detective Nardin Duncan. He was found guilty of violating the section of the law banning switchblade knives. He will be sentenced on March 12.

On Tuesday the City Council appointed a special committee to make recommendations concerning legislation designed to tighten control over the sale of dangerous weapons and ammunitions. One of the matters on the committee's agenda for discussion at its meeting on Monday is the gravity knife.

The New York Times

Published: February 6, 1958
Copyright © The New York Times

KR01474

# Ban Asked on Teen-Agers' Weapons



The New York Times

**Police Commissioner Stephen P. Kennedy, left, and Grover A. Whalen, a former Commissioner, examine a zipgun.**

A committee of public officials and private citizens began a campaign yesterday for 250,000 signatures to petitions for outlawing the gravity knife and the sale of ammunition to anyone except a licensed hunter.

The drive was begun by the Committee to Ban Teen-Age Weapons at its new headquarters, 714 Fifth Avenue. The legislation is aimed at young hoodlums in New York, but enactment by city, state and nation was felt to be necessary. Bills have been introduced into the City Council, Legislature and Congress. The gravity knife is one in which a long blade slides by its own weight out of a hollow handle and locks in place. It became popular among young gangsters after the switch-blade knife was outlawed in 1954. A Special Sessions court ruling on Wednesday held that the sale of gravity knives was illegal under the Sullivan Law.

The proposed ban on ammunition is intended primarily to stop the sale of .22-caliber cartridges to boys who shoot them from homemade guns.

Police Commissioner Stephen P. Kennedy said the proposed legislation would be "helpful" although not the final answer.

KR01475

# HIGHER AGE LIMIT FOR ARMS IS URGED

## Kennedy Asks State to Raise Minimum for Purchase of Weapons From 16 to 18

The state's Penal Law should be revised to raise from 16 to 18 years the age of persons permitted to purchase firearms and ammunition, Police Commissioner Stephen P. Kennedy declared yesterday.

The Commissioner said adoption of the higher age limit would "provide leadership to other states, particularly those contiguous to New York."

Mr. Kennedy gave his views in an appearance at City Hall before a hearing of a City Council committee. The hearing was on proposals before the Council to seek a state legislative ban on the sale of .22-caliber bullets to teen-agers and on the sale of gravity knives altogether.

A gravity knife is one in which a long blade slides by its own weight out of a hollow handle and locks in place.

The Police Commissioner was one of nine speakers favoring the ban. Five persons opposed it.

Mr. Kennedy called gravity knives "dangerous" and said they should be specifically banned by law. A Special Sessions Court ruling last Wednesday held that the sale of gravity knives was illegal under the Sullivan Law.

The Commissioner conceded that .22-caliber bullets should be available to authorized persons, such as members of rifle clubs, but said that some means of identifying authorized purchasers should be established.

### Proposed Ban Scored

The suggested ban on .22-caliber bullets and gravity knives was, however, ridiculed by persons who opposed it.

Karl Frederick, former president of the National Rifle Association and winner of the individual pistol title at the 1920 Olympics in Antwerp, declared that the proposed ban would "disarm the honest people for the benefit of the crook."

The ban, Mr. Frederick asserted, could lead ultimately to prohibiting baseball bats, stones, sticks and kitchen cutlery as dangerous weapons.

Mr. Frederick, a lawyer of Rye, N. Y., and a member of the Commissioner's Advisory Committee of the State Conservation Department, said he had heard that young hoodlums had sometimes used can openers.

"Are you going to ban can openers?" he asked. "They are a very ugly weapon."

According to Mr. Frederick, gravity knives offer convenience to hunters, who can open them with one hand.

Speakers in favor of the proposed ban included Mrs. Nathaniel Singer, women's division chairman of the Committee to Ban Teen-Age Weapons, and James E. McCarthy, executive director of Big Brothers, Inc.

Mr. McCarthy declared that "more New York City youngsters are killed by .22 bullets than by any other."

Two resolutions were the subject of the hearing. One would call on the Legislature to outlaw the sale of gravity knives to persons under 16. The other would call for a ban on the sale of .22-caliber ammunition to teen-agers as "an important factor in curbing juvenile delinquency."

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘
Published: February 11, 1958
Copyright © The New York Times

KR01476

# THREATS CHARGED IN TRIAL OF BOYS

## Delivery Man Held in High Bail as Material Witness in Gang Murder Case

### By JACK ROTH

A 25-year-old delivery man was held yesterday afternoon in $50,000 bail as a material witness in the murder case involving seven teen-agers in General Sessions Court.

Assistant District Attorney Howard D. Blank told Judge Irwin D. Davidson that the delivery man, Frank Cruz of 518 West 134th Street, also known as Frankie Loco, had "vital information concerning the death of Michael Farmer." He said that it was feared that Cruz might leave or be induced to leave town.

Cruz is alleged to have told Carmen Berrios, 15-year-old girl friend of Louis Alvarez, 16, one of the defendants, that he was "going to get" one of the prosecution witnesses. It was also said that Cruz had made threats to the girl against several other prospective witnesses.

Alvarez and six other teen-agers, all members of a gang known as the Egyptian Dragons, are accused of fatally stabbing and beating the 15-year-old Farmer boy in High Bridge Park last July 30.

### Not a Gang Member

Assistant District Attorney Robert R. Reynolds has told the all-male jury that Michael was not a gang member, but that he was a victim of infantile paralysis who had gone to High Bridge Pool the night of the killing to "sneak a swim" with Roger McShane, 16, a friend.

McShane, who testified despite a threatening letter, is under a twenty-four-hour police guard. It was understood that the District Attorney's office was also questioning Cruz about the note.

Judge Davidson told Cruz at his arraignment in chambers that the District Attorney's office believed Cruz had a "close association" with the defendants. Cruz replied: "I got nothing to do with the case."

Because the hour was too late for the judge to assign a lawyer to Cruz, who said he had no funds, he was directed to reappear on Monday when counsel will be assigned.

### 'War Lord' Testifies

Earlier in the day, Ralph Largo, 15-year-old "war lord" of the Egyptian Dragons, completed his direct testimony. Young Lago, who directed battle strategy for the gang, testified that he had alerted seventeen boys on July 30 that Farmer and McShane were going to the park.

He said that he didn't see what happened to the Farmer boy because he was pursuing McShane, but, he said, he thought that he had seen Farmer "fall near some bushes."

Mr. Reynolds put into evidence two weapons used by the defendants. One was a gravity knife, which is operated by a flick of the wrist; the other, a length of dog chain with a fishing weight attached.

Judge Davidson adjourned the trial until Monday at 10:30 A. M. when Lago, who was 14 at the time of the attack, will be cross-examined. Because of his age last July, he was charged with juvenile delinquency and is serving a term in the New York State Training School for Boys in Warwick.

The New York Times

Published: February 15, 1958
Copyright © The New York Times

KR01477

## DEFENSE BALKS IN YOUTHS' TRIAL

### Lawyers Refuse to Question Witness Pending Medical Testimony on Murder

**By JACK ROTH**

The threat was raised yesterday that several lawyers might withdraw as counsel to several teen-agers on trial in General Sessions Court for first-degree murder.

The twenty-seven court-appointed defense lawyers joined in demanding that Assistant District Attorney Robert S. Reynolds put the medical examiner on the witness stand so that the corpus delicti—or fact that a murder had been committed—might be established.

The teen-agers are accused of fatally beating and stabbing 15-year-old Michael Farmer, a victim of infantile paralysis, last July 30 in Highbridge Park. The defendants, ranging from 15 to 18 years old, are members of a gang known as the Egyptian Dragons.

After a 14-year-old prosecution witness had told how he had seen young Farmer being beaten by a defendant who held a "long knife," Mr. Reynolds told the defense he had completed his direct examination.

**Would Recall Witness**

Harold O. N. Frankel, a defense lawyer, moved for permission to reserve cross-examination until the medical examiner had testified. He said he could not "conscientiously" conduct a cross-examination of the witness until he knew the cause of young Farmer's death.

Judge Irwin D. Davidson said that in the "interest of justice," he would permit the recall of the witness for cross-examination, but that he was not giving any lawyer the privilege of reserving his right to cross-examine.

Albert Felix, another defense lawyer, said that this was the first time in his recollection that "so late" in a first-degree murder trial the District Attorney's office still had not established the corpus delicti.

Mr. Reynolds retorted that Mr. Felix's recollection was "limited." The assistant district attorney said that he would present evidence as he saw fit and that his procedure was becoming the "rule" in the District Attorney's office rather than the exception.

Judge Davidson then began calling defense lawyers to cross-examine the witness. Each declined to do so until the medical examiner testified.

**'Travesty on Justice'**

After Judge Davidson excused the jury until 10:30 A. M. today, Emil Schlesinger, one of the lawyers said that if the corpus delicti were not established the trial "will have become a travesty on justice." He said several of the lawyers were "talking of withdrawing from the case."

The prosecution witness yesterday was Patrick O'Kelly, 14, a pale and obviously frightened member of the Egyptian Dragons. For his part in the Highbridge Park assault, he was adjudged a juvenile delinquent and is serving an indeterminate sentence in Lincoln Hall, a reformatory at Lincolndale, N. Y.

Young O'Kelly said that on July 30 he had seen one of the defendants carrying a tin broom handle and another a so-called gravity knife. He said a third had a knife in his belt, and a fourth had a "long knife" with a blade twenty-four inches long.

The witness said he had seen Charles Horton, 18, of 740 Riverside Drive—the youth with the long knife — striking the Farmer boy, who was lying on the steps near the park pool. O'Kelly said he then had become frightened and had run away.

The defendants, besides Horton, are Leroy Birch, 19, of 532 West 131st Street; Lencio De-Leon, 15, of 569 West 150th Street; John McCarthy, 15, of 614 West 152d Street; Richard Hills, 15, of 583 Riverside Drive; George Melendez, 18, of 130 West 125th Street and Louis Alvarez, 16, of 1494 Amsterdam Avenue.

The New York Times
Published: February 20, 1958
Copyright © The New York Times

KR01478

# SENTENCE IN KNIFE SALE

## Suspended Term Imposed in Gravity-Blade Case

A 25-year-old novelty store salesman received a three-month suspended sentence yesterday for the sale of a gravity knife. Sentence was imposed in Special Sessions Court by Justices Louis I. Kaplan, John V. Flood and Anthony Maglio.

At the trial of the salesman, Terry Powell of 305 East Twenty-fourth Street, the Court had held that gravity knives were in the same category as switch-blade knives and that their sale or possession was a violation of the Sullivan Law. Powell had sold a gravity knife to a detectve.

A gravity knife opens with the flick of the wrist or by holding it blade-down so that gravity sets the blade in place for cutting.

𝕿𝖍𝖊 𝕹𝖊𝖜 𝖸𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘

Published: March 26, 1958

Copyright © The New York Times

KR01479

# SWITCHBLADE CURB
# VOTED BY CONGRESS

WASHINGTON, July 31 (UPI)—Final Congressional approval was given today to a ban on the interstate manufacture and shipment of switchblade knives.

The Senate passed and sent to the White House a bill to carry out the ban. It would impose penalties of up to a $2,000 fine and five years in prison for violations.

Warren G. Magnuson, Democrat of Washington, chairman of the Senate Commerce Committee, emphasized that the legislation would "not affect sportsmen, mumblety-peg or having a Boy Scout knife." He said it was designed to make concealed-blade weapons less available for criminal purposes.

"When I was a boy a juvenile delinquent was a kid who owed 8 cents overdue on a library book," Mr. Magnuson told the Senate. "Apparently times have changed."

The bill would not bar possession or manufacture of switchblades within states that permit their use. Twelve states have banned the weapons.

The sale of switchblade knives has been banned in New York State since March 28, 1954.

However, a new version called the "gravity knife" has appeared in an attempt to circumvent the law. Switchblades use a spring. The gravity knife uses a weighted blade concealed in a hollow handle. A flick of the wrist locks the blade in position.

The New York Times

Published: August 1, 1958
Copyright © The New York Times

KR01480

# ASSEMBLY VOTES GRAND JURY CURB

## Would Require Secrecy for Presentments That Do Not Accuse Anyone of Crime

By WARREN WEAVER Jr.

Special to The New York Times.

ALBANY, Feb. 29—A bill requiring that grand jury presentments be kept secret if they do not accuse anyone of a crime was approved tonight by the Assembly. The vote was 120 to 22.

There was no debate on the measure. Three Democrats joined nineteen Republicans in opposing it. The bill now goes to the Senate.

The measure provides that presentments, reports or minutes of a grand jury that charge misconduct not amounting to a crime cannot be published or made public unless there is some allegation of misconduct in public office.

The bill provides, however, that it will not restrict the right of a court to transmit any such grand jury record to "legally constituted governmental agencies or officers for appropriate action."

The sponsor of the bill was Assemblyman Bentley Kassal, Democrat of Manhattan.

Two bills recommended by the State Law Revision Commission would give these courts the power to issue an "order of protection" in any case involving a child within their jurisdiction.

At present such orders may be issued only in support proceedings.

An order of protection would affect a child's parent or guardian or their spouses. It would require them to take certain steps or it would forbid certain acts.

### Examples Are Cited

For example, it could guarantee a parent visiting rights with respect to a child living with the other parent, or it could prevent a husband from "offensive conduct" toward a wife who has received custody of their child.

Such an order could force a person with custody of a child "to give proper attention to the care of the home" and "to refrain from acts of commission or omission that tend to make the home not a proper place for the child."

The bills were sent to the Assembly for concurrence. They are sponsored by Senator John H. Hughes, Republican of Syracuse.

The Senate also approved and sent to the Assembly a measure that would make the presence in a car of a switchblade or gravity knife presumptive evidence of its illegal possession by the driver and all the passengers. Such presumption already attaches where unlicensed pistols or blackjacks, slingshots, brass knuckles, bludgeons, bombs, and daggers are found in cars.

### Anti-Bias Bill Adopted

Final passage was also given in the Senate to a bill that would require parties intending to initiate an action under the state's anti-discrimination laws to notify the Attorney General.

Other bills approved in the upper house today would:

¶Authorize a trial judge in a criminal case to furnish the defendant or his attorney with a transcript of the proceeding after conviction if he sees fit.

¶Authorize municipalities to supplement pensions being paid to widows, dependent children or dependent parents of policemen and firemen, as well as to the pensioners.

¶Increase the maximum interest rate on bonds of the Suffolk County Water Authority from 5 to 6 per cent.

The New York Times
Published March 1, 1960
Copyright © The New York Times

KR01481

# Arsenal Of Delinquency

### By WILLIAM McINTYRE

CUTLERY FOR SALE—A display in a Forty-second Street store window.

THE Europeans who regard America as a contemporary Roman Empire have new affirmation of their appraisal: juvenile delinquents in New Jersey have revived an ancient Roman weapon called the cestus. The pugilists of two thousand years ago reinforced each hand with a heavy circlet of leather—which was often loaded with lead or iron. The N. J. J. D.'s modernized this handy device by adding a bristling row of sharp nails.

The arsenal of delinquency is growing. "Use of dangerous weapons by youths and children under the age of 21 is much greater than indicated by arrests," said a lieutenant of the New York City Police Youth Division. One thousand sixty-seven arrests for possession of dangerous weapons were made last year. There are almost a hundred fighting, or "bopping," gangs in New York City with an average enrollment of thirty-five or forty members. Half the gang members—by conservative estimates—carry dangerous weapons, or have them

readily available. More liberal estimates claim three-quarters of the gang members are armed. No one knows how many local juveniles not associated with gangs possess arms, but there are undoubtedly thousands.

The dangerous weapon has become a status symbol of delinquency. It gives color, glamour and prestige to the Big Man who carries it; and, the more dangerous the weapon, the more "rep," or prestige, it brings.

THE Sullivan Act has made it very difficult for juvenile delinquents to arm themselves with conventional hand guns—a police pistol permit is necessary to buy them. As a result, they have learned to make their own: the famous "zipgun." The barrel of this piece of gutter ordnance is made of a length of automobile-radio antenna, or metal tubing whose bore neatly accommodates a .22-caliber bullet. Segments of the tubing are either taped to a wooden frame, or else fixed inside the barrel of a toy pistol.

In the toy pistol, the firing mechanism is powerfully strengthened by heavy rubber bands looped behind the hammer. In the wooden-frame zipgun, an ordinary, sliding-bolt lock used on doors serves as the firing device. Again, rubber bands—or springs—hooked around the stud of the sliding bolt, snap the bolt forward to strike the base of the cartridge. A .22-caliber cartridge needs no firing pin to explode it; a sharp blow on the base is sufficient. In spite of the ingenious design, however, a zipgun is wildly inaccurate—it is

almost as dangerous to fire one as to be the target.

The source of supply of zipguns obviously can't be shut off, and furthermore, the police must apprehend an owner with one in his possession in order to prosecute him. Consequently junior gunmen often use girl friends, or "debs," as gun-bearers. A female can be searched only by a policewoman, and the toughs know that it's usually difficult for patrolmen to secure the assistance of a policewoman on chance investigations. What is more, young children are often

coerced into carrying the weapons.

The police feel that zipguns could be eliminated as a serious problem if the sale of ammunition were controlled by state laws. If a hunting license, a pistol permit, or a membership card in a reputable rifle association were necessary to purchase ammunition, they say, virtually none would get into the hands of zipgunmen.

Legislation to control sale of ammunition passed the

(Continued on Page 62)

The New York Times

Published: May 1, 1960
Copyright © The New York Times

KR01482

(Continued from Page 59)

state Senate as part of Mayor Wagner's program in the last session at Albany, but subsequently suffered a decisive defeat in the Assembly. Opponents, taking the point of view of hunting clubs and rifle associations, argued that such a restriction would infringe on the constitutional rights of an individual to bear arms.

Next to zipguns, knives are the most dangerous weapons in delinquency land. Until about three years ago, the switch-blade knife was the favorite weapon in this category. This pocket dagger has a folding blade that springs into place when released by a safety-catch. When state legislation specifically outlawed it, the "gravity knife" became the favorite for a brief period. This ingenious design features a hollow handle out of which the blade slides when released by a catch. An amendment to the law banned the gravity knife as well. Now both these weapons play a minor rôle in the arsenal of juvenile delinquency.

Under state law, a concealed knife whose blade exceeds a four-inch length is illegal, but an unconcealed knife can be any size. Consequently, many cutlery merchants in New York City deal in a colorful assortment of commando daggers, hara-kari knives, machetes, throwing knives, bolos, hunting



CESTUS—New Jersey J. D.'s improved upon this weapon of ancient Roman pugilists by adding spikes.

knives and bayonets. Inevitably, many of these reach the hands of juvenile delinquents.

Knife-like weapons also include beer-can openers, razors and cleavers. The array is so variegated that state laws don't cover them adequately. As a result, local police in booking offenders have had to cite a section of the city's Administrative Code.

This section of the code is so inclusive that it proscribes practically every instrument, of whatever size, capable of penetrating or cutting. Under this sweeping regulation, even a Boy Scout could be held a criminally armed juvenile. The code section is scheduled to come under fire before the Court of Appeals. The American Civil Liberties Union, carrying the attack, contends it violates constitutional rights.

LAWS prohibit the carrying of bludgeons —yet they are carried and used. They include chains (dog, bicycle and tire), sandbags, blackjacks, billy clubs, rubber hose, segments of heavy electrical cable, whip-like automobile radio antennas and, cruelest of all, a variety of small industrial conveyor belt, one side of which is closely set with sharpened metal teeth a quarter-inch long.

When asked why so many young people risk arrest for carrying weapons, a policeman shrugged and laconically conceded they knew how overcrowded the "correctional" facilities are. The small-fry hoods knew they would probably escape punishment, he said, simply because there's no place to put them.

Anyway, it's clear that the people who are attempting to eliminate the arsenal of delinquency in New York are getting no further than the delegates to the disarmament conference in Geneva.

KR01483

# Rise of 40 Million In Care of Elderly Voted by Assembly

**By LAYHMOND ROBINSON**

Special to The New York Times.

ALBANY, March 13.—The Rockefeller Administration bill providing for a $40,000,000 expansion of medical care for the needy aged sailed through the Assembly today.

The measure was unanimously approved after a minimum of debate. It was then sent to the Senate, where approval is expected this week.

The bill, which would take advantage of Federal legislation passed last year, would go into effect April 1.

Governor Rockefeller's program is in two parts. First, it covers for the first time 92,000 persons 65 years old or older who are "medically indigent"—that is, who have enough to live on but not enough to pay doctor or other medical bills.

### Aid Would Rise

Second, it would increase state and Federal contributions to localities now providing medical care under public welfare for aged persons and make available to welfare patients some medical services not now available at public expense.

The provisions of the new program would be administered by local welfare departments.

New York City and a few municipalities upstate already aid the "medically indigent" at their own expense. It has been estimated that the new program will save the city $16,-000,000 a year by passing most of the burden to the Federal Government.

The Governor's program would provide payment in whole or in part for the following: physicians' services; treatment, maintenance and nursing services in hospitals, nursing homes and other medical insti-

Continued on Page 24, Column 6

**The New York Times**

Published: March 14, 1961
Copyright © The New York Times

KR01484

# ASSEMBLY VOTES MORE AGED CARE

Continued From Page 1, Col. 3

intimes; outpatient hospital and allied services; home nursing services; drugs; sickroom supplies; dental work and physical therapy.

Meanwhile, a series of bills to require the Port of New York Authority, the Triborough Bridge and Tunnel Authority and other authorities to file annual financial reports were submitted. These also had the backing of the Rockefeller Administration.

Other legislative actions here today included the following:

## SAFETY BELT ATTACHMENTS

The Senate passed by a vote of 55 to 1 and sent to the Assembly a measure that would require new automobiles sold in the state after June 30, 1963, to have fixtures for attaching safety belts.

The automobile industry has agreed to place such fixtures in cars but the measure, introduced by Republican Senator Edward Speno of Nassau County, would make them mandatory and would set quality standards. Motorists would have to supply their own safety belts.

## LIMITED DRIVING PERMITS

The Assembly approved and sent to the Senate a measure that would permit the Motor Vehicle Department to issue limited licenses to truck and taxi drivers who have had their regular chauffeurs' licenses suspended or revoked.

The special permit would allow such drivers to continue to earn a livelihood. They would, however, be restricted to driving vehicles owned by their employers. Several members of the Assembly objected to the measure on the ground that it did not extend this privilege to salesmen and others who need a car to earn a livelihood.

## TESTIMONY OF PSYCHIATRISTS

In a unanimous vote, the Assembly approved and sent to the Senate a measure that would give psychiatrists greater freedom in testifying in court cases involving the question of criminal insanity of the defendant.

The measure is a companion to another bill passed by the Assembly last week that would give a new and broader definition to criminal insanity. The bill passed today would permit psychiatrists to explain and clarify their diagnosis of the mental condition of the defendant instead of being restricted largely to "yes" and "no" answers as they now are.

## LIABILITY OF BOAT OWNERS

The Assembly passed and sent to the Senate a measure that would make boat owners liable for accidents in, which other persons were using their vessels. It would thus extend to boat owners the same liability as now exists for automobile owners.

The measure was introduced by William Expelman, Democrat of the Bronx.

## JURY DUTY FOR TEACHERS

Governor Rockefeller signed a bill extending for two more years the right of school teachers in New York City to be exempted from serving on juries.

## STATE HEALTH CODE

The Assembly passed and sent to the Senate a bill that would require the State Health Council, which supervises the State Sanitary Code, to hold public hearings before amending the code.

## HOUSING

The Assembly approved, over the opposition of some Democrats, a Republican-sponsored resolution calling upon the New York City Board of Estimate to spend authorization of $47,400,000 in proposed middle-income housing projects as a means of aiding the lagging construction industry. The bill was sponsored by Alfred Lerner, Republican of Queens.

## DELINQUENCY

The Senate approved and sent the Assembly an anti-delinquency measure that would regard the finding of a switchblade or gravity knife anywhere in an automobile as proof that the knife was in the possession of all persons in the car.

## HUMAN RELATIONS

The Assembly approved and sent to the Senate a measure authorizing county boards of supervisors to create human relations commissions in their counties as a means of promoting better racial relations. The measure was sponsored by J.

## MORTGAGES

The Assembly approved by a 130-12 vote and sent to the Senate a measure that would permit savings banks to lend up to 66 per cent of the appraised value of a one or two-family home in mortgage transactions. The investment ceiling the savings banks is now 80 per cent of the appraised value of the home.

The measure, introduced by Christian E. Armbruster, Republican of Westchester, would also give savings banks the right to collect, without payment of interest, one-twelfth of real estate taxes, school taxes and insurance premiums in addition to the monthly repayment on the mortgage loan. This provision would write into law a practice that is common in arranging mortgages.

## RENT CONTROL

At the night session the Republican majority in the Assembly beat back Democratic attempts to force from committee four bills sponsored by Bertram L. Podell, Democrat of Brooklyn, aimed at closing loopholes in the Rent Control Law and curbing profits of landlords.

## MILK DATING

Also at the night session the Republicans voted down a motion by Assemblyman Daniel M. Kelly, Democrat of Manhattan, to bring to the floor his bill to reinstate the requirement that milk sold in New York carry the date of pasteurization. The state stripped the city of the right to require milk-dating last year.

## SUNDAY LAW

Just before it adjourned late tonight, the Assembly, by a vote of 145 to 4, approved a measure to permit the sale on Sunday of gasoline and other supplies for boats. Opposition came mostly from New York City Democrats, who complained that the Sunday closing law should not be charged piecemeal but should undergo a comprehensive revision that would include the right of non-Christian store owners to remain open on Sunday.

KR01485

# CURBS EXTENDED ON BUSINESS RENT

## But State Grants Landlords Here More Authority

Special to The New York Times

ALBANY, April 16—Rent controls on business and commercial properties in New York City have been extended for another year. But the new laws give the landlords greater authority than they now enjoy.

The companion bills, which Governor Rockefeller's office said today he had signed without comment, continue action begun by the Legislature about ten years ago to decontrol rents on such property. Only a relatively small part of the commercial and business space in the city is now affected by the controls.

The new laws allow a landlord to evict a tenant on behalf of a prospective tenant who wishes to lease or sub-lease the entire building for twenty-one years or more. At present the tenant may not be evicted unless the landlord himself wants the space.

The new laws force commercial tenants with rents of $1,250 a year or more to match any offer made in good faith by someone else or to vacate. Up until now only those paying at least $2,500 a year were required to match offers from others.

### Rent Figures Cut

A landlord may now evict a commercial tenant paying a controlled rent of $1,250 a year or more who refuses to accept a two-year lease. The same applies to a store tenant who declines to accept a ten-year lease at $1,250 a year or more if such an offer had been made by another prospective tenant. In both cases, the rent figure has been cut in half from $2,500.

### RENEWAL OF CONTRACTS

Mr. Rockefeller approved legislation that prohibits the automatic renewal of service, maintenance and repair contracts, unless advance notice is given that the contract is expiring. The bill applies to contracts signed or renewed after Oct. 1.

### HEALTH CODE

The Governor also signed a bill changing the name of the New York City Sanitary Code to the Health Code.

### CITY MARSHALS

In another action the Governor vetoed a bill for the appointment of 100 city marshals to serve six-year terms in a proposed New York City Court of Civil Jurisdiction.

Provision for the city-wide court is included in a constitutional amendment to be submitted to the voters in November. The amendment calls for reorganization of the state's court system.

The Governor said that the matter of marshals for the proposed court should be studied by a joint legislative committee charged with implementing the court reorganization plan.

### SWITCHBLADE KNIVES

Mr. Rockefeller signed a bill making the presence of a switchblade or gravity knife in an automobile presumptive evidence of its illegal possession by all persons in the car at the time the weapon is found.

The New York Times
Published: April 17, 1981
Copyright © The New York Times

KR01486

# NEW LAW WIDENS HOUSING BIAS BAN

### Governor Hails Measure That Is Effective Today

Special to The New York Times.

ALBANY, Aug. 31—A new state law prohibiting discrimination in the sale or rental of some private housing was praised tonight by Governor Rockefeller.

The Governor cited the housing measure, one of sixty-one laws passed by the Legislature that go into effect tomorrow, as "a further gain" by the state in legislation against discrimination based on race, color, creed or national origin.

"I am confident that New Yorkers will look upon this measure in the same spirit of human brotherhood and social advance as previous legislation in this field has met," Mr. Rockefeller said in a statement issued by his office here.

The major provisions of the law prohibit the following things:

¶Discrimination in the sale or rental of multiple dwellings of three or more units, except three-family dwellings in which the owner occupies one unit.

¶Discrimination in the rental or initial sale of private houses in developments of ten or more.

¶Discrimination in the sale or rental of all commercial property.

¶A refusal by a real estate broker or salesman to offer any housing accommodation to a prospective customer because of his race, color, creed or national origin.

¶Printing or circulating by a broker or salesman of any statement expressing a discriminatory limitation in the sale or rental of property.

¶Any religious or racial discrimination by a lending institution in mortgage rates, terms or conditions.

#### Law Being Explained

The law, which was sponsored by Senator George R. Metcalf, Republican of Auburn, and Assemblyman Bertram L. Baker, Democrat of Brooklyn, carries an appropriation of $100,000 for the State Commission Against Discrimination to enforce its provisions. The commission has been holding public meetings throughout the state to explain the new law.

The main effect of the law is expected to be felt in the New York suburbs. The Committee on Discrimination in Housing has estimated that it will affect only about 20 per cent of private housing upstate.

Also going into effect tomorrow is the controversial Speno-Brennan Law, granting free transportation for private and parochial school pupils. The law was enacted by the 1960 Legislature, but was amended this year.

One amendment makes clear that New York City and other city school systems do not have to provide such transportation. Another requires transportation only to the school nearest the child's home.

Under the law, school districts must provide free bus service if it had been requested by Aug. 1, when a home is at least two miles, but not more than ten miles from the school. Heretofore, such transportation was optional on the part of the districts.

#### Other Laws Effective

Some of the other laws that become effective tomorrow do the following things:

¶Automatically revoke the driver's license of anyone convicted of advocating the overthrow of the government.

¶Provide greater legal protection for children involved in adoptions arranged between families instead of by regular adoption agencies.

¶Make the presence of a switchblade or gravity knife in a car "presumptive evidence" of its illegal possession by everyone in the car.

¶Set up a central registry for fathers of abandoned children who are on relief. The purpose is to locate the fathers and force them to support their families.

¶Require school districts to train or instruct severely retarded children and permit schools to set up special classes for emotionally disturbed pupils.

¶Allow osteopaths to be licensed by the State Education Department to practice medicine and surgery.

¶Require secrecy about state personal income tax returns on the part of any private employer who, in doing work for the state, might see such returns.

In another law that becomes effective the unauthorized use in advertisements of the name of any nonprofit organization is forbidden.

The New York Times
Published: September 1, 1961
Copyright © The New York Times

KR01487

# A DEFENSIVE ARM MAY BE ILLEGAL

### Law Rules Out Possession of Switchblade Girl Used to Repel an Assailant

#### OTHER WEAPONS BARRED

### Many Women Are Reported to Be Buying Small Hatpins to Fight Off Attackers

**By CHARLES GRUTZNER**

A woman may legally defend herself against a mugger or a rapist with a Boy Scout knife, a hunting knife, pen knife or a carving knife, but she may not carry a switchblade or gravity knife for the purpose.

And a storekeeper or householder may shoot a burglar with a rifle or shotgun, but not with a submachine gun or a pistol for which he has no permit.

These legal niceties of self-defense were spelled out yesterday by the police and Queens District Attorney Frank D. O'Connor in explaining the arrests of Arlene Del Fava and Frank L. Felicetti in separate cases.

Miss Del Fava, 27-year-old secretary to a New York University professor, who used a switchblade knife early Sunday against an alleged rapist near her home in Forest Hills, Queens, faces a court hearing on July 14 for possession of an illegal weapon.

Mr. Felicetti, 31-year-old owner of a candy store at 105-



*United Press International*
Arlene Del Fava at home in Queens after her release.

01 Corona Avenue, Corona, Queens, is awaiting the action of a grand jury on a felony charge of illegal possession of a revolver. He shot two burglars, one of them fatally, on June 7 as they fled from his store with $30 from his cash register and 500 packs of cigarettes.

Mr. O'Connor said yesterday that Miss Del Fava's offense, like Mr. Felicetti's, was possession of an outlawed weapon, not the use made of it. There would have been no arrest, he said, if Miss Del Fava had used some other kind of knife or Mr. Felicetti had used a rifle or shotgun.

Switchblade knives — whose blades spring open at the touch of a button—and gravity knives —whose blades snap open at the flick of a wrist—are specifically outlawed by Section 1897 of the State Penal Law, commonly known as the Sulli-

Continued on Page 71, Column 5

**The New York Times**
Published July 7, 1964
Copyright © The New York Times

KR01488

# A DEFENSIVE ARM
## MAY BE ILLEGAL

### Continued From Page 57

van Law. Like pistols, whose owners lack police permits, these weapons are "malum per se," which is lawyer talk for "evil of themselves."

Other weapons whose mere possession is cause for arrest are listed in Section 1897 as a blackjack, slingshot, billy, sandclub, sandbag, metal knuckles, bludgeon, machine gun, submachine gun, bomb and bombshell.

Possession of other weapons, including a dagger, dirk, dangerous knife, razor, stiletto and imitation pistol, is illegal only if it can be proved that the owner intended "to use them illegally."

Miss Del Fava, who was released in her own custody by Criminal Court Judge Thomas Fitzgerald, said at her home, 87-15 102d Street, that she had found the three-inch switchblade knife in a bureau drawer at home a year ago. She said she began carrying it in her purse after the murder last March of Catherine Genovese in nearby Kew Gardens.

### Didn't Know Law

"I didn't want to be another Kitty Genovese," Miss Del Fava told reporters. "I didn't know it was against the law to carry that knife.

"The police were wonderful. They felt really bad that they had to arrest me just because it was the kind of knife I used. When I have to go out again, I'm going to try not to stay out late alone. But if I am, I'll be carrying a hatpin — one like grandmother used to carry."

Department store clerks said many New York women were buying hatpins for defense, but not the 10- or 12-inch kind that grandmother used to wear. The hatpins selling briskly in the notions departments are two to five inches long. The shorter ones, priced at 10 cents and 29 cents, have black or imitation pearl tops; the larger ones, with multicolored "jeweled" knobs, are $1.

"We sell about a hundred a week," said a saleswoman in a midtown notions department. "They're used for corsages, only occasionally for hats, and about a dozen women a week tell me they use them for self-defense. I carry one in my purse. It wouldn't do much good in a real attack, but it's handy in a crowded subway. You'd be surprised how many smart molesters there are."

### O'Connor Investigating

Mr. O'Connor said his office was investigating how the switchblade came to be in the bureau drawer in which Miss Del Fava said she found it.

"I don't know just what we'll do," he said, "but if her story checks out all right I think any judge would let her off."

Capt. Paul Glaser, spokesman for the Police Department's community relations unit, said it was legal for anyone to defend himself with any instrument at hand, but that the fact of possession of a proscribed type of weapon was of itself an offense. Such weapons as switchblade knives and pistols, except those covered by a pistol permit, were outlawed because of their habitual use by gangsters and other criminals.

Miss Del Fava said she had gone to the World's Fair, within walking distance of her home with a girl friend on Saturday night. On their return, after midnight, she left the friend at her home and started walking several more blocks toward her own home.

"I noticed this man walking behind me, very quietly," she

said. "Suddenly, he grabbed me around the legs and tried to drag me into the shadows. I reached into my bag. I threw myself over him so I wouldn't fall backward on the ground. I pressed the button on the knife, and suddenly he let go.

"I didn't realize that I had stabbed him. I had blood on my hand but I had cut my finger and I thought it was mine. Then he came at me again. I pleaded with him to let me alone. I told him I didn't want to hurt him, but he kept coming. Then I panicked and ran. I flagged down a car and a man drove me home.

"When the man who drove me home saw the knife he told me it was against the law. He said I'd be arrested if I called the police. But I told him I had to because that man was still loose and had to be picked up."

The alleged assailant, Harold Moffett, a 20-year-old Navy apprentice fireman of 105-21 83d Street, Forest Hills, was arrested at Queens General Hospital, where his parents had taken him. He was reported yesterday in good condition, with two stab wounds in the back and left side.

KR01489

# Running Afoul of the Law

**By LYDIA STRONG**

THE scene was a street in New York, with three high-school seniors on their way to school. A car stopped and honked; the driver was a boy they knew.

"Want a lift, fellas?"

They got in, but they didn't get to school. They were stopped by police. The car had been stolen, and all four boys were charged with grand larceny. The case against the three passengers was eventually dismissed, since they convinced the judge that they had not known the car was stolen. The arrest record, however, remains on the books—an obstacle and a cause for explanation throughout their lives, each time one of them applies for a government job, for a job requiring security clearance, or for most other jobs or careers.

Everyone knows that rape and murder and robbery are crimes, but normal youngsters don't usually commit such crimes. What everyone doesn't know is that even a fairly well-behaved boy or girl can fall afoul of the law through mischief, high spirits, carelessness, or ignorance.

Jerome M. Lasky, former judge in the Nassau County District Court, became so concerned over some of the cases coming before him that he wrote a pamphlet, "The 'Innocent' Offender," to warn agers against crimes they unwittingly commit.

"An arrest record follows you wherever you go, no matter how small the offense," says Judge Lasky. "It can keep you from getting a bond. It can prevent you from working for the city. It can stop you from getting a job in a defense plant. It can prevent you from becoming an officer in the armed forces, from entering Government service, from entering the law or other professions."

THE truth of Judge Lasky's assertions is illustrated by a brief filed recently in the New York State Supreme Court by Nanette Dembitz of the New York Civil Liberties Union. She is seeking to expunge the arrest records of several college students.

The students engaged in peaceful picketing on the opening day of the World's Fair. They did not obstruct traffic, but merely walked up and down in front of a company exhibit to call attention to what they considered the company's discrimination against Negroes. They were arrested and charged with disorderly conduct and obstructive conduct, but the charges were dismissed. They were innocent.

... e of the group spent months ... ng for a State Civil Service job as an employment interviewer. He took an examination for this job. But he had to say yes to a question on the application blank: "Were you ever arrested for any violation of the law?"

It took months to investigate the arrest record, Miss Dembitz says, and in the meantime the jobs were filled by applicants with lower examination grades than her client.

Many private employers and employment agencies ask job applicants to state whether they have ever been arrested, and also whether they have ever been convicted of a law violation. Even if the New York Civil Liberties Union were to succeed in its attempt to get the arrest question off application blanks, the question on convictions would remain—and many young people are convicted of crimes they might have avoided had they fully understood the nature and consequences of the act.

BOYS fight. But the law says it is illegal to use force or violence toward a person, with or without a weapon, except in self-defense—and even then, one must use no more force or violence than is required for self-protection. This means that the boy who starts a fight is wrong from the start. His opponent is wrong, too, if he keeps on fighting after he has won.

Few youngsters understand the wide sweep of "disorderly conduct." Standing on a street corner and making offensive remarks is disorderly conduct—and what seems only like mild joshing to a group of boys may seem offensive to passers-by. A police officer may agree with them.

Youngsters are often picked up for hanging around a diner or soda parlor after the proprietor has asked them to leave. They feel they have spent their money there and have a right to stay. But this, too, is disorderly conduct in the eyes of the law.

Loitering in a school building, in itself and without any other action, is disorderly conduct. A boy was convicted of this offense for coming back to his old school to talk with his friends, after the principal had objected. His 10-day sentence was suspended—but the conviction remains on his record.

Weapons are contraband. It is illegal for anyone not specifically authorized or licensed to have in his possession any firearm, gravity knife, switchblade knife, billy, blackjack, or metal knuckles. It is also illegal for children under 16 to possess an air gun, a spring gun, a toy pistol that looks like a real one, or a slingshot. (There's an exception for members of rifle clubs and teams.)

Youngsters frequently involve themselves in trouble through a mistaken sense of loyalty. A boy may be with another who violates a law—by shoplifting, by harassing a younger boy, by turning in a false fire alarm. If the boy can't dissuade his companion, he should leave him. And if a police officer arrests the lawbreaker, the innocent boy should not help him to resist arrest. He can't help his friend, but he can get into trouble.

All of this may sound as though the police were anxious to arrest young people; they are not. But it is their job to uphold the law; a young lawbreaker is bound to collide with them sooner or later.

IF he is under 16, he gets a certain amount of protection under the Family Court Act of 1962. Short of capital crimes, a child under 16 cannot be charged with crime; his offenses are called juvenile delinquency. He may be detained rather than arrested; therefore he can say no in later years to the arrest question.

After an investigation, he may have to appear in court, where a finding of facts is made. If he is found to have committed the act complained of, he may be put on probation or sent to an institution. He will not have to say later that he has been convicted of a

(Continued on Following Page)



A highway patrolman stops a teen-ager. Young people must learn that the record of an arrest arising out of high spirits or ignorance of the law can follow them for the rest of their lives.

The New York Times

Published: January 16, 1966
Copyright © The New York Times

KR01490

# Running Afoul of the Law

*(Continued from Preceding Page)*

crime. These records are "sealed" —but, as we shall see, some employers can and do look at them.

Youths of 16 to under 19, if they have not previously been convicted of a felony, may at the judge's option receive Youthful Offender treatment. Under this procedure, the trial is not in open court and the conviction, if any, is for being a youthful offender. These records, too, are supposed to be sealed.

But in practice, sealed records don't necessarily remain entirely confidential. Some employers, like the New York City Civil Service Commission and the U. S. Armed Forces, fingerprint applicants. The fingerprints are checked and if a police contact of any kind is found, the applicant may be asked to produce the court record, or to sign a release permitting the employer to check the record.

WHAT should a young person do if he's picked up — rightly or wrongly—on a charge of violating the law?

First, Judge Lasky advises, he should call his parents immediately or ask the police to call them. Some youngsters don't do this either because they fear their parents more than the police, or because they have a pathological fear of "disappointing" their parents.

Second, he should not plead guilty to any charge without having consulted his parents and, preferably, an attorney. Even if he has done something wrong, he may not be guilty of the offense as charged. He's not in a position to decide this, and he should not let the police decide it for him.

"Some children plead guilty just to get away," Judge Lasky says. "They feel if they get off with a small fine or suspended sentence, their parents need never know. They don't realize the consequences."

Should a child in police custody answer questions put by the police? He certainly is under no legal obligation to do so. And there is the possibility that a youngster, confused and in panic, may confess to something he did not do. On the other hand, he might have something to say that could clear up a mistake and reduce or remove the charge against him. It is probably safer for him to tell his lawyer first, or at least his parents, and let them decide.

WHAT can parents do to keep their children out of court?

Obviously, they should know the laws—especially those most often broken by youngsters—and they should share this information with their children. One way to learn is to read Judge Lasky's pamphlet, "The 'Innocent' Offender" (25 cents from the Young Adults Publishing

Company, Box 200, Merrick, N. Y.) or another on the same theme, "The Law and You" (free from Nassau County Police Department, Mineola, N. Y.).

In a deeper sense, parents start keeping their children out of court and out of trouble almost from the day they are born.

If discipline from babyhood on has been not just the imposition of external constraints, but the development of judgment and conscience, the child has usually learned to respect himself and the rights, the property and the sensibilities of others. This is what law is all about.

This does not mean, of course, that a youngster can be left entirely to his own devices. He still is a child; his judgment has not been tempered by experience, and he can be influenced by other children to do things in a group he would not do of his own accord.

Judges, youth workers, lawyers, and psychologists agree on the

> **66Some children plead guilty just to get away. They feel if they get off with a fine, their parents need never know. They don't realize the consequences.99**

need for parental supervision and on the woeful—and surprising— lack of it in many families. One hears, tales like these: a mother whose son is arrested for stealing —and who is genuinely surprised to learn he's been using narcotics for a year; parents who are called about a child picked up in the small hours in a dangerous area, who say, "Can't you keep him overnight?" and parents whose son is arrested Saturday night, and who have not noticed by Sunday morning that he is missing from the home.

Whether such seeming neglect is caused by trust, by indifference, or by fear of alienating the child, it can be damaging.

Be aware, say the law enforcement people. Take time to look at your children, and to talk with them. Know what they're doing and what's on their minds. Helping them keep out of trouble will be only one of your rewards.

Published: January 16, 1966
Copyright © The New York Times

KR01491