USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 27, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
JOHN COPELAND, PEDRO PEREZ, AND                                   :
NATIVE LEATHER, LTD.,                                             :
                                                                  :        11 Civ. 3918 (KBF)
                                        Plaintiffs,               :
                                                                  :        OPINION & ORDER
               -v-                                                :
                                                                  :
                                                                  :
CYRUS VANCE, JR., in his Official Capacity as                     :
the New York County District Attorney, and CITY                   :
OF NEW YORK,                                                      :
                                                                  :
                                        Defendants.               :
                                                                  :
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        Plaintiffs John Copeland, Pedro Perez, and Native Leather, Inc. ("Native

Leather") assert an as-applied constitutional challenge to the validity of New York

Penal Law §§ 265.00(5) and 265.01(1), which criminalize the possession of gravity

knives (the "Gravity Knife Law" or "Gravity Knife Statute"). (See Amended

Complaint ¶¶ 59-60, ECF No. 61.) The Gravity Knife Statute defines a gravity

knife as "any knife which has a blade which is released from the handle or sheath

thereof by the force of gravity or the application of centrifugal force which, when

released, is locked in place by means of a button, spring, lever or other device." N.Y.

Penal Law § 265.00(5). Defendants employ a functional test – referenced as the

"Wrist-Flick test" – to determine whether a knife falls within the prohibitions of the

Gravity Knife Law. Under the New York Penal Law, a person who possesses a

gravity knife is "guilty of criminal possession of a weapon in the fourth degree."

1

N.Y. Penal Law § 265.01(1).

Plaintiffs contend that the definition of a gravity knife in the Gravity Knife Statute, as measured by the Wrist-Flick test, is unconstitutionally vague in violation of the Fourteenth Amendment.  Specifically, plaintiffs argue that the Gravity Knife Statute is unconstitutionally vague as applied to "Common Folding Knives," which plaintiffs define as "folding pocket knives that are designed to resist opening from the closed position."  (Amended Complaint ¶ 1.)

The core of plaintiffs' challenge is that enforcement of the Gravity Knife Statute through use of the Wrist-Flick test prevents an individual from ever knowing whether a Common Folding Knife that they possess (or would like to possess) is an illegal gravity knife.  This is so, according to plaintiffs, primarily because the Wrist-Flick test is inherently subjective and indeterminate in that outcomes of the test necessarily reflect personal characteristics of the tester such as skill and dexterity.  In support of their position, plaintiffs proffer various hypotheticals.  For example, plaintiffs argue that "[a] person's ability to flick open a knife will vary based on degree of tiredness, injury, etc. . . . Suppose a person has a blister or cut on his strong hand, or has injured his hand or arm.  That person will be entirely unable to perform the Wrist Flick [t]est, or his ability will be diminished."  Plaintiffs likewise argue that someone might be arrested for possession of a gravity knife if they encounter a strong and well rested police officer, whereas they might not be arrested if they encountered a weak and tired officer.  Based on these and other hypotheticals, plaintiffs conclude that application of the

Gravity Knife Law to Common Folding Knives is void for vagueness under the Fourteenth Amendment because no one can determine with any reasonable degree of certainty which Common Folding Knives are legal to possess and/or sell. Plaintiffs assert that the Gravity Knife Law ought to prohibit only those knives that can open by the force of gravity alone, using as their prototypical example "German Paratrooper Knives."

After careful review and consideration, the Court determines that plaintiffs' as-applied vagueness challenge fails and judgment must be entered for defendants. In reaching this determination, the Court hews closely to the facts relating to the particular plaintiffs now before the Court. As to these plaintiffs, the statute provided sufficient notice that their conduct was prohibited. With regard to plaintiffs' claims of future harm due to alleged vagueness inherent in the Wrist-Flick test, the Court finds that none of the plaintiffs has demonstrated that the many hypotheticals that the parties have so vigorously debated is in fact reasonably likely to occur to him or her. Furthermore, the Court concludes that the Gravity Knife Law provides sufficiently clear standards for law enforcement, and that in any event, plaintiffs' conduct fell within the core of the statute's prohibitions.

I.    PROCEDURAL HISTORY

This case was initially filed on June 9, 2011. After a trip to the Second Circuit and back,[1] the parties conducted discovery and proceeded to trial. The

---

[1] This Court initially dismissed plaintiffs' complaint for lack of standing. (ECF No. 80; see also ECF No. 95.) The Second Circuit vacated and remanded that decision in part, finding that although one of the plaintiffs did not have standing, plaintiffs Copeland, Perez, and Native Leather had standing to bring the instant challenge. See Knife Rights, Inc. v. Vance, 802 F.3d 377 (2d Cir. 2015).

parties agreed to a trial proceeding that was largely on the papers.  Plaintiffs

presented affirmative evidence in the form of written submissions.  Specifically,

plaintiffs presented declarations from each of plaintiffs John Copeland, Pedro Perez,

and Carol Walsh (for Native Leather); declarations from experts Bruce Voyles and

Paul Tsujimoto; and a declaration from Douglas S. Ritter.  Defendants also

presented evidence in the form of written submissions.  Defendants presented

declarations from Assistant District Attorney Dan Rather and the following

members of the New York Police Department: Sergeant Tomas Acosta, Lieutenant

Daniel Albano, Sergeant Noel Gutierrez, Detective Ioannis Kyrkos, and Lieutenant

Edward Luke.  The Court also received deposition designations for Captain Michael

Tighe, Lieutenant Albano, Sergeant Acosta, Assistant D.A. Rather, Walsh, and

Tsujimoto.[2]

In addition to receiving written submissions, the Court held a live

evidentiary hearing on June 16, 2016, which included a presentation by Douglas

Ritter[3] (subject to cross-examination) and a cross-examination of Assistant District

Attorney Rather.  Both sides also presented closing arguments.

---

[2] In addition to the papers submitted by the parties, the Court received a motion to file an amicus curiae brief by the Legal Aid Society.  (ECF No. 159.)  The Legal Aid Society submitted their proposed amicus curiae brief alongside their motion papers.  (ECF No. 159-1.)  The Court also received an opposition to the motion from defendants (ECF No. 162) as well as a reply from the Legal Aid Society (ECF No. 163).  Having considered these submissions, the Court denies the motion by the Legal Aid Society (ECF No. 159).  District courts have discretion in deciding whether to accept amicus briefs.  Under the particular circumstances presented here, the Court declines to entertain or accept the filing.  In their proposed amicus curiae brief, the Legal Aid Society presents various facts outside of the trial record and relating to individuals other than plaintiffs here.  In all events, neither the facts presented nor the arguments would alter the outcome of this matter.

[3] Ritter is the founder and Chairman of Knife Rights, a former plaintiff in this case.  (Ritter Decl. ¶ 1.)

II.     FINDINGS OF FACT[4]

    A.     <u>Statutory Framework</u>

        1.     <u>New York Penal Law §§ 265.00(5) and 265.01(1)</u>

Under the New York Penal Law, "[a] person is guilty of criminal possession of a weapon in the fourth degree when: (1) he or she possesses any . . . gravity knife." N.Y. Penal Law § 265.01(1).  Criminal possession of a weapon in the fourth degree is a class A misdemeanor.  N.Y. Penal Law § 265.01.  The statute defines a gravity knife as "any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device."  N.Y. Penal Law § 265.00(5) (together with § 265.01(1), the "Gravity Knife Law" or "Gravity Knife Statute").[5]  Thus, the Gravity Knife Statute consists of two separate requirements: (1) a knife must open by force of gravity <u>or</u> the application of centrifugal force, and (2) once the blade of the knife is released, it must lock in place by means of a button, spring, lever or other device.  <u>See</u> N.Y. Penal Law § 256.00(5).

To meet the first statutory requirement of the Gravity Knife Law, it is clear that a knife need not open by both gravity and the application of centrifugal force; if a knife opens by centrifugal force alone and the blade locks in place once released,

---

[4] The majority of the facts in the trial record are undisputed.  To the extent that the Court must make a finding as between competing assertions, it does so based upon the preponderance of the evidence.

[5] New York first prohibited gravity knives in 1958, and the definition of such knives remains the same today.  <u>See</u> 1958 N.Y. Laws ch. 107, sec. 1, § 1896.  The Court notes that on December 31, 2016, Governor Andrew Cuomo vetoed Assembly Bill 9042-A, entitled: "AN ACT to amend the penal law, in relation to definitions of a switchblade knife and a gravity knife." (<u>See</u> ECF No. 193.)  The vetoed bill, which would have altered the statutory definition of a gravity knife, has no effect on the issues before the Court (and no impact on the Court's decision).

the knife is an illegal gravity knife.  See U.S. Customs Serv., Region II v. Fed. Labor Relations Auth., 739 F.2d 829, 832 (2d Cir. 1984) ("When 'or' is inserted between two clauses, the clauses are treated disjunctively rather than conjunctively."); see also Mizrahi v. Gonzales, 492 F.3d 156, 164 (2d Cir. 2007) ("It is a standard canon of statutory construction that words separated by the disjunctive ['or'] are intended to convey different meanings unless the context indicates otherwise.").  As described below, the Court finds that the Wrist-Flick test measures whether a knife opens by centrifugal force.

> ### 2.   The "Wrist-Flick test"

There is no dispute that the definition of a gravity knife, as drafted in the statute, is a functional one.  To determine whether a particular knife meets that statutory definition, defendants utilize the "Wrist-Flick test."  The Wrist-Flick test is just what its name suggests: using the force of a one-handed flick-of-the-wrist to determine whether a knife will open from a closed position.  Both the statutory text[6] and existing New York precedent make clear that the Wrist-Flick test measures whether a knife opens by centrifugal force.

Centrifugal force is defined as "the apparent force that is felt by an object moving in a curved path that acts outwardly away from the center of rotation." Centrifugal force, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/centrifugal%20force (last visited Dec. 22, 2016).  At trial,

---

[6] The Court also notes that at least some of the Gravity Knife Statute's legislative history supports this conclusion.  The 1957 Bill Jacket of the Gravity Knife Law included a New York Times article from December 1957 that describes a sponsor of the statute opening a gravity knife by "flick[ing] his wrist sharply downward."  (Ex. D-4 at 20.)  Then, as now, knives which could be opened by a flick of the wrist were considered to be particularly dangerous.

plaintiffs' counsel and Douglas Ritter both repeatedly sought to demonstrate what they purported was the Wrist-Flick test.[7]  The New York Court of Appeals recently confirmed that a knife that opens via the Wrist-Flick test meets the statutory definition of a gravity knife.[8]  See People v. Sans, 26 N.Y.3d 13, 17, 41 N.E.3d 333 (2015) (statement in criminal complaint that the defendant's knife opened "with centrifugal force" conveyed that the officer "flicked the knife open with his wrist"); see also People v. Herbin, 927 N.Y.S.2d 54, 55-56 (1st Dep't 2011) (statutory definition of a gravity knife satisfied where "officers release the blade simply by flicking the knife with their wrists"); People v. Neal, 913 N.Y.S.2d 192, 194 (1st Dep't 2010) (operability of knife conformed to statute where officer opened the knife "by centrifugal force, created by flicking his wrist"); Johnson v. New York, 1988 U.S. Dist. LEXIS 9397, at *2 n.1. (S.D.N.Y. Aug. 25, 1988) ("A 'gravity knife' is one in

---

[7] Portions of this demonstration were videotaped.  Plaintiffs' counsel and Mr. Ritter demonstrated a number of knives, none of which were the make and model of the knives possessed by Copeland and Perez at the time of their arrests.  (See June 16, 2016, Tr., ECF No. 191, at 26:09-22.)  Furthermore, there was no evidence that either of these two plaintiffs would purchase one of the specific knives demonstrated if allowed to do so.  Of the knives demonstrated, only one – a "Buck Crosslock" – was specifically identified as a knife that may have been confiscated from Native Leather or was a knife that Native Leather would sell.  (See id. at 24:12-25:10, 26:23-27:04; see also Walsh Decl. ¶ 21.)  In all events, there was a distinct difference between the maneuver employed by plaintiffs' counsel and Ritter and the Wrist-Flick test that is employed by NYPD officers and the D.A.'s Office.  Assistant D.A. Rather testified credibly on this point.  (See June 16, 2016, Tr., at 72:23-73:18.)  Rather testified, and the Court credits, that the motion utilized by plaintiffs' counsel and Ritter was exaggerated and was not the Wrist-Flick test.  (See id.)  Accordingly, the Court found the demonstration interesting, but not relevant to the question of whether different applications of the Wrist-Flick test would have different outcomes.

[8] Courts have examined whether a knife must open on every attempt in order to be considered a gravity knife and have found that it does not.  See, e.g., People v. Smith, 309 A.D.2d 608, 609, 765 N.Y.S.2d 777 (1st Dep't 2003) (upholding conviction under the Gravity Knife Statute against evidentiary challenge where "the knife malfunctioned on some of the detective's attempts to operate it"); see also Carter v. McKoy, 2010 U.S. Dist. LEXIS 83246, at *13 (S.D.N.Y. Aug. 9, 2010) (noting that "under New York law, a knife need not work consistently in order to support the finding that it is a gravity knife").  This is plainly correct as the statute does not, on its face, require any particular number of applications of gravity or centrifugal force.

which the blade is exposed by a simple flick of the wrist in a downward motion, locking the blade into position.").

As the statutory text and above analysis illustrates, New York Penal Law § 265.00(5) employs a functional test to identify a gravity knife.  "The intended use or design of the knife by its manufacturer is not an element of the crime and is irrelevant to the issue of whether the knife is a gravity knife."  People v. Fana, 2009 N.Y. Misc. LEXIS 956, at *9 (N.Y. County Crim. Ct. 2009).  By contrast, other Penal Law provisions incorporate the design of a weapon into their definitions.  See, e.g., Penal Law §265.00(11) ("'Rifle' means a weapon designed . . ."); §265.00(12) ("'Shotgun' means a weapon designed . . ."); §265.00(14) ("'Chuka stick' means a weapon designed . . ."); §265.00(15-a) ("'Electric dart gun' means any device designed . . .").  Furthermore, under the Gravity Knife Statute, a gravity knife is a per se illegal weapon: if a person possesses one, whether or not he knows that it is a gravity knife, he is in violation of §265.01(1).  See N.Y. Penal Law § 256.00(5).

Throughout this case, plaintiffs have maintained that the Wrist-Flick test inappropriately expands the boundaries of the Gravity Knife Statute and that, in fact, gravity knives are and should be limited to a very specific subset of knives – those that are capable of opening solely as a result of gravity, that is, holding the knife upside down.  According to plaintiffs, "Common Folding Knives" – which plaintiffs define as "folding pocket knives that are designed to resist opening from the closed position" – are not gravity knives.[9]  In support of this argument, plaintiffs

---

[9] The term "Common Folding Knife" used by plaintiffs has no meaning under New York law.

point to the legislative history of the Gravity Knife Statute[10] and have proffered expert opinions from Paul Tsujimoto, who is an expert in knife design,[11] and Bruce Voyles, who has experience in the history of knives.[12]  Plaintiffs have also offered testimony from Douglas Ritter, who is the founder and Chairman of Knife Rights, Inc., a former plaintiff in this case.

Tsujimoto and Voyles purport to offer factual, not legal opinions.  Yet, their opinions are primarily directed at how the Gravity Knife Statute should be interpreted in order to implement what they describe as the historical origins of gravity knives and the historical usage of the term "gravity knives."  Before proceeding further, the Court therefore notes that it could largely ignore Tsujimoto and Voyles's opinions on relevancy grounds alone, as the legal interpretation of the Gravity Knife Statute is beyond the proper scope of their expertise.  The Court

---

[10] Plaintiffs also cite United States v. Irizzary, 509 F. Supp. 2d 198 (E.D.N.Y. 2007) to argue that a folding knife cannot be classified as a gravity knife because of its design.  (Plaintiffs' Opening Trial Brief and Proposed Findings of Fact and Conclusions of Law ("Pltfs' PFOF"), ECF No. 128, at 14 ¶32.)  Irizarry did not involve a vagueness challenge, or a challenge to law enforcement's practice of using the Wrist-Flick test to identify gravity knives.  Rather, in that case, the court held that the arresting officer did not have probable cause to believe that the defendant's knife was a gravity knife – despite the fact that it opened by application of the Wrist-Flick test – because the knife was "designed, sold, and used as a folding knife" and "was obviously not designed to be opened [by a wrist-flick] and does not readily open through such force."  Irizzary, 509 F. Supp. 2d at 210.

The facts of that case are important and distinguishable from those here.  There, the arresting officer could not "readily open" the defendant's knife by application of the Wrist-Flick test and required "three strenuous attempts" to do so.  Irizarry, 509 F. Supp. 2d at 204, 210.  In addition, and perhaps based on its particular facts which rendered certain distinctions less meaningful, the court then stated that the knife at issue "was designed and sold as a folding knife," when the test is functional and not design based.

[11] Tsujimoto is currently Vice President of Engineering for Ontario Knife Company and states that he has "spent the last 27 years of [his] 39 year working career in the cutlery industry."  (Tsujimoto Decl. ¶3.)

[12] Voyles is currently Editor-at-Large at Knife Magazine, and states that he has been a cutlery journalist and writer since 1977 and has owned a knife auction company since 1999.  (Voyles Decl. ¶¶4-5.)

nevertheless provides an overview of Tsujimoto and Voyles's opinions, as plaintiffs rely heavily upon them.  These opinions do not alter the Court's conclusion that the Wrist-Flick test appropriately applies centrifugal force under the Gravity Knife Statute to determine whether Common Folding Knives are illegal gravity knives.

Tsujimoto opines that the Wrist-Flick Test "is not a true test for centrifugal force" but rather involves "a misinterpretation of the term 'centrifugal force.'" (Tsujimoto Decl. ¶¶ 44, 50.)  Tsujimoto does not deny that the Wrist-Flick test employs the use of centrifugal force; he concedes that centrifugal force is "imparted during the initial arm and wrist movement."  (Id. ¶ 50.)  Rather, Tsujimoto opines that "[i]t is th[e] sudden stopping of the blade and the inertia of the blade continuing to move, not centrifugal force, which opens the blade."  (Id. ¶ 51)  According to Tsujimoto, the statute covers only knives that open without "the sudden stopping of the arm and wrist" that Tsujimoto alleges is involved in the "second part of the [Wrist-Flick test]."  (Id.)

Tsujimoto concludes that the statute covers only knives similar to German Paratrooper Knives.  (Tsujimoto Decl. ¶ 26.)  Tsujimoto states that this is "the understanding that knife companies have had since the 1950's."  (Id. ¶¶ 11-26, 52.)  Voyles reaches a similar conclusion.[13]  (Voyles Decl. ¶¶ 8-10, 16.)  Voyles bases his opinion on his "more than 35 years in the cutlery trade" and his review of historical references to gravity knives.  (Id. ¶ 10, 15-24, 37-40.)

Tsujimoto explains that, by design, the German Paratrooper Knife easily

---

[13] Voyles traces the history of gravity knives back to the 1800's and states that original gravity knives were similar to "German Paratrooper Knives" prevalent during WWII.  (See Voyles Decl. ¶¶ 11-13.)

slides out from the handle based on gravity alone – that is, holding it upside down causes the knife to slide out.  (Tsujimoto Decl. ¶ 26; see also Voyles Decl. ¶ 16.) Tsujimoto further explains that a German Paratrooper Knife also easily slides out from the handle if one were to hold the knife handle pointing outward, away from their body, and rotate the arm around the shoulder, such as in a chair seat so that the individual spins around on the chair frame (what Tsujimoto describes as the "Swivel Chair Test").  (Tsujimoto Decl. ¶¶ 22, 51.)  Tsujimoto opines that the type of centrifugal force intended by the Gravity Knife Statute must be only that which is necessary to open a German Paratrooper Knife via the Swivel Chair Test.  (Id. ¶ 51.)  Voyles also reaches a similar conclusion.  (See Voyles Decl. ¶ 8-10.)  The Court notes that despite this testimony from Tsujimoto and Voyles, plaintiffs did not argue that the Gravity Knife Statute is unconstitutionally vague because it does not involve the application of centrifugal force to open a knife.  In fact, plaintiffs forfeited any such argument.  (Plaintiffs' Reply/Rebuttal Trial Brief, Objections, and Opposition to Motion to Strike/Motion in Limine ("Reply Mem."), ECF No. 153, at 12.)[14]  Furthermore, how a German Paratrooper Knife functions is a point that defendants do not contest but assert is irrelevant.  The Court agrees.

Relatedly, plaintiffs spent a fair amount of time on evidence regarding "bias" as it relates to the blade of a knife: "bias toward opening" and its opposite, "bias toward closure."  Tsujimoto explains that switchblades and German Paratrooper Knives are examples of knives with a "bias toward opening."  (Tsujimoto Decl. ¶ 28;

---

[14] Plaintiffs state: "Whether or not a folding knife actually opens by centrifugal force (as engineers and physicists understand the term) or opens by inertia or a combination of the two has no impact on the vagueness argument."

see also Voyles Decl. ¶ 14; Ritter Decl. ¶ 15.)  In contrast, according to Tsujimoto,
"folding knives" (such as slip joints, lock backs, and liner locks) have a "bias toward
closure." (Tsujimoto Decl. ¶ 29.)  Different types of locking mechanisms – including
liner locks and lock backs – correspond with differences in resistance to opening.
(Id. ¶¶ 35, 46(1).)[15]  Knives which have a bias toward closure feature blades that are
held in the closed position by a spring or other mechanism, and the blade will
remain in the closed position until the blade is manipulated to overcome the closing
tension.  (Id. ¶ 34.)

Plaintiffs have submitted evidence that differences in the manufacturing
process can result in differences between how knives of the same brand and model
open.  (Tsujimoto Decl. ¶46(2).)  Defendants did not contest this evidence.  (See
Rather Decl. ¶23.)  It is also clear that use of a knife over time may create
differences in how the same knife opens at one point in time versus another.
(Tsujimoto Decl. ¶46(3).)  Loosening in joints and screws, resulting from, inter alia,
use over time, may result in a knife opening by centrifugal force with a wrist-flick
when it had not previously.  By the same token, a knife that once opened with
application of the Wrist-Flick test may not later.  For example, if the knife has been
stored continuously in a cold or arid location, or the knife has been exposed to
moisture causing corrosion on the blade or in the handle.  (Rather Decl. ¶24.)

---

[15] In both types of knives, the same device that creates tension on the blade also locks it in place once
open.  (Tsujimoto Dep. at 85:7-86:1.)  In a liner lock, that device is a metal cutout in the side of the
handle, called the liner, which snaps across the back side of the blade as the blade opens to lock it in
the open position.  (Tsujimoto Dep. at 85:7-15; Tsujimoto Decl. ¶35; Ex. P-12.)  In a lock back, that
device is a spring-loaded bar that wedges itself into a notch on the blade to prevent it from closing.
(Tsujimoto Dep. at 84:17-22, 102:21-103:10; Tsujimoto Decl. ¶35; Ex. P-11.)

Tsujimoto concludes that folding knives with a "bias toward closure" will not open with what he describes as "centrifugal force" (i.e., via the Swivel Chair Test), and therefore, in his opinion, should not meet the statutory definition of a gravity knife.  (Id. ¶¶ 34, 49.)  These opinions are here, again, largely irrelevant to the issues before the Court.  Despite plaintiffs' vigorous arguments as to how they would like to reinterpret the Gravity Knife Statute,[16] basic statutory interpretation is a legal, not factual, question.  The application of centrifugal force through the Wrist-Flick test may result in the opening of a knife with bias toward opening or closure.  While the knife design industry may differentiate between knives just as Tsujimoto and Voyles state, those opinions do not mean that the legal definition of a gravity knife under the Gravity Knife Statute tracks those views.

> 3.   Enforcement

While being trained at the Police Academy, officers of the New York Police Department ("NYPD") are instructed on the Penal Law definition of a gravity knife and the charges to be imposed for its possession.  (Acosta Dep. at 28:06-30:09; Gutierrez Decl. ¶15; Kyrkos Decl. ¶14.)  The law enforcement personnel involved in testing the knives possessed by plaintiffs here had such training.  The evidence at trial made it clear that the same Wrist-Flick test has been used by the NYPD to identify gravity knives since the statute's effective date.  The evidence supports consistent, continued application of this historical practice under the current New York District Attorney, Cyrus Vance, Jr.  New police officers are trained to use the

---

[16] Plaintiffs acknowledge, as they must, that "it is clear that under New York law, a Common Folding Knife can be considered a gravity knife."  (Reply Mem. at 3.)

same test that officers were trained to use decades ago.  Moreover, there is no evidence that the manner of conducting the Wrist-Flick test is, in fact, different from officer to officer.[17]  Finally, there is no evidence in the record that two different police officers – each applying the Wrist-Flick test to a knife (either plaintiffs' or any other person's) on the same occasion – had different outcomes.[18]  In other words, while plaintiffs have described hypothetical scenarios that are possible, they did not introduce sufficient evidence for the Court to find that any of the scenarios are probable as to plaintiffs or anyone else.  There was no evidence, for instance, that a strong or well rested officer was once able to open a knife with the Wrist-Flick test while a weaker or tired officer was not; there was likewise no evidence that dexterity resulted in different outcomes.[19]  In short, the evidence supports a known, consistent functional test for determining whether a knife fits the definition of a "gravity knife" and does not support inconsistent outcomes under that test.

Prosecutions charging gravity knife possession constitute a very small

---

[17] In his trial declaration, Ritter claims that in his experience, "every individual who attempted a wrist flick maneuver executed it in their own individual manner.  There was never any obvious consistency in execution between individuals nor often consistency even by the same individual when conducting multiple attempts at such maneuvers." (Ritter Decl. ¶ 20.)  The Court does not credit this testimony, and finds that that the record supports consistent application of the Wrist-Flick test.

[18] There was evidence that when Assistant D.A. Rather and his staff were testing Native Leather's array of knives, there were some that had different outcomes under the Wrist-Flick test after multiple attempts by different individuals.  However, in the sole specific example Rather gave, he discussed a knife that opened only once in ten attempts.  (See Rather Dep. 43:12-44:6.)  Rather specifically stated that such a knife was not one that the D.A's office was "going to determine to be a gravity knife."  (Id. 44:07-45:2.)  Plaintiffs did not pursue whether there were specific Native Leather knives tested fewer times with different outcomes that were nonetheless deemed gravity knives.

[19] Ritter also claims in his trial declaration that on many occasions he was able to open a Common Folding Knife by application of the Wrist-Flick test where someone else was not.  (Ritter Decl. ¶ 16.)  The Court finds that, even accepting this testimony, the record supports consistent application of the Wrist-Flick test.  As a whole, the record does not suggest that the manner of conducting the Wrist-Flick test is, in fact, different from officer to officer.

fraction of the total number of misdemeanor prosecutions commenced in New York County each year.  (Rather Decl. ¶¶ 33-34.)  The record fully supports that arrests and prosecutions for possession of a gravity knife only occur once a knife has opened in response to the Wrist-Flick test.  Prosecutions are not – and were not with regard to plaintiffs here – initiated based on a theoretical possibility that a knife could, might, or should open in response to a wrist-flick; they are commenced only if and when a knife does.  (Rather Decl. ¶25.)

     B.    <u>The Plaintiffs</u>

          1.    <u>Native Leather</u>

Native Leather is a corporation organized under New York law that operates a retail store (with the same name) in Manhattan.  (Walsh Decl. ¶2.)  The retail store sells mostly men's accessories and leather goods, including, <u>inter alia</u>, folding pocket knives.  (<u>Id.</u>)  Carol Walsh is the owner and President of Native Leather. (Walsh Decl. ¶1.)

In 2010, during an investigation by the New York District Attorney's Office, investigators purchased knives from Native Leather and subjected them to the Wrist-Flick test.  Upon application of the Wrist-Flick test, investigators determined that Native Leather was, in fact, offering gravity knives for sale to the public. (Rather Decl. ¶42.)  The D.A.'s Office then issued a subpoena to Native Leather, which required it to produce those knives in its inventory that met the statutory definition of a gravity knife under the New York Penal Law.  (Ex. P-1; <u>see</u> Rather Dep. at 16:11-19, 37:8-23; Walsh Decl. ¶4.)  After she received the subpoena, Walsh reviewed the Gravity Knife Statute and understood that she could not sell knives

that met the description of what "the DA's Office was looking for," but that she could sell anything outside of that description. (Walsh Dep. at 9:14-22; see also id. at 57:4-12.) Even though she had been in business for a number of years, Walsh was not certain that she had ever read the definition of a gravity knife in the Penal Law before this time. (Walsh Dep. at 57:4-12.)[20] In response to the subpoena, Walsh collected and provided to the D.A.'s Office "almost every folding knife that [she] thought could be opened with one hand, with or without gravity or centrifugal force," for a total of over three hundred knives. (Walsh Dep. at 64:17-65:10.)

The D.A.'s Office subjected each knife to the Wrist-Flick test. Assistant D.A. Rather either personally tested each knife or observed other members of the District Attorney's staff personally test each knife. (Rather Decl. ¶45.) A number opened. It appears that one or more of those knives opened only after multiple attempts of the Wrist-Flick test by different individuals. (Rather Dep. 43:15-44:06.) However, the record contains significant ambiguity on this point, and in particular, regarding the number of wrist-flick attempts applied to any particular knife, whether two different individuals had different outcomes, and whether in all events knives requiring multiple attempts were designated as gravity knives or were returned to Native Leather. In short, the Rather testimony on this issue was never clarified by plaintiffs and is therefore useless as proof of any particular point with respect to plaintiffs' specific knives. For instance, during questioning regarding Native

---

[20] Prior to receiving the subpoena, the only precaution Walsh took to ensure that she was not selling illegal gravity knives was a trip to the 6th precinct, in early 2000, to inquire about "Iceberg Army Navy," another retail store that had its knife inventory "confiscated" (or so she had heard). (Walsh Dep. at 57:13-59:1.)

Leather his deposition, plaintiffs asked D.A. Rather: "And did you ever have the circumstance arise where a knife passed the functional test with one person, but failed it with another?" (Rather Dep. 43:15-17.) D.A. Rather responded: "In a fashion. Gravity knives by law don't have to open each and every time. . . ." (Rather Dep. 43:18-20.) Plaintiffs continued to question D.A. Rather but framed their questions as hypotheticals instead of focusing specifically on the events that occurred with regard to Native Leather.

The D.A.'s Office retained those knives submitted by Native Leather that the D.A.'s office determined, by application of the Wrist-Flick test, to be illegal gravity knives. (Rather Dep. at 39:16-40:17, 41:24-43:11; Rather Decl. ¶¶45-46; Walsh Dep. at 65:11-23.) None of the knives that Native Leather provided to the D.A.'s Office were German Paratrooper Knives. (Rather Decl. ¶48.) Each of the knives that functioned as a gravity knife could also be described as a type of folding knife.[21] (Rather Decl. ¶47.)

On June 15, 2010, Walsh entered into a deferred prosecution agreement with the D.A.'s Office. (Ex. P-2; see Walsh Decl. ¶12.) She agreed, inter alia, not to sell gravity knives and to personally test Native Leather's inventory for gravity knives. (Walsh Decl. ¶¶13, 15.)

Walsh tests knives that she determines need testing based on her experience selling knives for "many, many years." (Walsh Dep. at 23:9-24:5; see also id. at 66:21-67:4.) For example, Walsh testified that a knife that does not lock in the open

---

[21] Defendants submitted demonstrative videos of counsel opening certain of Native Leather's knives with application of the Wrist-Flick test. (Rather Decl. ¶¶ 53-55, 58-59, 63, 66; Exs. D-10, D-11, D-14, D-15, D-18, D-20, D-21.)

position – such as a Swiss Army knife – does not need to be tested because there is no way it will lock automatically upon opening. (Walsh Dep. at 23:14-24.) Similarly, she testified that a knife that locks in the closed position does not need to be tested because there is no way it could be opened with one hand. (Walsh Dep. at 23:14-21.) Walsh began testing Native Leather's knives herself in September 2010. (Walsh Dep. at 42:2-12.) After identifying which knives need to be tested, Walsh applies the Wrist-Flick test. (Walsh Dep. at 24:15-25:10.) If Walsh can't open a particular knife using the Wrist-Flick test but determines that a "stocky [man]" could open the knife with a wrist-flick, she rejects it and does not place it in her inventory for sale. (Walsh Dep. at 21:15-25:10.) Walsh testified that she understands that certain knives, while not designed to open by the application of gravity or centrifugal force, may nonetheless function as gravity knives. (Walsh Dep. at 67:16-68:16.)

As part of the deferred prosecution agreement, Walsh also agreed to the appointment of an independent monitor to inspect the books, records, and inventory of Native Leather. (Walsh Decl. ¶13.) Kroll Inc. was selected by the D.A.'s Office to fulfill that role. (Walsh Decl. ¶17; Rather Dep. at 35:13-15.) In May 2011, Kroll employees tested certain of Native Leather's knives employing the Wrist-Flick test. (Walsh Decl. ¶20.) Walsh was present at the time. According to Walsh, "if the blade swung out of the knife, it was loose enough to be called a gravity knife"; conversely, "if the blade was snug into the handle [and] it wouldn't come out," the Kroll employees would not classify the knife as a gravity knife. (Walsh Dep. at 18:2-

19:3.)

        2.    <u>John Copeland</u>

John Copeland is a resident of Manhattan.  In October 2009, Copeland purchased a Benchmade brand knife at Paragon Sports in Manhattan.  (Copeland Decl. ¶3.)  In his trial declaration, Copeland states that shortly after purchasing the knife, he showed it to two different NYPD officers and that both officers applied the Wrist-Flick test to the knife.  (Copeland Decl. ¶5.)  Copeland testified that because both officers could not open the knife using the Wrist-Flick test, they told him that the knife was legal and returned it to him.  (<u>Id.</u>)

Thereafter, Copeland regularly used the knife in connection with his work as a painter and sculptor.  (Copeland Decl. ¶¶1, 4.)  A year after his initial purchase of the knife, Copeland had the knife clipped to his pocket and was stopped in Manhattan by Sergeant Noel Gutierrez and Detective Ioannis Kyrkos of the NYPD.  (Copeland Decl. ¶7; Gutierrez Decl. ¶¶4-5, Kyrkos Decl. ¶¶4-5.)  According to Sergeant Gutierrez and Detective Kyrkos, Copeland told the officers that he used the knife in connection with his employment as a mechanic.  (Gutierrez Decl. ¶7; Kyrkos Decl. ¶9.)  In Copeland's presence, Detective Kyrkos applied the Wrist-Flick test to Copeland's knife by gripping the handle of the knife and flicking his wrist in a downward motion.  (Gutierrez Decl. ¶¶8-9, Kyrkos Decl. ¶¶7-8.)  The knife opened on the first attempt and the blade locked into place.  (Gutierrez Decl. ¶8, Kyrkos Decl. ¶7.)  The officers then placed Copeland under arrest for Criminal Possession of a Weapon in the Fourth Degree in violation of New York Penal Law § 265.01(1).  (Gutierrez Decl. ¶11, Kyrkos Decl. ¶11.)  Prior to the events giving rise to his arrest

for gravity knife possession, Copeland knew that the New York Police Department employed the Wrist-Flick test to identify illegal gravity knives.  (Copeland Decl. ¶5.) The Court finds that Copeland's knife met the definition of a gravity knife and the ability of Copeland's knife to open by application of the Wrist-Flick test immediately prior to his arrest, as compared to its inability to open a year earlier, was due to usage over time.

At the precinct, Copeland was given a Desk Appearance ticket and was then released.  (Copeland Decl. ¶7, Gutierrez Decl. ¶¶11-12.)  On November 3, 2010, Sergeant Gutierrez signed a criminal court complaint charging Copeland with possession of a gravity knife.  (Gutierrez Decl. ¶¶13, 22-25; Ex. D-3.)  On January 26, 2011, Copeland accepted an Adjournment in Contemplation of Dismissal. (Copeland Decl. ¶9.)

Both Sergeant Gutierrez and Detective Kyrkos submitted trial declarations stating that they apply the Wrist-Flick test to determine whether a knife is a gravity knife.  (Gutierrez Decl. ¶¶13, 17; Kyrkos Decl. ¶¶13, 16-17.)  Both officers testified that they hold the handle of a knife and flick their wrist to apply centrifugal force – if the blade exits the handle and locks into place, the knife is a gravity knife.  (Gutierrez Decl. ¶17; Kyrkos Decl. ¶17.)  Sergeant Gutierrez and Detective Kyrkos learned how to apply the Wrist-Flick test during their time as probationary officers by observing other officers use the test, as well as through their own first-hand experience during that time.  (Gutierrez Decl. ¶16; Kyrkos Decl. ¶15.)  Both Sergeant Gutierrez and Detective Kyrkos have consistently, and

exclusively, used the Wrist-Flick test to identify gravity knives over the course of their careers.  (Gutierrez Decl. ¶¶17-18, Kyrkos Decl. ¶¶16-18.)

In his trial declaration, Copeland states that he will not purchase a folding knife in New York similar to the Benchmade brand knife that he was previously arrested for because he fears future arrest and prosecution.  (Copeland Dec. ¶ 11.)

### 3.   Pedro Perez

Pedro Perez also resides in Manhattan.  In approximately April 2008, he purchased a Gerber brand folding knife from a retailer in Manhattan.  (Perez Decl. ¶4.)  The knife had a stud mounted on the blade that enabled the user to open it with one hand by "swivel[ing]" the blade open with his thumb.  (Perez Decl. ¶5.)  Perez, who is a "purveyor of fine arts," regularly used the knife to cut canvas and open packaging.  (Perez Decl. ¶¶1, 3, 5.)  Two years after Perez purchased the knife, on April 15, 2010, Lieutenant Luke observed the knife clipped to the pocket of Perez's pants and stopped Perez inside a New York City subway station.  (Perez Decl. ¶6; Luke Decl. ¶¶4-11.)  Police Officers Julissa Sanchez and Ray DeJesus were present with Lieutenant Luke when he stopped Perez.  (Luke Decl. ¶4-11.)  All three officers were assigned to the Anti-Crime Unit.  (Luke Decl. ¶4.)

In Perez's presence, Lieutenant Luke applied the Wrist-Flick test to Perez's knife by gripping the handle of the knife and flicking his wrist in a downward motion away from his body.[22]  (Luke Decl. ¶12.)  The knife opened on the first

---

[22] Lieutenant Luke, who is now retired, served as an officer in the New York Police Department for twenty-two years and has been involved in approximately one hundred and fifty arrests for possession of a gravity knife.  (Luke Decl. ¶¶1, 3, 21.)  Lieutenant Luke consistently and exclusively used the Wrist-Flick test to identify gravity knives over the course of his career.  (Luke Decl. ¶28.)

21

application of the Wrist-Flick test and the blade locked in place automatically. (Luke Decl. ¶13.)  Perez was then arrested.  (Luke Decl. ¶15.)  The arrest was assigned to Police Officer Angel Guerrero, who completed a Desk Appearance ticket charging Perez with possession of a gravity knife in violation of Penal Law §265.01. (Luke Decl. ¶16; see also Perez Decl. ¶7.)  The Court finds that Perez's knife met the definition of a gravity knife.

In his trial declaration, Perez states that the officers who arrested him could not open Perez's knife using the Wrist-Flick test but inexplicably charged him with possession of a gravity knife because it was "theoretically" possible to do so.  (Perez Decl. ¶7.)  The Court has no basis to credit this statement over the sworn statement of Lieutenant Luke, who was present on the scene at the time of the arrest.  Perez did not contest the charge and accepted an Adjournment in Contemplation of Dismissal and agreed to perform seven days of community service.  (Perez Decl. ¶8.) Indeed, the Court views this fact as some evidence that Perez understood his knife functioned as a gravity knife.  But, in addition, the plaintiff carries the burden of proof in this matter and so when weighing statements of equal credibility, a tie goes to the defendants.

---

Lieutenant Luke estimates that he has personally tested between forty and fifty gravity knives. (Luke Decl. ¶24.)  Based on his training and experience, Lieutenant Luke understands a gravity knife to be a folding knife that possesses two characteristics: the knife will open via gravity or the application of centrifugal force and, once open, the blade will lock into place automatically.  (Luke Decl. ¶25.)  Without exception, the gravity knives that Lieutenant Luke encountered during his career were folding knives.  (Luke Decl. ¶24.)  In Lieutenant Luke's experience, the resistance in a folding knife such as the one carried by Perez can change over time, either through regular use or intentional modification.  (Luke Decl. ¶30.)  Lieutenant Luke never charged someone with possession of a gravity knife if the knife in question did not open after the first or second application of the Wrist-Flick test, nor would he charge someone with possession of a gravity knife if Lieutenant Luke could open the knife via the Wrist-Flick test but another officer could not.  (Luke Decl. ¶31.)

In his trial declaration, Perez states that he will not purchase a folding knife in New York similar to the Gerber brand knife that he was previously arrested for because he fears future arrest and prosecution.  (Perez Dec. ¶ 10.)

III.    CONCLUSIONS OF LAW

As the factual findings above detail, each of plaintiffs' knives met both of the statutory requirements under the Gravity Knife Law.  The knives which plaintiffs possessed at the time of their arrests (or, in the case of Native Leather, those retained by the D.A.'s Office after compliance with the subpoena), opened with application of the Wrist-Flick test.  Upon opening, the blades of such knives locked in place.

Plaintiffs now assert an as-applied constitutional challenge to the validity of the Gravity Knife Statue.  The Gravity Knife Statute has been subject to a number of previous vagueness challenges, including as to the definitional provision.  See, e.g., Herbin, 86 A.D.3d at 446-447.  Challenges to the constitutionality of a criminal statute on the basis of vagueness are brought pursuant to the guarantee in the Fourteenth Amendment that "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. Amend. XIV, § 1.  "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law."  Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926); accord Farrell v. Burke, 449 F.3d 470, 485 (2d Cir. 2006).

A law that burdens constitutional rights or that imposes criminal penalties

must meet a higher standard of specificity than a law that merely regulates economic concerns.  Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99 (1982); see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242, 265 (2d Cir. 2015), cert. denied sub nom. Shew v. Malloy, 136 S. Ct. 2486, 195 (2016).  This higher standard applies here because the Gravity Knife Law at issue imposes criminal penalties.

Based on these principles, the void-for-vagueness doctrine requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." N.Y. State Rifle & Pistol Ass'n, Inc., 804 F.3d at 265 (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983)). Accordingly, "[a] statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 186 (2d Cir. 2010) (quoting Hill v. Colorado, 530 U.S. 730, 732 (2000)).

Throughout this litigation, plaintiffs have consistently characterized their claim as an "as-applied" challenge to the Gravity Knife Statute.  (See, e.g., Amended Complaint ¶60 ("The Due Process Clause of the Fourteenth Amendment invalidates Penal Law §§ 265.01(1) and 265.00(5) as void for vagueness, as applied to Common Folding Knives that are designed to resist opening from their folded and closed

position."); Pltfs' PFOF, at 43 ("Plaintiffs' claim is straightforward.  Plaintiffs assert that application of the Gravity Knife Law to Common Folding Knives is void for vagueness under the Fourteenth Amendment because no one can determine with any reasonable degree of certainty which Common Folding Knives are legal to possess and/or sell.")  This characterization, however, "is in significant tension with [plainitffs'] general failure to focus narrowly on the actual conduct in which they are engaged or would like to be engaged."  Expressions Hair Design v. Schneiderman, 808 F.3d 118, 130 (2d Cir. 2015), cert. granted, 137 S. Ct. 30 (2016).

"A facial challenge is an attack on a statute itself as opposed to a particular application."  City of Los Angeles, Calif. v. Patel, 135 S. Ct. 2443, 2449 (2015).  Such challenges "are generally disfavored," Dickerson v. Napolitano, 604 F.3d 732, 741 (2d Cir. 2010), and are "the most difficult . . . to mount successfully."  United States v. Salerno, 481 U.S. 739, 745 (1987).  Outside of the First Amendment context, a facial challenge generally must show that "no set of circumstances exits under which the [law] would be valid."  Dickerson, 604 F.3d at 743 (alteration in original) (quoting Salerno, 481 U.S. at 745); see Vill. of Hoffman Estates, 455 U.S. at 497.  In contrast, an as-applied challenge requires that a plaintiff show that the challenged statute is unconstitutional when applied to the particular facts of his or her case.  See Farrell, 449 F.3d at 486; see also Dickerson, 604 F.3d at 745 ("To successfully make an as-applied vagueness challenge, the plaintiff must show that section 14-107 either failed to provide them with notice that the possession of their badges was

prohibited or failed to limit sufficiently the discretion of the officers who arrested them under the statute.") (emphasis in original).

As noted above, plaintiffs frame their challenge to the Gravity Knife Statute as an applied challenge to all Common Folding Knives – defined by plaintiffs as knives that are "designed to resist opening from the closed position." Plaintiffs have not narrowed their challenge, however, to their specific conduct or specific Common Folding Knives (i.e. those that prompted the previous enforcement actions against plaintiffs).[23]  (See, e.g., Pltfs' PFOF at 1 ("[N]o-one can determine any longer whether a particular knife in their possession will be deemed illegal or prohibited"); Pltfs' PFOF at 53 ¶ 55 ("At its core, this entire case comes down to one simple question.  How can a person draw the conclusion that a given locking, folding knife (Common Folding Knife) can never be flicked open by anyone?  No one can ever draw that conclusion."))  In this way, plaintiffs' challenge resembles a pre-enforcement facial challenge.  See N.Y. State Rifle & Pistol Ass'n, Inc., 804 F.3d at 265 ("Because plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than 'as-applied,' challenge.")  This has caused some confusion in this case, which the Court sought to address during the closing-arguments.

In all events, for the reasons described below, plaintiffs' challenge fails whether it is considered an as-applied challenge or a facial challenge.  On the record before it, the Court concludes that the Gravity Knife Statute was, and will continue

---

[23] As explained by the Second Circuit, plaintiffs' standing to bring the instant challenge is predicated on their desire "to engage in the very conduct that prompted defendants' prior enforcement action[s]."  Knife Rights, Inc., 802 F.3d at 385, 387 (emphasis added).

to be, constitutionally applied to plaintiffs.  This determination necessarily means that the Gravity Knife Statute is not unconstitutional in all of its applications (i.e. on its face).[24]  The Court finds that none of the plaintiffs has demonstrated that the many hypotheticals the parties have so vigorously debated are in fact reasonably likely to occur to him or her.

A.   Notice

"The first way that a law may be unconstitutionally vague as applied to the conduct of certain individuals is 'if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'"  VIP of Berlin, LLC, 593 F.3d at 187 (quoting Hill, 530 U.S. at 732).  In determining whether a statute fails to provide people of ordinary intelligence with a reasonable opportunity to understand what conduct it prohibits, courts look to see whether individuals had fair notice or warning of such prohibitions.  Hill, 530 U.S. at 732; see VIP of Berlin, LLC, 593 F.3d at 187.  The Court asks whether "the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  VIP of Berlin, LLC, 593 F.3d at 187; see also Rubin v. Garvin, 544 F.3d 461, 467 (2d Cir. 2008).  To comply with the notice element requires that "[the] statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  Mannix v. Phillips, 619 F.3d 187, 197 (2d Cir. 2010) (quotation marks omitted).  The

---

[24] Similarly, the Court finds that the statute is not "permeated with vagueness."  N.Y. State Rifle & Pistol Ass'n, Inc., 804 F.3d at 265; see City of Chicago v. Morales, 527 U.S. 41, 55 (1999) (plurality). This is not to say, however, that the statute could not be improved upon.  Many statutes that pass constitutional muster may nonetheless benefit from close attention to possible improvements.  That is so here.

standard is objective and it is therefore irrelevant "whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." <u>Dickerson</u>, 604 F.3d at 745.

"[T]he test does not demand meticulous specificity in the identification of the proscribed conduct." <u>United States v. Coppola</u>, 671 F.3d 220, 235 (2d Cir. 2012) (quotation omitted). Only an "unexpected and indefensible" interpretation of a statute that gives a defendant "no reason to even suspect that his [or her] conduct might be within its scope" will violate the notice element. <u>United States v. Smith</u>, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (quotations omitted); <u>see</u> <u>Mannix</u>, 619 F.3d at 199 (rejecting vagueness claim where New York courts had previously ruled that conduct similar to the defendants' satisfied the elements of the challenged statute); <u>see also</u> <u>Smith</u>, 985 F. Supp. 2d at 588 ("[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well").

The Court finds that plaintiffs' had adequate notice that their conduct was prohibited under the Gravity Knife Statute. Each of plaintiff Copeland and Perez's knives opened on the first Wrist-Flick test applied. The knives confiscated from plaintiff Native Leather also opened by application of the Wrist-Flick test. As the Court has already explained, it is clear from the statutory text that the Wrist-Flick test involves the use of centrifugal force. Furthermore, the New York Court of Appeals, as well as lower New York courts and juries have all found the existence of centrifugal force based on the Wrist-Flick test. <u>See, e.g.,</u> <u>Sans</u>, 26 N.Y.3d at 17;

Herbin, 927 N.Y.S.2d 54; Neal, 913 N.Y.S.2d 192, 194 (1st Dep't 2010).  Both the statutory text and these judicial decisions provided plaintiffs with the requisite notice that their conduct was prohibited.

In support of their position, plaintiffs have proffered numerous hypotheticals throughout this litigation.  For example, plaintiffs argue that "[a] person's ability to flick open a knife will vary based on degree of tiredness, injury, etc. . . . Suppose a person has a blister or cut on his strong hand, or has injured his hand or arm.  That person will be entirely unable to perform the Wrist Flick [t]est, or his ability will be diminished."  (Reply Mem. at 7-8.)  Plaintiffs also imagine a situation where someone buys a knife, tests such knife inside the store and the knife fails the Wrist-Flick test, but then exits the store moments later where an officer is able to successfully perform the Wrist-Flick test to the same knife.  (See June 16, 2016, Tr., ECF No. 191, at 25:07-21.)  Plaintiffs claim that no one possessing a folding knife "can ever be sure he possesses a legal pocket knife versus an illegal gravity knife, because the test results are highly dependent on the strength, dexterity, skill, and training of the individual employing the test, the particular specimen of the knife, and other highly variable and uncertain characteristics."  (Id.)  Similarly, plaintiffs argue that "there is no number of people a person can consult to determine that his Common Folding Knife is not an illegal gravity knife, because no matter how many individuals fail to flick it open, the very next person might be able to do so, and the person in possession of that knife will be subject to arrest and prosecution."  (Pltfs' PFOF, at 47 ¶ 19.)  With regards to Copeland and Perez, plaintiffs claim that "no

29

matter how many times [they] tr[y] and fail[] to flick a folding knife open, as long as

any police officer, anywhere, at any time in the future can flick the knife open using

the technique the police use to test folding knives, [they] would be subject to arrest."

(Pltfs' PFOF at 19 ¶ 55, 21 ¶ 64.)

Defendants assert, with effect, that the many interesting hypotheticals that

plaintiffs have described are just that – hypotheticals.  Ultimately, according to

defendants, the particular plaintiffs before the Court bear the burden of proving

that the statute is unconstitutional as to them, and this plaintiffs have not done.

See VIP of Berlin, LLC, 593 F.3d at 189 (noting that the "pertinent issue [] is not

whether a reasonable person . . . in general" would know what the statute prohibits,

but rather whether a reasonable person in the plaintiffs specific circumstance would

know that their conduct was prohibited).  The Court agrees.  Despite the various

hypotheticals raised by plaintiffs, there is no evidence that any of the plaintiffs tried

but were unable to open their knives by application of the Wrist-Flick test.[25]  Nor is

there evidence that the officers who arrested plaintiffs Copeland and Perez, as well

as those individuals at the D.A.'s Office who tested the knives confiscated from

plaintiff Native Leather, possessed any special strength, skill, or dexterity.

"What renders a statute vague is not the possibility that it will sometimes be

difficult to determine whether the incriminating fact it establishes has been proved;

---

[25] The Court noted in its Findings of Fact that two NYPD officers applying the Wrist-Flick test a
year before plaintiff Copeland's arrest were unsuccessful in causing the blade of his knife to open.
As the Court found above, however, the ability of Copeland's knife to open by application of the
Wrist-Flick test by Detective Kyrkos immediately prior to his arrest, as compared to its inability to
open a year earlier, was due to usage over time.

but rather the indeterminacy of precisely what that fact is." <u>United States v. Williams</u>, 553 U.S. 285, 306 (2008).  The Gravity Knife Statute provides clear notice of the "incriminating fact" to be proven – namely, the blade of the knife must open and lock into place in response to gravity or centrifugal force – and the statute does not run afoul of the Fourteenth Amendment simply because the owner claims "difficult[y]" determining whether that fact has been proven.

In an analogous case, the Supreme Court rejected a vagueness challenge to a statute that criminalized the mailing of firearms that "could be concealed on the person." <u>United States v. Powell</u>, 423 U.S. 87, 88 (1975).  The defendant, a female, was convicted for mailing a sawed-off shotgun that was twenty-two inches in length. <u>Id.</u> at 93.  The statute did not specify whether the "person" against whom to measure capability of concealment was to be "the person mailing the firearm, the person receiving the firearm, or, perhaps, an average person, male or female, wearing whatever garb might be reasonably appropriate, wherever the place and whatever the season." <u>Id.</u> (quotation omitted).  Attributing the "commonsense meaning" to the statute that the person would be of "average" stature and dress, the Court upheld the statute and further noted that the defendant, in mailing the shotgun, assumed the risk that a jury would conclude that her conduct fell within the statute. <u>Id.</u> at 93-94.  New York's Gravity Knife Law criminalizing knives that have "a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force" gives no less adequate notice – and,

as discussed below, no less sufficient standards for enforcement – than a law that proscribes the mailing of a "concealable firearm."

Plaintiffs assert that the current District Attorney, Cyrus Vance, Jr., and the City have moved away from an interpretation of the Gravity Knife Statute that had been enforced with "clarity and predictability" for fifty years to one that treats "nearly any ordinary folding knife as an illegal 'gravity knife.'"  (Pltfs' PFOF at 1.) According to plaintiffs, this alteration of a decades-old interpretation has led to unconstitutional unpredictability and "no-one can determine any longer whether a particular knife in their possession will be deemed illegal or prohibited." (Id.)  The record contradicts these arguments, however.  As noted, the evidence supports consistent, continued application of Wrist-Flick test.  As defendants asserted, that same application was applied to plaintiffs, and there is no factual basis to believe that it will not be applied similarly to plaintiffs in the future.

B.   Arbitrary and Discriminatory Enforcement

"The second way in which a statute can be found unconstitutionally vague is if the statute does not 'provide explicit standards for those who apply it'" in order to avoid arbitrary and discriminatory enforcement.  VIP of Berlin, LLC, 593 F.3d at 191 (quoting Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007)).  Having concluded that the Gravity Knife Statute provided plaintiffs with sufficient notice, the Court asks: whether "(1) the 'statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement;' or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that enforcement before the court was not the result of the

32

unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.'" Id. (quoting Farrell, 449 F.3d at 494); see also Dickerson, 604 F.3d at 748.

For largely the same reasons that the statute gave plaintiffs sufficient notice, on the record before the Court, the Court concludes that the Gravity Knife Statute provides sufficiently clear standards.  There is no evidence of any arbitrary and discriminatory enforcement of the Gravity Knife Law.  To the contrary, the record contains ample evidence that NYPD officers are trained in an appropriate manner on the correct definition of a gravity knife under applicable law.  The record fully supports that the NYPD generally, and with respect to plaintiffs here, apply that definition via the Wrist-Flick test in a consistent manner.

Again, plaintiffs assert that the Wrist-Flick test is "subjective, variable and indeterminate."  (Pltfs' PFOF at 3.)  According to plaintiffs, the Wrist-Flick test allows for the possibility that different units of the same model knife could have different legal statuses: one unit could pass the Wrist-Flick test (e.g. not open) and be deemed lawful; another unit could fail and be deemed to be a gravity knife and therefore unlawful.  Or, worse still, if two different people perform the test one after another, with the first Wrist-Flick test failing to open the blade and the second succeeding, the same knife, tested at relatively the same time, could be both a lawful folding knife and an unlawful gravity knife.  (Id.)  Similarly, plaintiffs argue: "If a person encounters an NYPD officer on a day the officer is rested and strong, he may be arrested for possession of a gravity knife, while another person may

encounter the same officer at the end of his shift when he is tired.  Both individuals could be in possession of identical knives, yet one could be arrested and the other not, merely due to the officer's physical state at the time." (Id. at 8.)

Again, the Court emphasizes that the various hypotheticals plaintiffs present are not supported by the record.  Rather, the record establishes that NYPD officers are trained in an appropriate manner and apply the Wrist-Flick test in a consistent manner.  If one of the many hypotheticals that plaintiffs describe does indeed arise, plaintiffs "could bring an 'as applied' vagueness challenge, grounded in the facts and context of [that] particular set of charges."  N.Y. State Rifle & Pistol Ass'n, Inc., 804 F.3d at 266.  The hypotheticals plaintiffs raise cannot, however, support their challenge here.  See id.

Alternatively, even a statute that provides "what may be unconstitutionally broad discretion if subjected to a facial challenge" may still be upheld on an as-applied challenge "if the particular enforcement at issue [is] consistent with the core concerns underlying the [statute] such that the enforcement did not represent an abuse of the discretion afforded under the statute."  Dickerson, 604 F.3d at 748 (citations and internal quotation marks omitted).  Here, plaintiffs' conduct plainly fell within the core of the Gravity Knife Statute.

As previously noted, plaintiff Copeland and Perez's knives opened on the first application of the Wrist-Flick test.  And plaintiffs did not adduce evidence regarding how many applications of the Wrist-Flick test were necessary to open those knives confiscated from native leather that did not open on the first application of the

Wrist-Flick test.  Furthermore, the officers who arrested plaintiffs Copeland and Perez, as well as those individuals at the D.A.'s Office who tested the knives confiscated from plaintiff Native Leather, were nothing but average in all relevant respects and did not possess any special strength, skill, or dexterity.  Prohibiting knives that open by the use of centrifugal force in the manner that plaintiffs' knives opened falls squarely within the core concerns underlying the Gravity Knife Statute.  Even if the Gravity Knife Statute does not provide clear enforcement standards, its enforcement against plaintiffs "was not the result of 'unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute.'" VIP of Berlin, LLC, 593 F.3d at 193 (quoting Farrell, 449 F.3d at 494); see Thibodeau, 486 F.3d at 69.  In short, this is not a case where one of the many implausible hypotheticals that plaintiffs present actually occurred.

IV.    CONCLUSION

The Clerk of Court is directed to enter judgment for defendants and to terminate this action.

SO ORDERED.

Dated:      New York, New York
            January 27, 2017

_____
        KATHERINE B. FORREST
        United States District Judge

35